UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARRY LINTON,<br><br>    Plaintiff<br><br>                v.<br><br>NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION,<br><br>    Defendant. | C.A. No. 04-11362-RWZ |

**NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION'S
CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, Defendant New York Life Insurance and Annuity Corporation ("New York Life") submits this Concise Statement of Material Facts of Record as to which There is No General Issue to be Tried in support of New York Life's Motion for Summary Judgment.

**FACTS**

*The Parties*

*New York Life*

      1.    New York Life is a life insurance company organized under the laws of the State of Delaware. See Declaration of John Hess, Jr. in Support of Defendant's Motion for Summary Judgment ("Hess Decl.") at ¶ 1; Flexible Premium Variable Universal Life Insurance Policy for Barry J. Linton, Policy Number 63 615 359 (the "Policy") at 1, attached as Exhibit A to the Declaration of Levina Wong Transmitting Documents ("Wong Decl.").[1]

---

[1]     Hereinafter, all citations to "Exhibit __" will refer to respective exhibits to the Wong Decl.

9897128

*Barry Linton*

2. Barry Linton is an individual residing at 9 New Meadow Lane, Topsfield, Massachusetts. See Compl. at ¶1; Transcript of the Deposition of Barry J. Linton (hereinafter "Linton Dep. Tr.") at 6, attached as Exhibit V.

3. From 1987 – 1991, Mr. Linton managed assets for Shetland Properties, an industrial real estate company. As its Vice-President of Financial Investing. Mr. Linton implemented his investment strategy, also known as "market timing," investing primarily in mutual funds using an investment model that Mr. Linton had developed over time. See Compl. at ¶ 5, Linton Dep. Tr. at 11-13; Transcript of the Deposition of JoAnn D. Lepke (hereinafter 'Lepke Dep. Tr.") at 12, attached hereto as Exhibit W.

4. From 1991 – 1994, Mr. Linton was a sub-advisor for Enterprise General Partnership, where Mr. Linton was also principally investing clients' assets in mutual funds using a market timing investment strategy. See Linton Dep. Tr. at 16-17.

5. Mr. Linton was registered as an investment advisor with the State of Massachusetts.
See Linton Dep. Tr. at 15-16.

6. Mr. Linton's "market timing" investment model was based on short term trends, meaning that his model tracked day to day differentials between the value of the underlying portfolio securities and the Net Asset Value (NAV) of the mutual fund. Mr. Linton's model told him what price the fund (the NAV) was expected to close at on any given day, which he compared with historical data from a period of about fifteen years. See Linton Dep. Tr. at 37-41. Mr. Linton's "market timing" investment strategy sometimes resulted in daily transfers into and out of mutual funds. See Linton Dep. Tr. at 22.

7.      Over time, Mr. Linton's investment model developed into one that could tell him when to buy/sell and also how to select the mutual fund. See Linton Dep. Tr. at 18, 23-25. Mr. Linton used the NAV to predict the change in the price, which he compared to the historical data: the maximum combination of buy/sell signals for the last fifteen months compared to the maximum return. See Linton Dep. Tr. at 44-45. Because Mr. Linton's model was accurate towards the end of the day, he waited as late in the day as possible to make buy/sell decisions. See Linton Dep. Tr. at 52-53, 146-147. This investment strategy could not have been effected if Mr. Linton were required to trade with a writing that he signed; execution of trades had to be done over the telephone or over the internet. See Linton Dep. Tr. at 53-54.

8.      During the time Mr. Linton was a sub-advisor, Mr. Linton had been stopped from further trading in a mutual fund because the mutual fund company had determined that Mr. Linton was trading too frequently. See Linton Dep. Tr. at 20-21.

9.      In 1994, Mr. Linton formed Contemporary Investment Management, Inc. ("CIM") to manage assets for individuals and institutions, investing primarily in mutual funds; CIM was registered as an investment advisor in the state of Massachusetts. See Linton Dep. Tr. at 27-28; Contemporary Investment Management Limited Partnership Brochure at PR0289, attached hereto as Exhibit F.

