**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARRY LINTON,<br><br>    Plaintiff<br><br>v.<br><br>NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION,<br><br>    Defendant. | C.A. No. 04-11362-RWZ |

### AFFIDAVIT OF BARRY LINTON IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Barry Linton, depose and state as follows:

1. My name is Barry Linton and I reside at 9 New Meadow Lane, Topsfield Massachusetts. I am the plaintiff in this lawsuit. This affidavit is given in support of my Motion for Partial Summary Judgment in the above action.

2. I have personal knowledge of the facts set forth in this affidavit based on my personal knowledge.

3. Over the course of the last 20 years I have been employed in the investment field as an investment advisor/money manager. During this time I worked for money management firms and I owned and operated my own company as a registered investment advisor. I also developed and implemented, both for myself and my investment advisor clients, a successful investment strategy whereby computerized models of historical economic performance are analyzed, and "buy" or "sell" signals are generated based on the confluence of specific market indicators which I used since 1986.

L:\10567\000\Pld\30

## AFFIDAVIT

4. In order to successfully implement my strategy I need to make quick trades, either by telephone or the internet, before the close of a trading session in order to take advantage of the market trends predicted by my computer models.

5. In or around 1996, I was contacted by Mr. Paul Redfearn, an insurance agent. Mr. Redfearn solicited me to consider purchasing a life insurance policy.

6. Mr. Redfearn asked whether I might be interested in purchasing a variable universal life product because it offered life insurance, as well as an investment opportunity through access to mutual funds made available to policyholders.

7. While I did not need any life insurance, the variable life product component intrigued me because I might be able to employ my investment strategy to mutual funds, and any appreciation in value would accrue tax deferred.

8. I explained to Mr. Redfearn that in order to consider any such policy, I would need to be able to use the essential elements of my investment strategy. More specifically, I told him I needed to have the right to make unlimited transfers within investment accounts and that all transfer requests within accounts needed to be made quickly, usually at the end of the day and either by phone or the internet. I also told Mr. Redfearn that I had to be assured that these rights could not be restricted during the term of the Policy.

9. I specifically told Mr. Redfearn that if at the end of the trading day the computer models signaled "Buy" or "Sell", then I needed to buy or sell, as quickly as possible, and this right had to be assured.

10. Over the next few years, Mr. Redfearn researched variable universal life products that might fit my requirements. If a product did not allow telephonic transfers, or if it

## AFFIDAVIT

limited transfers in the future or reserved the right to limit transfers in any way, then the product was deemed by me to be unacceptable.

11. After reviewing numerous prospectuses from various insurance companies, in 1999, Mr. Redfearn proposed the New York Life variable universal life product. Mr. Redfearn told me he was an authorized agent for New York Life. Mr. Redfearn told me that the New York Life Policy satisfied all the requirements I had identified to him.

12. Upon review of the 1999 Prospectus for the New York Life Variable Universal Life policy (the "Policy") supplied by Mr. Redfearn, I confirmed that there were no limits on transfers between investment divisions and that I could effectuate transfers within investment divisions by telephone. Mr. Redfearn explained the terms of the Policy to me and I reviewed the Prospectus and Policy in detail. The Policy required a payment of a premium for a life insurance policy in the amount of $5,696 annually. I also had the right, at my option, to pay additional amounts to New York Life, which could be invested in specific mutual funds made available to policyholders. These designated funds, or "Divisions", had specific investment objectives and amounts could be transferred between the Divisions without restriction. The growth in the value of the amounts held in the Divisions was tax-deferred. I also had the right to borrow against the appreciated value and to have the loan paid at my death by application of the available life insurance.

13. When I requested more specificity as to how transfers could be made, Mr. Redfearn reassured me that unlimited trades within the Investment Divisions could be made by telephone, he directed me to the 1999 Prospectus for the Policy that outlined the established procedures and later to the provisions of the Policy that dealt with unrestricted transfers. He

L:\10567\000\Pld\30

3

## AFFIDAVIT

represented that these provisions satisfied my requirements and that New York Life intended to maintain those rights throughout the term of the Policy.

14. When I had additional questions concerning some areas of the 1999 Prospectus that were unclear, I understood that Mr. Redfearn consulted New York Life directly. Mr. Redfearn again advised me that New York Life did not intend to change the provisions of the Policy that he told me gave me the right to make unlimited numbers of transfers by telephone.

15. Upon receiving adequate responses from Mr. Redfearn and after reviewing the Policy and confirming that New York Life did not have the legal right or intention to alter the Policy without my consent and based on the assurances from Mr. Redfearn that the 1999 Prospectus would govern my agreement with New York Life, I agreed to purchase the Policy.

16. In connection with the issuance of the Policy, I received notification that New York Life acknowledged my right to make telephone transfers.

17. Shortly thereafter, I began transferring funds within my Investment Divisions by telephone and later by the internet.

18. New York Life accepted and processed all my telephonic or internet transfer requests for the next four plus years.

19. During this period I was charged and paid all premiums, fees and costs associated with the Policy.

20. During the period from 1999, until July, 2003, implementation of my investment strategy resulted in an increase to the value of the investment portfolio of $276,760 or 201%. During this same period, the value of the Dow Jones Industrial Average fell approximately 14.6%. Other indices also fell in value.

## AFFIDAVIT

21. In July 2003, New York Life informed me that I could no longer transfer funds within my Investment Division by telephone or the internet, and that I had to do so via mail or overnight delivery.

22. Having been denied the ability to implement my investment strategy, during the period from July 2003 through today, my investment performance was 2.7%.

23. I have prepared an analysis of the performance of my investment strategy since the termination of my rights in 2003. Applying the "Buy" and "Sell" signals generated by the computer models to the actual market data during this period, I would have increased the value of the portfolio by $ 942,227 or approximately 179%.

24. Had I known that New York Life intended to retain the right to restrict my trading authorization in the manner it did, I would not have purchased the Policy.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 13th day of February 2006.

Barry J Linton