EXHIBIT 1

Page 1

1           UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                        C.A. No. 04-11362-RWZ

4      ***********************************

5    BARRY LINTON,

6                  Plaintiff,

7         v.

8    NEW YORK LIFE INSURANCE AND

9    ANNUITY CORPORATION,

10                 Defendant.

11     ***********************************

12                 DEPOSITION OF BARRY J. LINTON, a

13    witness called on behalf of the Defendant, taken

14    pursuant to the Federal Rules of Civil

15    Procedure, before Maureen O'Connor Pollard, RPR

16    and Notary Public within and for the

17    Commonwealth of Massachusetts, at the offices of

18    Ropes & Gray, One International Place, Boston,

19    Massachusetts, on the 13th of October, 2005,

20    commencing at 8:56 o'clock a.m.

21

22

23

24

BARRY J. LINTON
10-13-05

Page 8

1  understanding or getting any of the questions

2  that are asked, let me know, we'll try to

3  clarify them for you.

4           If you want to take any breaks, let

5  your counsel know or let me know and we'll

6  accommodate you as quickly as we can.

7           It's important that you make every

8  effort to record your answer verbally with a yes

9  or a no.  And there might be times when either I

10  or even, God forbid, the court reporter will

11  look over at you or even suggest that you have

12  to do something verbally; we're not doing it to

13  be testy, we're doing it to help the court

14  reporter get the record down as clearly as she

15  can.

16           How old are you, sir?

17  A.    Fifty-four.

18  Q.    And you're married?

19  A.    Yes.

20  Q.    And your wife's name is?

21  A.    Joanne D. Lepke, L-E-P-K-E.

22  Q.    Can you relate to me what education

23  you have starting with high school?  Where did

24  you go to high school?

BARRY J. LINTON
10-13-05

Page 37

1    has at the top of it the caption "Buy/Sell

2    Decisions."  Do you see that?

3         A.   Yes, I do.

4         Q.   Okay.  There's a chart there in the

5    middle of the page, it says "Demonstration of

6    Investment Strategy."  Do you see that?

7         A.   Yes, I do.

8         Q.   Okay.  Can you explain what is meant

9    to be conveyed by that chart, please?

10        A.   Basically that we buy when we see a

11   mutual fund starting to go up, and we sell when

12   we see the trend -- when the trend looks like

13   it's not going to continue to go up.

14        Q.   It's fair to say that you're looking

15   at short-term trends?

16        A.   Yes.

17        Q.   So you're looking at day to day

18   differentials between the price of portfolio

19   shares and the NAV price?

20        A.   Could you repeat the question?

21        Q.   You're looking at day to day

22   differentials between the value of the

23   underlying portfolio securities on the one hand

24   and the NAV on the other?

BARRY J. LINTON
10-13-05

1    particular fund in that sector would have?

2        A.    Yes.

3        Q.    Okay.  And then the historical data

4    analysis that you were referring to a moment ago

5    that has pricing data over the past fifteen

6    years, is that analysis specific to a fund?

7        A.    That is specific to the fund.

8        Q.    So you're using the blending to give

9    you an estimate of what the NAV is doing that

10    day?

11        A.    Correct.

12        Q.    And you're, depending on which fund

13    you're in, you're looking at pricing data in

14    that fund over the past fifteen years to help

15    you do what?

16        A.    To help us decide when to buy and sell

17    funds.

18        Q.    And what is it about the review of the

19    historical data over the past fifteen years that

20    helps you decide whether it's time to purchase

21    or sell a fund?

22        A.    Basically it's -- it looks at the

23    change in price of a fund, and it does a what if

24    scenario; if you bought the fund when it was up

BARRY J. LINTON
10-13-05

1    one percent and sold it when it was down one

2    percent, what kind of return would you get.  If

3    you bought the fund when it was up a percent and

4    you sold it when it was down two percent, what

5    kind of a return would you get, and so on, and

6    you can create a matrix of numbers.

7        Q.    Okay.  And that matrix tells you what?

8        A.    It tells us what the optimal would

9    have been for the last twelve months.  You guys

10   can't use the strategy, though.

11       Q.    When I understand it, I promise I

12   won't use it.

13            Is the model in some sense making

14   predictions about what will happen in the future

15   based on what's happened in the past in that

16   fund specifically, or not?

17       A.    I don't know how to answer that

18   question.

19       Q.    Is there any part of this buy/sell

20   decision that you make?  In other words, that

21   you've got a piece of analysis over here looking

22   at the blend of securities trying to figure out

23   what the NAV is doing that day, you've got the

24   historical price data over fifteen years you're

BARRY J. LINTON
10-13-05

Page 44

1    watching to see what would happen under certain

2    conditions, do the two together drive a buy/sell

3    decision?

