EXHIBIT 2

Case 1:04-cv-11362-RWZ    Document 28-3    Filed 02/13/2006    Page 1 of 17

VOLUME: I

PAGES: 1 to 140

EXHIBITS: 1 to 17

ORIGINAL

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11362-RWZ

BARRY LINTON,  )
    Plaintiff,  )
  )
v.  )
  )
NEW YORK LIFE INSURANCE and  )
ANNUITY CORPORATION,  )
    Defendant.  )
  )

DEPOSITION OF PAUL E. REDFEARN, called as a witness on behalf of the Plaintiff, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Jeanette N. Maracas, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Looney & Grossman, LLP, 101 Arch Street, Boston, Massachusetts, on Friday, October 7, 2005, commencing at 8:55 a.m.

1    tax-free basis and the ability to take it
2    out, income tax-free as well.
3 Q. Before you sold the policy, did you
4    understand that Mr. Linton intended to
5    actively be involved in the investment
6    strategies?
7 A. I understood that. Whether he told me that,
8    I just understood him to be actively managing
9    it.
10 Q. Did you understand that he would be doing,
11    with respect to the sub-accounts in the
12    variable life policy, something substantially
13    similar to what he was doing in his business?
14 A. I presumed he would be acting in a similar
15    manner in this program. It was not ever
16    made clear how he would manage these things
17    or the frequency of trades, or any of that
18    stuff wasn't really spelled out. I just
19    presumed based on how they indicated to me
20    they do trade, it would be a similar action
21    in this program.
22 Q. And you had that presumption before you
23    actually sold the policy?
24 A. Yeah, I guess that would be correct, yes.

Page 50

1  that they were pretty much very pleased with,
2  and then all of a sudden, they reported to
3  me that it had become diluted.  I don't know
4  quite what that meant, but it was no longer
5  quite an attractive investment for them.  So
6  I think their focus on that investment or at
7  least away from that particular fund shifted.
8  Q. Did they ever express -- did Mr. Linton ever
9     express any concern with respect to the
10    possible variable universal life products
11    being considered with respect to how trades
12    could be made?
13 A. I can't recall the timing on this, but I
14    know that both Barry and JoAnn, there was a
15    concern about being limited on the number
16    of trades you can make.  There was an
17    acknowledgment that yes, they may chart
18    some transactional fee that I recall being
19    inconsequential to them.  But the main
20    concern is they needed the ability to make
21    trades as frequently as they wished and
22    not be limited to 12 trades a year or
23    something.
24 Q. Did they discuss with you at any point prior

1  to the purchase of the New York Life policy
2  how trades could be implemented under any of
3  these possible products?
4  A. As in how they would orchestrate trades?
5  Q. Yes.
6  MR. JONES: This is prior to the
7  placement of the trade, the policy?
8  A. So your question again is?
9  Q. Did Mr. Linton discuss with you at any point
10 prior to the purchase of the New York Life
11 policy his concern with respect to how trades
12 could be made?
13 A. I don't recall a specific conversation on
14 that issue, but I know that we would have
15 discussed in the process of understanding
16 the contract and applying for the contract
17 and so forth, it would have been clear that
18 telephone trades were possible.
19 Q. Did Mr. Linton tell you about his interest
20 in being able to make telephone trades?
21 A. I don't recall. I think the real focus, as
22 I recall, was, again, the number of trades,
23 being limited in the number of trades.
24 Q. Did you ever have any discussion with him

Page 52

1    concerning the subject of how imperative it
2    was that his instructions be implemented
3    quickly?
4  A. His instructions in terms of trading
5     instructions?
6  Q. Correct.
7  A. No, I don't recall a specific conversation
8     on that with regard to variable universal
9     life. I think it's kind of understood by
10    how they conducted business on behalf of
11    their clients that they have to move
12    quickly.
13 Q. And you knew as of your initial meeting with
14    him that moving quickly was at the end of
15    the day just before the end of the trading
16    session; is that correct?
17 A. Correct.
18 Q. I'm going to show you what we've marked as
19    Exhibit 6 and ask you whether you could
20    identify that, please.
21 A. Yes. This is correspondence between myself
22    and my boss at the time, George R. Gordon,
23    who is no longer in that capacity.
24 Q. What was your purpose in sending this letter

1   A.   You did.
2   Q.   That was consistent with your understanding
3        at or about this time?
4   A.   Yes.
5   Q.   And it reads, "our toll-free number is
6        available 24 hours a day, seven days a week."
7        Do you see that?
8   A.   I do.
9   Q.   That was consistent with your understanding
10       at or about that time?
11  A.   Yes.
12  Q.   All right.  Now, what happened to Policy
13       No. 63-608-179?
14                MR. JONES:  If you know.
15  A.   I don't know.  I saw two applications in
16       the file, one dated March, a subsequent one
17       dated June 11th.  The March application,
18       there was no money submitted with the
19       application.  The June 11th, $100,000 was
20       submitted with the application.  So I'm not
21       clear as to whether -- clearly both policies
22       weren't taken, and I believe it's the
23       subsequent policy with the application date
24       of June 11th, policy date of June 22nd is

