UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARRY LINTON,<br><br>    Plaintiff<br><br>v.<br><br>NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION,<br><br>    Defendant. | C.A. No. 04-11362-RWZ |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Richard J. Grahn (BBO#206620)
P. Andy Henderson, Jr. (BBO#655891)
Looney & Grossman, LLP
101 Arch Street
Boston, MA  02110
(617) 951-2800

*Attorneys for Plaintiff*

Dated:  February 13, 2006

# TABLE OF CONTENTS

**PAGE(S)**

TABLE OF CONTENTS .................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................ii

I. INTRODUCTION .......................................................................................................1

II. STATEMENT OF UNDISPUTED FACTS...............................................................2

III. STANDARD FOR SUMMAR JUDGMENT........................................................... 9

ARGUMENT

THERE ARE NO GENUINE ISSUES OF MATERIAL FACT CONCERNING PLAINTIFF'S CLAIMS AND THE PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO LIABILITY AS A MATTER OF LAW…10

    A. THERE ARE NO GENUINE ISSUES OF MATERIAL FACT CONCERNING PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT..............................................................................................10

    B. THERE ARE NO GENUINE ISSUES OF MATERIAL FACT IN DISPUTE REGARDING PLAINTIFF'S CLAIM FOR MISREPRESENTATION ..................................................................16

    C. THERE ARE NO GENUINE ISSUES OF MATERIAL FACT IN DISPUTE CONCERNING PLAINTIFF'S CLAIM FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING ........................................................................................18

CONCLUSION ..............................................................................................................19

# TABLE OF AUTHORITIES

## FEDERAL CASES

|  | PAGE(S) |
|---|---|
| Celotex Corp. v. Catrett<br>477 U.S. 317 (1986) | 10 |
| Coll v. PB Diagnostic Systems, Inc.<br>50 F.3d 1115 (1st Cir. 1995) | 10,11,13 |
| Euromotion v. BMW of N. Am.<br>136 F.3d 866 (1st Cir. 1998) | 10 |
| Goldman v. First Nat'l Bank of Boston<br>985 F.2d 1113 (1st Cir. 1993) | 10 |
| Michelson v. Digital Financial Services<br>167 F. 3d 715 (1st Cir. 1999) | 10,11,13 |
| Rodowicz v. Mass. Mut. Life Ins. Co.<br>279 F.3d 36 (1st Cir. 2002) | 16,17 |

## STATE CASES

| | |
|---|---|
| Am. Nat'l Bank & Trust Co., v. Allmerica Fin. Life Ins. & Annuity Co.<br>304 F. Supp. 2d 1009 (N.D. Ill. 2003) | 15 |
| Am. Nat'l Bank & Trust Co. v. AXA Client Solutions, LLC<br>2001 U.S. Dist. LEXIS 8893 (N.D. Ill., 2001) | 16 |
| Am. Home Assur. Co. v. Merck & Co.<br>2005 U.S. Dist. LEXIS 7951 (D.N.Y. 2005) | 14 |
| Anthony's Pier Four v. HBC Assoc.<br>411 Mass. 451, 583 N.E. 2d 806 (1991) | 18 |

Bolen v. Paragon Plastics Inc.
    747 F. Supp. 103 (D. Mass. 1990)                                              14

Camp Dresser & McKee, Inc. v. Home Ins. Co.
    30 Mass.App.Ct. 318, 568 N.E.2d 631 (1991)                                    14

Cody v. Connecticut General Life Ins. Co.
    387 Mass. 142, 439 N.E.2d 234 (1982)                                          13

Druker v. Roland Wm. Jutras Associates, Inc.
    370 Mass. 383, 348 N.E. 2d 763 (1976)                                         18

Halstead Indus. v. Home Ins. Co.
    1998 Mass. Super. LEXIS 735, 7-8 (Mass. Super. Ct. 1998.)                     14