10.     At CIM, Mr. Linton employed the same "market-timing" investment strategy he had used in the past, using daily buy/sell signals to execute trades into and out of mutual funds. See Linton Dep. Tr. at 30, 37-38, 39-45, 51-53; Exhibit F at PR0294.

11.     At one time, CIM managed over $20,000,000 in assets. See Exhibit F at PR0292. While managing assets at CIM, Mr. Linton regularly reviewed prospectuses for mutual funds and received updated prospectuses annually for mutual funds. See Linton Dep. Tr. at 32.

12. CIM issued an offering memorandum which, on its face, cautioned investors about the risks of investing, stating "This offering involves significant risks …" and "Any representations to the contrary and any predictions, written or oral, as to the amount or certainty or any profits or tax consequence which may flow from an investment in this program is not permitted." See Confidential Offering Memorandum of Contemporary Investment Management ("Offering Memorandum"), attached as Exhibit G; Linton Dep. Tr. at 49-50. CIM's Offering Memorandum also stated, "No dealer, salesman or any other person has been authorized to give any information or to make any representation other than those contained in this memorandum and, if given or made, such information and representations must not be relied upon." See Exhibit G at 1-2. Mr. Linton was involved in the drafting of the Offering Memorandum. See Linton Dep. Tr. at 50.

13. Also while Mr. Linton was managing assets at CIM, he reviewed notices from at least fifty (50) mutual funds that either a trade had been stopped or that the account had been stopped from trading. See Linton Dep. Tr. at 20, 33-34; List of Funds, attached hereto as Exhibit I. Mr. Linton was familiar with the right of mutual fund companies to take action to limit or stop such trading. See Linton Dep. Tr. at 20-22, 158-159. And he was well aware that fund companies believed that his market timing strategy was harmful to long-term shareholders in the mutual funds he was "timing." See Linton Dep. Tr. at 23.

14. CIM received notices to discontinue or limit its excessive trading from the following funds: 59 Wall Street Funds; AIM Funds; Allegiance; American Funds; American Century Funds; American Express IDS Funds; Artisan Funds; Barron Funds; Berger Funds; Brinson Funds; BT Investment Int'l Equity Fund; Columbia Funds; Credit Suisse Warburg Pincus Funds; Credit Suisse Funds; Deutsche Funds; Fifth Third Funds; Franklin Templeton

Funds; Fremont Funds; Gabelli Funds; GT Global; Harbor Funds; Invesco Funds; Janus Funds; JP Morgan Funds; Kemper Global Discovery Fund; Kent International Growth; Lexington Funds; Liberty Acorn Funds; Managers Funds; Markman Funds; Northern Funds; Oakmark Funds; Pimco Funds; Preferred Funds; Putnam Funds; Robertson Stevenson Funds; Safeco Funds; Scudder Funds; SEI Funds; Seligman Funds; SIT Funds; Stein Roe Funds; Strong Funds; TIAA-CREF Funds; T Rowe Price Funds; UMB Scout Funds; USAA Funds; Van Kampen Funds; Vanguard Funds; and Warburg Pincus.  See Exhibit I; Linton Dep. Tr. at 33-34.

15. Mr. Linton's business, CIM, was dissolved at year-end of 2003 because mutual funds ceased to allow market timing in their funds.  See Lepke Dep. Tr. at 82-83.

16. Mr. Linton is married to Ms. Joanne Lepke.  See Linton Dep. Tr. at 8; Lepke Dep. Tr. at 5.

17. Mr. Linton's wife, Ms. Lepke, was, at one time, a registered representative authorized to sell variable universal life insurance policies on behalf of the Equitable, an insurance company.  See Lepke Dep. Tr. at 13-14.  Ms. Lepke held securities licenses and was, additionally, a registered investment advisor.  See Lepke Dep. Tr. at 15, 31-32.

18. Ms. Lepke also spent some time managing assets in a similar manner as her husband – that is, by market timing in mutual funds.  See Lepke Dep. Tr. at 12, 17-20; Linton Dep. Tr. at 65-67, 148-149.  From 1994 – 2001, Ms. Lepke was President of TDC Group, Inc. ("TDC Group"), which business was to manage individually managed accounts, also by market timing mutual funds.  See Lepke Dep. Tr. at 17-19, 23-24.  While at TDC Group, Ms. Lepke owned a variable universal life product sold by Pacific Life Insurance Company, named Pacific Exec Select; Ms. Lepke applied her mutual fund market timing strategy to that account.  See Lepke Dep. Tr. at 25-26, 28.