4        A.   Yes.

5        Q.   Or is there any discretion involved on

6    your part to determine when it makes sense to

7    make the investment?

8        A.   It's 99 percent the system.

9        Q.   99 percent the system.

10        So describe to me what's happening on

11    both sides to drive the buy decision.  In other

12    words, what does the NAV need to be showing that

13    day coupled with what does the historical price

14    data need to be telling you that day to drive a

15    buy decision?

16        A.   The NAV predicts the change in the

17    price.  You compare that price to the maximum

18    for the last twelve months, the maximum return

19    that would have been gained, the maximum

20    combination of buy and sell signals that would

21    have produced the largest gain for the last

22    fifteen months, and if the stocks in the model

23    are predicting that it will be up sufficiently

24    according to the historical research, then you

BARRY J. LINTON
10-13-05

Page 45

1    buy it or sell it as the case may be.

2        Q.    What part of the analysis does this

3    chart on page PR0294 of Exhibit 1 represent?

4        A.    It doesn't really represent any part

5    of the analysis, I don't believe.

6        Q.    The line on the chart is showing what?

7        A.    The line.  Which line?

8        Q.    Well, the --

9        A.    The price line?

10       Q.    The price line.

11       A.    It's showing a mutual fund that

12   dropped in price and then went up in price and

13   then leveled out and starting to drop again.

14       Q.    In a period of a week or two?

15       A.    About a month.  Twenty-five business

16   days.

17       Q.    Fair enough.

18            And so what is the chart meant to

19   describe to a prospective investor?

20       A.    How we buy, that we buy and sell

21   mutual funds based on changes in price.

22       Q.    Who developed this investment

23   strategy, Mr. Linton?

24       A.    No one person developed the strategy.

BARRY J. LINTON
10-13-05

Page 52

1    accordance with the model that you've described

2    generally to us, are you required to make

3    investment buy/sell decisions during any

4    particular period of the day?

5         A.    Yes, late in the day.

6         Q.    Late in the day?

7         A.    Different mutual funds would have

8    different cutoff times, different brokers would

9    have different cutoff times.  But generally

10   after 2:00 o'clock in the afternoon.

11        Q.    And why is that?

12        A.    Because the mutual funds require us to

13   put any changes in prior to the market close.

14        Q.    Is there anything about the way your

15   model is running such that your model hasn't

16   given you an answer prior to a certain time

17   during the day?

18        A.    It's going to be most accurate at the

19   end of the day.

20        Q.    And why is that?

21        A.    Because you're trying to predict the

22   closing prices, so the closer you get to the

23   close the more accurate your price is going to

24   be.

BARRY J. LINTON
10-13-05

Page 53

1      Q.    It's fair to say that in making

2    buy/sell decisions your general practice was to

3    wait as late in the day as possible?

4      A.    Correct.

5      Q.    During the period that you were

6    investing on behalf of your clients either in

7    the limited partnership or in the individual

8    accounts, was it possible to execute trades on

9    behalf of those clients in writing?

10     A.    No.

11     Q.    It had to be done over the phone or

12   over the Internet?

13     A.    Correct.

14           When you say was it possible, do you

15   mean could I have effected a trade?

16     Q.    Not could you have effected a trade,

17   could you effected your strategy --

18     A.    No.

19     Q.    -- if at the end of every day you were

20   required to trade with a writing that you

21   signed?

22     A.    I could think of a situation where --

23   no, no.

24     Q.    The answer is no?

BARRY J. LINTON
10-13-05

Page 55

1    of a single client?

2        A.    No, I do not.

3        Q.    Did you ever have any discussions with

4    any representative of a mutual fund or a

5    management company seeking to secure permission

6    to trade in excess of prospectus limitations?

7        A.    No, no.

8        Q.    No discussions like that?

9        A.    No.

10       Q.    When did you first meet Paul Redfearn?

11       A.    I don't know.  I would say it would be

12   the early nineties, but I don't know the exact

13   date.

14       Q.    What were the circumstances of your

15   first meeting him?

16       A.    He was an insurance salesman, and I

17   believe we were looking for life insurance for a

18   buy/sell agreement, and he was referred to us by

19   the person that we buy car insurance from,

20   Michael Linnane, L-I-N-N-A-N-E.

21       Q.    Now, in this context, if you just

22   would for the record just tell me what you mean

23   by a buy/sell agreement?