1   the one that's in effect today.  So something
2   happened, whether we, you know, turned the
3   policy back in as not taken or whether we
4   ten-day-free looked it or 20-day-free looked
5   it, I'm not certain.
6  Q.  Well, is there anything in the ACT report,
7   Exhibit 2, that can help you explain that?
8  A.  No, not that I see.  Nothing sheds light on
9   that.  I'm moving up to June of '00, of 2000.
10 Q.  The fact that a policy that has been
11  numbered --
12 A.  With a policy number.
13 Q.  -- with a policy number, and subsequently
14  changed to a new policy number, is that the
15  kind of entry that you would include in the
16  ACT report?
17 A.  There's no reason why I wouldn't, no reason
18  why I would.  I mean, there are oftentimes
19  I'll have conversations and they don't get
20  documented, not in the ACT system, okay?
21  It would not surprise me to see it in there.
22  It would not surprise me to not see it in
23  there, okay?
24       I don't have a specific recollection

1       and JoAnn, it was an issue that they wanted
2       a company that didn't limit them to the
3       number of trades they could make. That
4       seemed to be their main concern, as I recall,
5       at the time.
6  Q.   Did you have discussions with Mr. Linton
7       about the means by which trading could be
8       effected?
9  A.   I don't remember a specific conversation
10      on that issue. Chances are I would have
11      mentioned you can use this phone service,
12      the 800 number, to contact to make those
13      trades.
14 Q.   Do you remember discussions concerning
15      Internet access to effect trades?
16 A.   Yeah, I don't.
17 Q.   You don't remember that?
18 A.   I don't remember that.
19           (Exhibit 9 marked for
20      identification.)
21 Q.   Mr. Redfearn, I'm going to show you a
22      document that bears the Bates stamp numbers
23      PR 0471 through 478. Is that accurate?
24 A.   I don't see the 471 on this. Oh, there it

1     three?

2  A.  These are like directions to my wife, who was
3     working in my office at the time, to make a
4     list of the companies with gold fund, with
5     the particular gold fund I presume that
6     Barry and JoAnn were looking for, get their
7     toll-free number and contact name and again
8     inquiring as to trade limits, Internet
9     access.  Oh, well, there it's 100,000 per
10     year premium, so maybe we're trying to get
11     illustrations from them.  I don't recall
12     seeing any, but that's what I have to believe
13     that means.

14  Q.  Having looked at this, does this refresh your
15     recollection as to whether this portion of
16     Exhibit 9 was prepared prior to June of 1999
17     or after June of 1999?

18  A.  I can't tell.  I don't know.

19  Q.  Why did you write the words "trade limits"?

20  A.  I believe that's because they were concerned
21     about not having limits on the number of
22     trades they can make per year.

23  Q.  Why did you write the words "want option to
24     trade"?

1  A.  I'm sorry.  The question again?  Do I see
2      anything?
3  Q.  In 511 or 512 that relate to reservations
4      to limit transfers in or between the
5      investment divisions.
6  A.  Again, in the first sentence, they don't
7      reference any limitations on that, but in the
8      second sentence, they appear to reserve that
9      right to put limitations on transfers.
10 Q.  That's transfers to what?
11 A.  To and from -- between the investment
12     divisions, to and from the separate account,
13     fixed account, separate accounts being the
14     mutual funds-structured investments.
15 Q.  That reservation is with respect to the
16     fixed account, is it not?
17 A.  True.  We reserve the right to limit the
18     number of transfers to the fixed account
19     after the first two policy years, yeah, in
20     511.
21 Q.  Do you see any restriction, similar
22     restriction with respect to transfers among
23     the investment divisions?
24 A.  Not in 511, no.

1   Q.   How about 512?
2   A.   No.
3   Q.   Turn to the next page to Paragraph 5.14.
4   A.   (Witness examines document) Mm-hmm.
5   Q.   Do you see that there is no limit to the
6        number of transfers that can be made?  Do you
7        see those words?
8   A.   I see those words.
9   Q.   To what does that relate?
10  A.   That a client is not limited by the number
11       of trades they can make per period or per
12       year from one account to another.
13  Q.   Is that within the investment division?
14  A.   Yes.
15  Q.   Is there a reservation of rights with respect
16       to the ability to apply a charge?
17  A.   There is a reservation of rights, yes.
18  Q.   Do you see any other reservation of rights?
19  A.   No, not in Section 5.14.
20  Q.   When was the last time you looked at what's
21       been marked as Exhibit 15 before today?
22  A.   At the time the policy was delivered.
23  Q.   Are you aware of any provision in the policy,
24       Exhibit 15, that would permit New York Life