Hazen Paper Co. v. U.S. Fidelity and Guar. Co.
    407 Mass. 689, 555 N.E.2d 576 (1990)                                          14

LiDonni, Inc. v. Hart
    355 Mass 580, 246 N.E.2d 446, 449 (1969)                                      14

Maynard v. Fabyan
    267 Mass. 312, 166 N.E. 629, 630 (1929)                                       14

McAdams v. Mass. Mut. Life Ins. Co.
    2000 U.S. Dist. LEXIS 22068 (D. Mass., 2000)                                  18

Popponesset Beach Association v. Marchillo
    39 Mass. App. Ct. 586, 658 N.E.2d 983, 987 (1996)                             14

Prusky v. Aetna Life Ins. & Annuity Co.
    2004 U.S. Dist. LEXIS 21597 (D. Pa. 2004)                                     11,12,15

Salamon v. Terra
    394 Mass. 857, 477 N.E.2d 1029, 1031 (1985)                                   14

Save-Mor Supermarkets, Inc. v. Skelly Detective Service, Inc.
    359 Mass. 221, 268 N.E.2d 666 (1971)                                          14

Therrien v. Leblanc
    282 Mass. 328, 185 N.E. 15, 16 (1933)                                         14

Tufankjian v. Rockland Trust Co.
    57 Mass. App. Ct. 173, 782 N.E. 2d 1 (2003)                                   18

| | |
|---|---|
| Vappi & Co, Inc. v. Aetna Casualty & Surety Co.<br>348 Mass. 427, 204 N.E.2d 273 (1965) | 14 |

## COURT RULES AND TREATISES

| | |
|---|---|
| Fed. R. Civ. P. 56(c) | 9 |
| Restatement (Second) of Contracts, § 19 (1981) | 14 |
| Restatement (Second) of Contracts § 202 (1981) | 14 |
| Restatement (Second) of Contracts § 205 (1981) | 18 |

## I.   INTRODUCTION

This case arises out of the marketing and sale of a New York Life variable annuity life insurance policy ("Policy") to the Plaintiff. In purchasing the Policy, the Plaintiff relied upon the representations of the New York Life's authorized agent that the Policy was suitable and appropriate for his particularized requirements, and that New York Life intended to maintain the material provisions of the Policy throughout its term. The features of most importance to the Plaintiff were that he retained the right to make an unlimited number of transfers in his accounts, that there were no restrictions in the manner by which transfer instructions could be communicated, including telephonic instructions, and that these rights could not be restricted in the future. Giving realization to the expectations of the parties, for four years following the purchase of the Policy, the Plaintiff utilized those critical investment allocation features that had been described by the Agent, and which were incorporated into the terms of the Policy.

In 2003, however, New York Life, unilaterally, and over the objection of the Plaintiff, terminated the right of the Plaintiff to use the Policy's investment allocation features in the manner he required. Despite numerous attempts by the Plaintiff to have the Defendant restore the Plaintiff's rights, New York Life refused, and the Plaintiff sustained significant damages.

This action has been commenced to restore those material features of the Policy, and to compensate the Plaintiff for the losses sustained. The undisputed material facts disclose that New York Life's agent solicited business from the Plaintiff; acknowledged the receipt from the Plaintiff of the specific requirements an acceptable policy would have to provide; investigated the various alternative available policies; identified the New York Life policy as one that met all the Plaintiff's requirements, and represented that it was New York Life's intent not to change the material features during the term of the Policy. Those facts also disclose that the Plaintiff relied

on those representations in purchasing the Policy, and in investing and transferring his assets over a four-year period, before New York Life wrongfully restricted the Plaintiff's ability to make investment transfers, causing him damage.[1] These undisputed facts demonstrate that the Defendant has breached it's contract with the Plaintiff, tortiously misrepresented the facts regarding the Policy and New York Life's intent, and breached the covenant of good faith and fair dealing.