19. Like Mr. Linton, Ms. Lepke was also familiar with the right of mutual fund companies to take action to limit or stop market timing. Lepke Dep. Tr. at 36-38. While Ms. Lepke was President of TDC Group, a number of funds took action to restrict to suspend TDC's trading, including the following mutual fund companies: Pimco Funds; Invesco; Kemper Funds; Scudder Funds; Putnam Funds; Franklin Templeton Funds; AIM Funds' Vanguard Funds; Seligman Funds; T. Rowe Price Funds; American Funds; Deutsche Funds; J.P. Morgan Funds; and Van Kampen Funds. See Lepke Dep. Tr. at 36-38.

*Variable Universal Life Insurance*

20. One of the products New York Life offers is a flexible premium variable universal life insurance policy (the "Policy"). See Exhibit A at 1. The Policy is "variable" because the policyholder has option to invest in underlying mutual funds sponsored either by New York Life affiliates or by other mutual fund companies. See Exhibit A at 1; Prospectus dated May 1, 1999 (the "1999 Prospectus") at 6, attached as Exhibit B.

21. The mutual fund investment options are referred to as "Investment Divisions" within a so-called Separate Account (in which the assets of all policyholders are placed). See Exhibit A at ¶¶ 5.1-5.14; Hess Decl. at ¶¶ 5, 22.

22. Investment Divisions available in June 1999 may be found on the page bearing Bates label NY 0051 of the 1999 Prospectus. See Exhibit B at NY0051.

23. Assets not held within the Separate Account, are held in what is called the Fixed Account. See Exhibit A at ¶ 6.1. The Policy enables the holder to revise his Separate Account allocations from time to time by transferring assets among the Investment Divisions within the Separate Account. See Exhibit A at ¶ 5.11.

24. Section 5.12 of the Policy allows for transfers among the Investment Divisions and states, "If you want to make a transfer, you must tell us in a notice you sign which gives us the facts that we need… ." Exhibit A at ¶ 5.12. There is no limit to the number of transfers that can be made among Investment Divisions under the Policy. See Exhibit A at ¶ 5.12. New York Life maintains forms specially designed to allow policyholders to provide this written notice in a form sufficient for processing. See Exhibit Z.

25. Section 9.1 of the Policy is an integration clause that states the "entire contract" consists of only "this policy, any attached riders or endorsements, and the attached copy of the application." Exhibit A at ¶ 9.1. Only the Chairman, President, Secretary, or one of New York Life's Vice Presidents is authorized to change the contract; no agent is authorized to change the contract. See Exhibit A at ¶ 9.1.

26. To receive coverage under this Policy, an applicant must complete an application. Hess Decl. at ¶ 6. New York Life must approve the application and, if it is approved, New York Life issues a Policy. Hess Decl. at ¶ 6. Upon delivery of the Policy, the policyholder is entitled to a twenty(20)-day "Free Look" period, wherein he is entitled to inspect the Policy and has the option to return the Policy for a full refund. See Exhibit A at 1; Hess Decl. at ¶ 14.

27. Because a variable life insurance product offers the possibility of investing in underlying mutual funds, such a policy is a security, regulated by the Securities and Exchange Commission (SEC). See Hess Decl. at ¶¶ 5, 10. As such, New York Life is required to file annually a prospectus (the "Prospectus") with the SEC relating to the Policy, as well as other periodic filings required by the federal securities laws. See Hess Decl. at ¶ 11. The Prospectus relating to the Policy also includes the respective prospectuses for the underlying mutual funds

(or Investment Divisions). See, e.g., Exhibit B at A-1; Prospectus dated May 1, 2003 (the "2003 Prospectus") at A-39-A-49 attached hereto as Exhibit E; Hess Decl. at ¶ 11.