24       A.    If something were to happen to either

BARRY J. LINTON
10-13-05

Page 58

1          A.    With Mr. Redfearn.

2          Q.    -- with Mr. Redfearn, but prior to

3     actually filling out the first application,

4     okay?

5          A.    Yep.

6          Q.    What discussions do you recall having

7     with Mr. Redfearn during that period prior to

8     March of 1999?

9          A.    Well, I believe that it was probably a

10    half a year before we actually signed that first

11    policy that we started to talk to Paul, maybe a

12    year.  And he brought the idea of buying a

13    variable universal life insurance policy and

14    explained how it would be a benefit to us.

15         Q.    What was your reaction?

16         A.    Well, I didn't want any more life

17    insurance.

18         Q.    You had life insurance?

19         A.    I did at the time.  I was required to

20    carry it because of a divorce.

21         Q.    So you didn't need insurance

22    protection, is that --

23         A.    No, I did not need insurance

24    protection.

BARRY J. LINTON
10-13-05

Page 59

1       Q.    Well, did the possibility of

2   purchasing a variable universal life insurance

3   policy appeal to you?

4       A.    It did, yes, it did.

5       Q.    Why?

6       A.    Because it was a way to shelter tax.

7       Q.    And a way to shelter what from tax?

8       A.    It was a way to shelter the gain on

9   the income from taxes.

10      Q.    Okay.  And what income did you think

11  that you'd be sheltering from taxes?

12      A.    Investment income.

13      Q.    And is it fair to say that the

14  possibility of executing trades in mutual funds

15  under a variable policy was one of the things

16  that interested you?

17      A.    Absolutely.

18      Q.    You considered the variable universal

19  life insurance policy an investment vehicle?

20      A.    Correct.

21      Q.    There came a time, didn't there, when

22  you discussed with Mr. Redfearn the possibility

23  of purchasing a variable universal life

24  insurance policy that included a gold fund?  Do

BARRY J. LINTON
10-13-05

Page 61

1     A.   No.

2     Q.   And what did you do during that period

3   prior to March of '99 on your own to examine

4   life insurance policies?

5     A.   We started with a disk from Principia,

6   a CD-ROM, which is a database of VUL insurance

7   policies.

8     Q.   When you say "we," this is who?

9     A.   My wife and I.

10     Q.   Your wife, Joanne Lepke?

11     A.   Lepke.

12     Q.   When were you married?

13     A.   '96, '97, '97.

14     Q.   We'll correct it either way.

15     A.   Please.

16     Q.   And where did you learn about the

17   existence of a Principia CD-ROM that would give

18   you information about VUL policies?

19     A.   We used Principia for mutual funds.

20     Q.   Principia is what?

21     A.   It's a product by Morningstar, it's

22   basically a database of mutual funds, and they

23   also have a database of variable universal life

24   insurance policies.

BARRY J. LINTON
10-13-05

Page 62

1      Q.   Did the database for the VUL policies

2   provide information on the name of the policy as

3   well as the funds that were included as

4   investment opportunities under those policies?

5      A.   I believe so.

6      Q.   And what did you do with that database

7   information, Principia VUL database information?

8      A.    We filtered it down to a list of

9   possible VULs.

10      Q.   How did you do that?  What was driving

11   your filter?

12      A.   The type of fund they had, the

13   restrictions on trading, the availability of

14   making trades over the Internet.  And there are

15   other things, but I don't remember them.

16      Q.   Okay.  When you say "the types of

17   funds," what types of funds were you looking

18   for?

19      A.   We were looking for gold funds,

20   international funds, emerging market funds,

21   which were the best performing funds at that

22   time, and lots of funds in general.

23      Q.   And you mentioned restrictions on

24   trading.  What were you referring to when you

BARRY J. LINTON
10-13-05

Page 63

1    said that?

2         A.    We didn't -- we weren't going to get

3    engaged in any kind of a variable universal life

4    policy if there were any restrictions on

5    trading.

6         Q.    What types of restrictions on trading

7    were important for you to review?

8         A.    There had to be unlimited trading.

9         Q.    Unlimited in the number of exchanges

10   that you could make --

11        A.    Correct.

12        Q.    -- between investment opportunities or

13   investment funds within a VUL?

14        A.    Yes.

15        Q.    And you mentioned Internet trading.

16   What was important about that?

17        A.    It just made it easier at the end of

18   the day.

19        Q.    When you say "Internet trading," are

20   you distinguishing between Internet trading and

21   being able to call in over an 800 line?

22        A.    Yes.

23        Q.    So it was important at least in the

24   first analysis to try and find policies under

BARRY J. LINTON
10-13-05

Page 64

1    which you could actually sit down at your

2    computer and trade?