1     to prevent Mr. Linton from making telephone
2     calls with instructions to make trades within
3     the investment division?
4  A. Can I have you ask the question again?  Am
5     I aware of?
6            MR. GRAHN:  If you could read that
7     back, please?
8            (Question read)
9            MR. JONES:  Objection.  You can
10    answer.
11 A. Not in the policy contract itself.
12 Q. Now, are you aware of any provisions in the
13    prospectus that we marked as Exhibit 3 that
14    would authorize New York Life to prohibit
15    Mr. Linton from using the telephone to
16    provide instructions to trade funds within
17    the investment divisions?
18 A. I've not reviewed it from beginning to end
19    and I'm not aware of any limitations on
20    transfers.
21 Q. And you knew as of June of 1999 that Mr.
22    Linton intended to make the use of the
23    telephone to make investment transfers
24    within the investment division?

1  A.  I understood that he wanted to -- again, the
2      nature of his business, he needed to trade
3      quickly, whether that was the telephone or
4      Internet.  I assumed he would be using either
5      method.
6  Q.  Are you aware of any federal statute, state
7      statute, federal or state regulation or SEC
8      regulation or any other directive that
9      precludes market timing --
10         MR. JONES:  Objection.
11 Q.  -- as you identified that term earlier in
12     your deposition?
13         MR. JONES:  Objection.
14 A.  Can I have you repeat the question?
15 Q.  Yes.  Let me state it more simply.  Are
16     you aware of any statute or regulation that
17     makes unlawful market timing, as you
18     understand that term and as you identified
19     it earlier in the deposition?
20         MR. JONES:  Objection.  You can
21     answer.
22 A.  All right.  I am not knowledgeable enough
23     on that to really say what -- I don't know
24     if there are laws in the books specific to

1   A.   Limitation on trades, no.
2   Q.   Had any of your other clients received a
3        similar notice?
4   A.   No, they have not, only because they don't
5        trade like Barry Linton and Company trades.
6        Everybody else is kind of a buy-and-hold
7        mentality so average trades might be one
8        or two a year, not one or two a week.
9   Q.   But you knew how Mr. Linton traded and
10       intended to trade prior to selling him the
11       policy, correct?
12  A.   Correct.
13  Q.   And you looked at a number of alternative
14       policies, did you not?
15  A.   Yes.
16  Q.   And it was your belief at the time of the
17       sale of the purchase that the New York Life
18       variable universal life policy was one that
19       matched Mr. Linton's desires, correct?
20  A.   Correct.
21  Q.   Do you remember in that conversation with
22       Mr. Linton what he said about being
23       restricted in trading?
24  A.   When he was first notified of the

1   A.   "I made abundantly clear that the then
2        current policy prospectus governed all
3        aspects of the policy, including the rights
4        of your policyowner as well as those of New
5        York Life Insurance and Annuity Corporation."
6   Q.   What did you mean by the use of the term "the
7        then current policy prospectus"?
8   A.   I think I was of the belief that when a
9        policy was issued on a variable basis, VUL
10       or variable annuity, the prospectus that was
11       in effect at that time presides, not a
12       subsequent prospectus, but that prospectus.
13       I have since found that to be incorrect,
14       that New York Life has informed me over the
15       years that there's going to be subsequent
16       prospectuses and those apply to the contract
17       as well.
18  Q.   But you told Mr. Linton before the policy
19       was purchased that the then current
20       prospectus governed all aspects of the
21       policy; did you not?
22  A.   I'm not sure if I made that -- I'm not sure
23       if I made that statement before the policy
24       being issued or after.  I can't -- let me

1     see. The preceding sentence indicates
2     "throughout all of our conversations, it was
3     clear to me that the Lintons' intentions from
4     the outset was to initiate a program that
5     would maximize their potential tax shelter
6     build-up over time, coupled with potential
7     tax-favorable distributions from the policy
8     in the future." So from this, yeah, looks
9     like I indicated that the prospectus, the
10     1998 or 1999 prospectus would apply.
11 Q. And how was it that you made it abundantly
12     clear?
13 A. No. 1, by delivering the prospectus to him.
14     No. 2, by fielding questions they had that
15     were specific to the prospectus itself. I
16     don't recall fielding any questions from
17     them with regard to the actual contract,
18     the policy document, I don't recall, and
19     that's how -- that's all I did to make it
20     abundantly clear, so to speak.
21 Q. Is it not fair to say that you made it
22     abundantly clear by telling Mr. Linton, as
23     you say in this letter, Exhibit 16, that the
24     then current policy prospectus governed all