Because there are no genuine issues of material fact as to any of Plaintiff's claims in this action, entry of partial summary judgment in favor of the Plaintiff as to the issue of liability is appropriate as a matter of law.

## II.   STATEMENT OF UNDISPUTED FACTS

1. Mr. Linton is an individual who had developed and implemented a unique and successful investment strategy over the past 20 years. *See Barry Linton Affidavit (hereinafter "Exhibit A, Linton Aff.,") at ¶ 3.*

2. At all times relevant to this action, Mr. Linton was married to JoAnn Leptke. *Affidavit of P. Andy Henderson Jr. (hereinafter Henderson Aff., Exhibit 1), Deposition of Barry Linton (hereinafter "Linton Dep.") at p. 8, 61.*

3. Mr. Linton had developed an investment strategy whereby computerized models of historical economic performance were analyzed and "buy" or "sell" signals were generated based on the confluence of specific market indicators. *See Exhibit 1, Linton Dep., pp. 37, 42-45; Exhibit A, Linton Aff., at ¶ 3.*

---

[1] The Plaintiff recognizes that genuine issue of material fact exist with respect to the quantification of the Plaintiff's damages. In addition to seeking monetary damages, the Plaintiff seeks a judgment compelling specific performance, which the Plaintiff believes this count may enter should it allow the Plaintiff's Motion for Partial Summary Judgment.

4.  Successful implementation of his investment strategy required timely end of the business day trades to take advantage of future market activity predicted by the models. *See Henderson Aff. Exhibit 2, Deposition of Paul Redfearn (hereinafter "Redfearn Dep.") at p.52; Exhibit 1, Linton Dep., at p.52-53.*

5.  Due to the nature of Mr. Linton's strategy, transfers could not be effectuated by mail, but had to be communicated quickly either by the telephone or through the internet. *See Exhibit 1, Linton Dep, at p. 53.*

6.  In the early 1990's, Mr. Linton was contacted by Mr. Paul Redfearn, an independent agent of New York Life, who solicited Mr. Linton to purchase a life insurance policy. *See Exhibit 1, Linton Dep. at p. 55; See Henderson Aff., Exhibit 3, Plaintiff's First Set of Interrogatories, Response number 4; Exhibit A, Linton Aff., at ¶ 5.*

7.  Mr. Linton told Mr. Redfearn that he did not need additional life insurance but was interested the investment opportunity they provided, as well as the opportunity to employ his investment strategy. *See Exhibit 1, Linton Dep., pp. 58-59; Exhibit A, Linton Aff., at ¶ 7.*

8.  While researching various options, Mr. Linton and Mr. Redfearn examined numerous variable universal life products to find one that matched Mr. Linton's requirements. *See Exhibit 2, Redfearn Dep., at p. 116; Exhibit A, Linton Aff., at ¶ 10.*

9.  In evaluating these life insurance products, Mr. Linton explained his investment strategy to Mr. Redfearn and informed him of his two primary concerns - the requirement that he be entitled to unlimited transfers within his accounts and that his trading instructions be acted upon in a timely fashion upon telephonic notice. *See Exhibit 2, Redfearn Dep., pgs. 50-51, 83, 86, 111-112; Exhibit 1, Linton Dep., pgs. 53, 62-64; See*

*Henderson Aff., Exhibit 4, Deposition of JoAnn Lepke (hereinafter "Leptke Dep.") at p. 34; Exhibit A, Linton Aff., at ¶ 8.*

10.   With the understanding of Mr. Linton's strategy, Mr. Redfearn suggested that the New York Life Variable Universal Life policy ("Policy") was the right match for Mr. Linton's investment needs. *See Exhibit 2, Redfearn Dep., at p. 116; Exhibit A, Linton Aff., at ¶ 11.*

11.   The Policy has two main components to it, life insurance where a death benefit is paid out upon the death of the insured and an investment vehicle that is based upon the investment performance of the New York Life eparate accounts, known as Investment Divisions. *See Henderson Aff., Exhibit 5 New York Life Policy, at p. 2.*