28. New York Life is required to send out the Prospectus (including the prospectuses for the underlying mutual funds) currently on-file with the SEC to all in-force policyholders and does so annually. Transcript of the Deposition of John Hess, Jr. (hereinafter "Hess Dep. Tr"). at 20, attached as Exhibit X; Hess. Decl. at ¶ 11. The annual updates to the Prospectus inform policyholders of changes to administrative or business practices. See Hess Dep. Tr. at 46; Hess Decl. at ¶ 13.

29. The Prospectus "describes" the Policy, but is not part of the contract between New York Life and the policyholder. See Hess Decl. at ¶ 12. See also 1999 Prospectus at 6; 2003 Prospectus at 6 ("The entire contract consists of the policy, the application and any riders to the policy.")

30. For example, in the issue of the Prospectus dated May 1, 2002 (the "2002 Prospectus"), New York Life informed policyholders of a change to its administrative practice that made internet service available to policyholders and described the availability of internet-based trading. See Exhibit D at 36; Hess Dep. Tr. at 31; Hess Decl. at ¶ 13. Prior to 2002, internet-based trading was not available to policyholders. See Hess Decl. at ¶ 13; Lepke Dep. Tr. at 62.

31. As another example, the Policy refers the policyholder to the "most current prospectus which is on file with the SEC" to determine the "actual surrender charge which applies in any year." See Exhibit A at 2.2.

32. Independent agents who sell securities (including, variable life insurance products) on behalf of New York Life to the public must hold appropriate securities licenses for the sale and distribution of securities. See Hess Decl. at ¶ 10.

33. Paul Redfearn is an independent agent of New York Life. See Agent's Contract, attached hereto as Exhibit H. Paul Redfearn is a registered representative of an affiliated company, which is registered as a broker-dealer under the Securities Exchange Act of 1934. See Hess Decl. at ¶ 10.

*Mr. Linton's Policy*

34. Mr. Linton and his wife, Joann Lepke, jointly researched variable universal life ("VUL") products, as a vehicle for their personal investments. See Linton Dep. Tr. at 65; Lepke Dep. Tr. at 33. Ultimately, the decision to invest in New York Life's variable life insurance policy was a joint decision between Mr. Linton and Ms. Lepke. See Lepke Dep. Tr. at 33. As part of their research into possible VUL products, Mr. Linton and Ms. Lepke reviewed the prospectuses for forty VUL products, as well as the prospectuses for the underlying funds. See Lepke Dep. at 33, 39, 48-50.

35. Mr. Linton and Ms. Lepke were not interested in the life insurance aspect of the VUL products. Rather, they sought a variable universal life ("VUL") product as a means to market time their investments and to shelter the gains from tax. Linton Dep. Tr. at 59, 80.

36. The two paid close attention to several factors, including (a) whether the policy in question made available fund choices that were appropriate to the kind of economic modeling on which a market timing strategy depended; (b) whether and how any gains generated by their trading activities would be sheltered from tax; and (c) whether the number of trades they could make was restricted. See Linton Dep. Tr. at 59-65, 68; Lepke Dep. Tr. at 40-42, 54-55;

Transcript of the Deposition of Paul Redfearn (hereinafter "Redfearn Dep. Tr." at 50-51, attached as Exhibit Y.

37. As part of that review, they obtained from Mr. Redfearn and reviewed a copy of the 1999 Prospectus relating to the Policy, as well as the individual prospectuses for the underlying mutual funds. See Linton Dep. Tr. at 113-114; Lepke Dep. Tr. at 53-54, 66-67.

38. Mr. Linton and Ms. Lepke determined that at least two of the mutual fund options available – an International Fund and Emerging Markets Fund – would be suitable for a market timing strategy. See Linton Dep. Tr. at 66, 68, 141-142; Lepke Dep. Tr. at 65, 74. From reading the 1999 Prospectus, they also concluded that the Policy did not place any restriction on the number of "transfers" a policyholder could make between and among the Investment Divisions within the Separate Account. See Linton Dep. Tr. at 68-69.