3        A.    Yes.  It wasn't that important, but it

4    was a consideration, it was one of the

5    considerations that we made.  The primary

6    consideration was the restrictions on trading.

7    I'd say the second consideration was the

8    availability of funds.

9        Q.    Can you recall the names of any

10   policies that you gave serious consideration to

11   prior to March of '99 other than the New York

12   Life policy?

13       A.    Pacific Life strikes a bell, but I

14   don't know why.  And Jefferson Pilot you've

15   mentioned, and that sounds familiar.  But

16   honestly, no.

17       Q.    Can you recall indicating to Mr.

18   Redfearn at some point in time that the

19   Jefferson Pilot product was no longer of

20   interest to you because the gold fund had become

21   diluted?

22       A.    Had become diluted?

23       Q.    Yes.

24       A.    I don't.

BARRY J. LINTON
10-13-05

Page 69

1          A.    Correct, both the size and the number.

2          Q.    How did you determine that the New

3    York Life VUL policy had in your view no

4    restriction on the number or amount of a trade?

5          A.    By reading the prospectus, by reading

6    all the documents relating to the policy, and by

7    the assurance of Paul, by the representations

8    that he made at the time.

9          Q.    At what time?

10         A.    Prior to signing the policy.

11         Q.    Prior to signing the application in

12   March?

13         A.    Correct.

14         Q.    So prior to your signing the first

15   application in March of 1999, Mr. Redfearn

16   specifically assured you of what?

17         A.    He specifically assured us that there

18   were no restrictions on trading, and he

19   specifically assured us that the current

20   prospectus would be the prospectus that would

21   always govern that policy.

22         Q.    So prior to March of 1999, prior to

23   March 12th of 1999, Mr. Redfearn specifically

24   assured you that there would be no restrictions

BARRY J. LINTON
10-13-05

Page 70

1  on the number or amount of trades?

2      A.    That there were not any restrictions

3  on the amount of trades.  There was nothing in

4  the prospectus which limited the number or the

5  size of trades, and the prospectus was going to

6  be the governing document forever.

7      Q.    Did he use the word "forever"?

8      A.    For the life of the policy.  I don't

9  know if he used the word "forever," I don't

10  know.

11      Q.    In other words, did he tell you that

12  the prospectus that you had in front of you at

13  the time governed the policy?

14      A.    Correct.

15      Q.    Did he also say that it governed the

16  policy for all time?

17      A.    Yes, he said it would not change.  I

18  asked him that question at least four times.

19      Q.    So you specifically recall asking him

20  whether or not the prospectus would change at

21  some time?

22      A.    Correct.

23      Q.    And he said it would not change in any

24  way?

BARRY J. LINTON
10-13-05

Page 88

1    automated system.  This is not speaking to an

2    operator.  There's three systems that New York

3    Life has.  One you can call and talk to an

4    operator, she will interrogate you, she'll ask

5    your account number, she'll ask you your Social

6    Security Number.

7           The second way was a voice, VAC, voice

8    actuated system where you could call in and you

9    didn't have to talk to an operator.  To do that

10   you needed to get a PIN, personal identification

11   number.  That's what I believe this document is.

12   This is a document to be able to get a PIN to be

13   able to call up so that you don't have to talk

14   to an operator and you can make exchanges in

15   your account, which we did for a while until New

16   York Life came out with the Internet where you

17   could get onto their site and make exchanges

18   directly on the site.

19      Q.    When did they come out with the

20   Internet access that you started to use?

21      A.    I don't know.  I can guess.

22      Q.    Well, just roughly.

23      A.    2000 maybe.

24      Q.    So in March of 1999, did you have any

BARRY J. LINTON
10-13-05

Page 107

1    whether or not the prospectus formed part of the

2    contract?

3         A.    I do not.

4         Q.    Do you recall having any discussion

5    with Mr. Redfearn specifically about whether the

6    prospectus was included in the materials

7    described here as consisting of the entire

8    contract?

9         A.    I remember Mr. Redfearn stating that

10   the prospectus ruled the contract, that

11   everything that was written in the prospectus

12   governed the insurance contract.  Yes, he said

13   that very clearly many times.  He made it

14   abundantly clear.

15        Q.    He made it abundantly clear that the

16   prospectus governed and applied to the contract?

17        A.    Correct.

18        Q.    Did he tell you that the prospectus

19   was among the materials identified here as

20   constituting the contract?  Did he tell you that

21   the prospectus was the policy?

22        A.    No.

23        Q.    Did he tell you that the prospectus

24   was an attached rider or endorsement to the