12.   Knowing that Mr. Linton intended to implement his investment strategy with the Policy, Mr. Redfearn confirmed that there were no restrictions on trading, both in the number of trades and the amount, and Mr. Redfearn further assured Mr. Linton that telephonic trading was authorized under the Policy. *See Exhibit 1, Linton Dep., p. 69, 70; Exhibit 2, Redfearn Dep., at pg. 48, 51, 83, 111-112; Exhibit A, Linton Aff., at ¶ 13.*

13.   As further assurance, Mr. Redfearn referred Mr. Linton to the 1999 Prospectus, which identified the specific procedures New York Life required in order to effectuate trades.

Transfer requests must be in writing on a form approved by NYLIAC or by telephone in accordance with established procedures.

*See Henderson Aff., Exhibit 6, the 1999 Prospectus at p. 43; Exhibit A, Linton Aff., at ¶ 13.*

14.   The "established procedures" were identified to Mr. Linton as those also found within the 1999 Prospectus;

**Procedures for Telephone Transfers**

You may effect telephone transfers in two ways. You may directly contact a service representative at (800) 598-2019. You may also request access to an electronic service known as a Voice Response Unit (VRU). The VRU will permit the unassisted transfer of monies among the Investment Divisions and/or the Fixed Account and change of allocation of future payments. If you intend to conduct telephone transfers through the VRU, you must complete a Telephone Authorization Form. We reserve the right to temporarily discontinue the availability of the VRU.

We will undertake reasonable procedures to confirm that instructions communicated by telephone are genuine. Before a service representative accepts any requests, callers will be asked for their social security number and address. All calls will also be recorded. A Personal Identification Number (PIN) will be assigned to all policyowners who request VRU access. The PIN is selected by and known only to the policyowner. Proper entry of the PIN is required before any transactions will be allowed through the VRU. Furthermore, we will confirm all transactions performed over the VRU and all transactions effected with a service representative, in writing. NYLIAC is not liable for any loss, cost or expense for action on telephone instructions, which are believed to be genuine in accordance with these procedures. Telephone transfer requests must be received no later than 4:00 p.m. Eastern Time to assure same-day processing. Requests received after 4:00 p.m. will be processed at the end of the next Business Day.

*See Exhibit 6, 1999 Prospectus at p. 43.*

15. The established procedures in the 1999 Prospectus were also consistent with the Policy language in Section 5.12, which states; **5.12 How Do You Make Transfers Between Investment Divisions and to the Fixed Account?** "If you want to make a transfer, you must tell us in a notice you sign which gives us the facts that we need." *See Henderson Aff., Exhibit 7, Deposition of John Hess at p. 57; See Exhibit 5, at ¶ 5.12*

16. Mr. Linton had some additional questions about some of the language in the 1999 Prospectus that might affect his ability to implement his strategy. *See Henderson Aff. Exhibit 8, Letter from Barry Linton to New York Life, dated June 11, 1999; Exhibit A, Linton Aff., at ¶ 14.*

17. New York Life addressed each of these issues with Mr. Linton to his satisfaction concluding that New York Life did not retain the ability to change the material terms of the Policy without his consent. *See Exhibit A, Linton Aff, at ¶ 15; Exhibit 5, at ¶ 9.1.*

18. Mr. Redfearn informed Mr. Linton, on numerous occasions, that the 1999 Prospectus was the one that applied to his Policy *See Exhibit 2, Redfearn Dep., at pg. 131-132; Exhibit 1, Linton Dep. p. 69, 70, 107; Exhibit 4, Lepke Dep. at pg. 44-45; Exhibit A, Linton Aff., at ¶ 13; See Henderson Aff, Exhibit 16, Letter from Paul Redfearn to New York Life, dated October 17, 2003.*