39. On or about June 11, 1999, Mr. Linton signed an application for a Flexible Premium Variable Universal Life Insurance Policy. See Exhibit A at Life Insurance Application (Part I), page 6. In his signed application, Mr. Linton acknowledged, inter alia, that "[n]o agent … has any right to accept risks, make or change contracts, or give up any of [New York Life's] rights or requirements." See Exhibit A at Life Insurance Application (Part I), page 6; Linton Dep. Tr. at 81-82.

40. The 1999 Prospectus, in addition to effecting transfers among Investment Divisions in writing, as called for by the Policy, stated that policyholders also had the option of effecting transfers among investment divisions by telephone (either through a live voice operator or an automated voice-recognition system), provided that the policyholder follow "established procedures," which included the completion of a Telephone Authorization Form. See Exhibit B at 34.

41.     At or about the time of Mr. Linton signed his application, Mr. Linton also completed a Telephone Authorization Form, wherein he acknowledged, "Telephone privileges may be discontinued at any time."  See Telephone Authorization Form at 2, attached as Exhibit C;  Linton Dep. Tr. at 87-88.

42.     New York Life approved Mr. Linton's application and, on or about June 30, 1999, Mr. Linton's "Free Look" period was extended through Sunday, August 8, 1999.  See Letter from P. Redfearn to B. Linton, dated June 30, 1999, attached as Exhibit L.

43.     During the "Free Look" period, Mr. Linton and Ms. Lepke considered canceling the Policy.  Lepke Dep. Tr. at 58.  In July 1999, Mr. Linton and Ms. Lepke considered alternative variable life insurance products, including one offered by Pacific Life Insurance Company, the Pacific Select Exec II product.  See Lepke Dep. Tr. at 59.

44.     In a letter dated June 11, 1999, Mr. Linton wrote to Customer Service at New York Life inquiring about several aspects of the Policy, including face amount changes, partial withdrawals, and transfers to investment divisions and the fixed account.  See Exhibit J; Hess Dep. Tr. at 14-15; Hess Decl. at ¶ 15.

45.     In response to Mr. Linton's June 11, 1999 Letter, John Hess, the Product Manager for the VUL product, pointed him to the then current prospectus, the 1999 Prospectus.  Mr. Hess also stated, "The [prospectus] states current limits for face amount charges, partial withdrawals and transfers between investment divisions and to the fixed account.  From time to time [New York Life] may be required to make product changes to comply with changing tax laws, regulatory provisions, state laws and changing business practices.  At this time we do not anticipate any revisions to the product however, we do reserve the right to make adjustments to our administrative provisions."  See Exhibit K; Hess Dep. Tr. at 15, 19; Hess Decl. at ¶ 16.

46. In a letter dated June 30, 1999, Mr. Redfearn wrote to New York Life on behalf of Mr. Linton seeking further clarification, and stating that Mr. Linton "is very much aware of the '20-day Right to Examine Policy' period which extends through Sunday, August 8th." See Exhibit M; Hess Decl. at ¶ 17.

47. In response, Mr. Hess provided some additional information to Mr. Linton but, repeated, "However, as I stated in my previous reply, we do reserve the right to make future adjustments to our administrative provisions." See Exhibit N; Hess Decl. at ¶ 18.

48. Mr. Linton did not cancel his Policy during the Free Look Period. See Linton Dep. Tr. at 140-141.

49. Mr. Linton and Ms. Lepke allege that they relied on Mr. Redfearn's assurance that the terms set forth in the 1999 Prospectus would govern their policy throughout the life of the policy. See Linton Dep. Tr. at 111; Lepke Dep. Tr. at 44-45.

50. Mr. Redfearn apparently believed at the time that this assurance was true, even though it was not. Redfearn Dep. Tr. at 131-133.

51. After the Policy went into effect, New York Life continued to send to Mr. Linton an annual prospectus relating to the Policy containing updated provisions and administrative procedures. See Lepke Dep. Tr. at 44-46; Linton Dep. Tr. at 156.

52. On or about May 1, 2002, New York Life issued its annual prospectus for the VUL product (the "2002 Prospectus"), which provided that transfers may also be effected through an interface on the Internet. See Exhibit D at 45.