19. In April 1999, having been advised by Mr. Redfearn as to the precise meaning of the terms used in the Prospectus and the Policy with reference the right to make unlimited telephonic transfers; having received written confirmation of these rights, and verifying that neither the Policy, nor the Prospectus, provided New York Life with the right to amend these material terms, Mr. Linton agreed to purchase the Policy and paid New York Life substantial fees associated therewith. *See Exhibit 2, Redfearn Dep., pg. 57-58; See Affidavit of Andy Henderson (hereinafter Henderson Aff, Exhibit 9) Letter from New York Life to Barry Linton, dated April 20, 1999; Exhibit A, Linton Aff., at ¶ 13-15;*

20. In 1999, Paul Redfearn was authorized to make representations to purchasers of NYL insurance products consistent with the representations of the 1999 Prospectus. *See Henderson Aff, Exhibit 10, Plaintiff's First Request for Admissions, Response number 5.*

21. The Policy provides that policyholders like Mr. Linton are entitled to unlimited trades among the assets assigned to "Investment Divisions" and held in the various mutual funds made available to policyholders by New York Life. Specifically, the Policy provides:

"There is no limit to the number of transfers that can be made. We reserve the right to apply a charge not to exceed $30, for each transfer after the first twelve in a given year."

*See Exhibit 5 at ¶5.14.*

22. The Policy authorizes Mr. Linton unlimited right to revise his asset allocations among the mutual funds by transferring assets among the Investment Divisions. *See Exhibit 5 at ¶5.11.*

23. Mr. Linton provided the required notice to New York Life as required by the Policy and as of the date of the Policy, was able to make transfers between Investments Divisions by telephone, by either talking to a New York Life representative, or by making use of the voice recognition system, or later, by use of the virtual service center, via the internet. *See Exhibit 7, Hess Dep., at pgs. 36-37, 41, 49, 56-57; Exhibit 10, Response number 11; Exhibit A, Linton Aff., at ¶ 16, 17.*

24. Sometime in or around 2000, New York Life allowed immediate transfer instructions under the Policy to be communicated by the internet. *See Exhibit 1, Linton Dep., at p. 88.*

25. Upon the mailing of a 2000 prospectus for the New York Life product Mr. Redfearn informed Mr. Linton to throw the prospectus away because it did not apply to his policy. *See Exhibit 4, Lepke Dep. At pgs. 45-46.*

26. Redfearn reported to the Plaintiff, that future prospectuses could not affect the material terms of the Policy. *See Exhibit 2, Redfearn Dep., p. 131-133.*

27. From June 1999 to July 9, 2003, a period of approximately four years, Mr. Linton and New York Life enjoyed a mutually rewarding contractual relationship and engaged in a course of performance with respect to telephonic trading identical to that identified within the Policy and 1999 Prospectus and confirmed by Mr. Redfearn, whereby Mr.

Linton made all of his transfers between Investments Divisions by telephone or the Internet, except as to Mr. Linton's initial premium allocation. *See Exhibit 10, Response number 19; Exhibit A, Linton Aff., at ¶ 16, 17; Exhibit 5, at 5.12; Exhibit 6, 1999 Prospectus, at p. 43.*

28. New York Life accepted and processed all Mr. Linton's telephone and internet transfer requests for the next four plus years. Moreover, from 1999 through June 8, 2003, New York Life never objected to Mr. Linton's transfer activity. *Exhibit A, Linton Aff., at ¶ 18; Exhibit 3, Plaintiff's First Set of Interrogatories at Response number 14.*

29. In 2003, New York Life advised Mr. Linton of the issuance of its annual prospectus, dated May 1, 2003 (the "2003 Prospectus") *See Henderson Aff., Exhibit 11, New York Life letter to Barry Linton, dated June 13, 2003.*

30. The 2003 Prospectus purportedly reserved to New York Life the right prospectively to limit transfers "to or from some or all of the Investment Divisions." *Id.; See Henderson Aff., Exhibit 12, 2003 Prospectus at p. 36.*