53. After May 1, 2002, Mr. Linton, or someone on his behalf (usually, Ms. Lepke), executed trades via the interface on the Internet. See Linton Dep. Tr. at 88, 143, 148. They did

not complain then about the changes to the administrative procedures for making transfers. Lepke Dep. Tr. at 62-63.

*New York Life's Procedures for Market Timers*

54. Market timing is an investment strategy that involves excessive trades into and out of mutual funds within short periods of time. Market timing can dilute the performance of mutual funds, and thus dilute the returns achieved by investors in those funds. Market timing frequently involves trading based on movements in specific market indices (and overseas developments which may move those indices) which, the timer believes, accurately predict how overseas markets will perform overnight, while the U.S. market is closed (and mutual fund trading suspended). Hess Decl. at ¶ 21.

55. The net asset value of a mutual fund, particularly ones which hold primarily securities and are traded on overseas markets, can be expected to increase overnight if the prediction based on market indices is correct. Thus, for example, a market timer may purchase shares of a mutual fund weighted towards international stocks late in the afternoon on Monday, relying on market signals indicating that the international markets will be up overnight, while the U.S. market is not trading. The timer may then sell the shares on Tuesday, locking in the overnight, overseas price movements. While a single overnight gain may be comparatively small, the market timer hopes to make money by making rapid trades, in large amounts, seeking to lock in repeated gains based on daily price movements. Because the trades are rapid, the cash "invested" by a market timer in the mutual fund rarely stays in the fund for more than a few days; portfolio managers have no time to put the cash to work in underlying investments on behalf of the fund. Even though the market timer is taking his share of the overnight gains in a fund's net asset value, his cash – because it was never invested on behalf of the fund in

underlying securities – did not contribute to the gain. (Indeed, from a fund accounting standpoint, the money invested by a market timer when he purchases a fund share late on Day 1 and sells the share on Day 2 never becomes available for the portfolio manager to invest.) The overnight gains repeatedly extracted from the fund by the market timer, therefore, dilute the gains earned by longer term investors in the fund. Hess Decl. at ¶ 22.

56. On or about May 1, 2003, New York Life filed an updated prospectus (the "2003 Prospectus") relating to the Policy with the Securities and Exchange Commission ("SEC"). See Exhibit E. The 2003 Prospectus announced a change in administrative provisions intended to prevent market timing and described New York Life's limitations on trading activity that would "disadvantage or potentially hurt the rights or interests of other policy owners." See Exhibit E at 36.

57. Specifically, New York Life reserved the right to discontinue a policyholder's ability to make transfers over the telephone or internet, by suspending his or her PIN, and to "require that all subsequent transfer requests for [the] policy be made through the U.S. mail or an overnight courier" (i.e., by a written notice signed by the policyholder giving New York Life facts as required by the Policy) should the policyholder request "more than two transfers into or out of one or more Investment Divisions within any 30-day period, and/or requests one or more transfers in sums in excess of … $500,000." See Exhibit E at 36.

58. Also in 2003, language cautioning traders against market timing appeared in the prospectus of one of the underlying funds in which Mr. Linton frequently traded, the Mainstay VP Cash Management Portfolio. See Exhibit E at A-48 (Bates labeled NY0313). It stated:

> **The Fund may bar excessive traders**.
>
> Short-term or excessive trading into and out of a Portfolio may harm performance by disrupting portfolio management strategies and by

> increasing expenses. … [T]he fund may reject any purchase or transfer orders at any time. In particular, the Fund may reject or cancel any order or part thereof from market timers or investors who … have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to that Portfolio."

*Id.* (emphasis in original).

59. After issuing the 2003 Prospectus, New York Life put in place procedures aimed at identifying market times and began in May 2003 to review transfers by policyholders among Investment Divisions in order, where necessary, to take appropriate action to limit excessive trading. Hess Dep. Tr. at 42, 62.

60. After the Company identified a series of rapid transfers in excess of $500,000 by Mr. Linton, New York Life first cautioned Mr. Linton in writing that market timing trades were harmful to other, long-term investors and that further rapid trading in large amounts would result in New York Life suspending his PIN, thereby discontinuing his ability to trade by telephone (or over the internet). See Exhibit O; Hess Decl. at ¶¶ 25-26.