31. Included within these reserved rights was that of requiring "that all subsequent transfer requests . . . be made through U.S. mail or an overnight courier. *Id.*

32. Mr. Linton responded by sending a letter to New York Life informing it that it did not have the right to impose transfer limitations on him. *See Henderson Aff, Exhibit 13, letter from Barry Linton to New York Life, dated June 19, 2003.*

33. There is no provision in the Policy that provides New York Life with the ability to modify the material terms of the Policy, without first obtaining the Plaintiff's prior consent. *See Exhibit 10, Response number 15; Exhibit 7, Hess Dep., P. 37-38.*

34. Asserting its rights under the 2003 Prospectus, but not referencing any right to limit the number of transfers or to modify the telephonic trading procedures under the Policy, in July 2003, New York Life prohibited Mr. Linton's from making transfers of assets within the Investment Divisions by telephonic instruction. *See Henderson Aff., Exhibit 14, Letter from New York Life to Barry Linton, dated July 9, 2003; Exhibit A, Linton Aff., at ¶ 21.*

35. New York Life never received Mr. Linton's prior consent before limiting his ability to transfer between Investments Division by telephone. *See Exhibit 10, Response number 16.*

36. Having been denied the ability to implement his investment strategy, from 2003 to date, Mr. Linton's investment performance was 2.7%. *Exhibit A, Linton Aff., at ¶ 22.*

37. Applying the "Buy" and "Sell" signals generated by the computer models to the actual market data during this period, Mr. Linton would have increased the value of the portfolio by $ 942,227 or approximately 179%. *Exhibit A, Linton Aff., at ¶ 23.*

38. Had Mr. Linton known that New York Life intended to retain the right to restrict his trading authorization in the manner it did, he would not have purchased the Policy. *Exhibit A, Linton Aff., at ¶ 24.*

III. **STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate when the moving party proves that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* This means that if, "after adequate time for discovery," the nonmoving party has failed to produce evidence to support an essential element of that party's case, then summary judgment is mandated. *Euromotion v. BMW of N. Am.,* 136 F.3d 866, 869

(1st Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The nonmoving party has the burden of establishing "the existence of a trial-worthy issue by presenting 'enough competent evidence to enable a finding favorable to the nonmoving party.'" *Id.* (citing *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993).

IV.  **ARGUMENT**

    **THERE ARE NO GENUINE ISSUES OF MATERIAL FACT CONCERNING THE PLAINTIFF'S CLAIMS, AND THE PLAINTIFF IS ENTITLED TO PARTIAL JUDGMENT AS TO LIABILITY AS A MATTER OF LAW.**

    A.   **THERE ARE NO GENUINE ISSUES OF MATERIAL FACT CONCERNING PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT.**

        i.   **EXPRESS CONTRACT.**

In order to succeed on a claim for breach of contract, the plaintiff must prove the existence of a valid binding agreement, the defendant's breach thereof, and damages resulting from the breach. *Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995); *Michelson v. Digital Financial Services*, 167 F.3d 715, 720 (1st Cir. 1999). In the present action, it is undisputed that Mr. Linton and New York Life entered into a written contract in 1999. *Exhibit 2, Redfearn Dep., p. 57-58.* In addition, it is also undisputed that on April 20, 1999, Mr. Linton was assured he could make an unlimited number of transfers between Investment Divisions without restriction as the means of communication, including by telephone. *Exhibit 9; Henderson Aff., Exhibit 10, Plaintiff's First Request for Admissions, Response number 11; Exhibit A, Linton Aff., at 16.* Moreover, Mr. Linton continued to communicate his transfer instructions by telephone and as the parties intended, for a period of four years, up to July 9, 2003. *Exhibit 10, Plaintiff's First Request for Admissions, Response number 19; Exhibit A, Linton Aff at 17, 18.*