61. When Mr. Linton's trading continued notwithstanding this notice, New York Life suspended his PIN. See Exhibit Q; Hess Decl. at ¶ 27. The letter stated:

> The additional language relating to market timing is a reflection of the fund manager's increased concerns with market timing activity. In the May 2003 prospectus, we added language to further support the Fund's transfer guidelines and restrictions and to define our administrative response to marketing.
>
> While limitations have been put in place to restrict the practice of market timing, *a disabled PIN will not prevent you from exercising your contractual right to request transfers*.

*See* Exhibit Q (emphasis added).

62. New York Life filed a Prospectus dated May 1, 2004 with the SEC (the "2004 Prospectus"), wherein New York Life announced another change in administrative procedure,

modifying its procedures with regard to market timing. New York Life still reserved its right to discontinue a policyholder's ability to make transfers over the telephone or internet, by suspending his or her PIN, and to "require that all subsequent transfer requests for [the] policy be made through the U.S. mail or an overnight courier," but now stated that it would exercise that right if the policyholder "request[s] three or more transfers into or out of one or more Investment Divisions within any 60-day period, or request a transfer of an amount of $250,000 or more," See Exhibit T at 36; Hess. Dep. Tr. at 69-70.; Hess Decl. at ¶ 29.

63. In a letter dated June 1, 2004, New York Life reinstated Mr. Linton's PIN (and his ability to effect transfers through the telephone or internet), subject to his willingness to abide by the revise guidelines. See Exhibit R; Hess. Dep. Tr. at 70; Hess Decl. at ¶ 30.

*Mr. Linton's Policy Value*

64. At the time Mr. Linton signed his application, on June 11, 1999, he paid an initial premium of $100,000. See Linton Dep. Tr. at 97, 149. Mr. Linton subsequently paid two more premiums, both for an additional $100,000 each, posted on July 7, 2000, and August 1, 2001, respectively. See Linton Dep. Tr. at 149.

65. As of June 13, 2003, Mr. Linton's net gain on investment under the Policy was over $200,000.00 See Linton Dep. Tr. at 154-155; Exhibit BB.

66. On March 31, 2005, the Cash Value of Mr. Linton's Policy was $520,001.12. See Exhibit BB. On March 31, 2005, the Cash Surrender Value of Mr. Linton's Policy was $499,098.90. See Exhibit BB.

67. As of the date of this declaration, Mr. Linton has been charged $ 66,908.76 in total fees under the Policy. See Exhibit U.

68.    At all times, Mr. Linton has had the unlimited right and ability to effect the transfer of funds via written notice. See Hess Dep. Tr. at 69-70; Exhibit Q.

69.    On May 3, 2005, Mr. Linton withdrew $200,00.00 from the Policy and placed the funds in a cash account, where the funds were not being actively traded. See Linton Dep. Tr. at 151, 165; Exhibit S at 7. The remaining money in the Policy is in the cash account. See Linton Dep. Tr. at 164-165.

70.    At his deposition, Mr. Linton stated that he had not quantified the damages he believes he has suffered as a result of New York Life's alleged conduct. See Linton Dep. Tr. at 174-175, 223; Lepke Dep. Tr. at 63-64; Exhibit S at 3-8

Respectfully submitted,

NEW YORK LIFE INSURANCE
AND ANNUITY CORPORATION

By its attorneys,

/s/ Robert G. Jones
John D. Donovan, Jr. (BBO # 130950)
john.donovan@ropesgray.com
Robert G. Jones (BBO #630767)
robert.jones@ropesgray.com
Levina Wong (BBO #654510)
levina.wong@ropesgray.com
ROPES & GRAY LLP
One International Place
Boston, MA 02110
(617) 951-7000

Dated: February 13, 2006

## CERTIFICATE OF SERVICE

      I hereby certify that on February 13, 2006, New York Life Insurance and Annuity Corporation's Concise Statement of Material Facts Pursuant to Local Rule 56.1 was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 13, 2006.

                                        /s/ Levina Wong
                                        Levina Wong

9897128