UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

BARRY LINTON,                                    :
                                                 :
        Plaintiff                                :
                                                 :
v.                                               :   C.A. No. 04-11362-RWZ
                                                 :
NEW YORK LIFE INSURANCE AND ANNUITY              :
CORPORATION,                                     :
                                                 :
        Defendant.                               :

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

John D. Donovan, Jr. (BBO # 130950)
john.donovan@ropesgray.com
Robert G. Jones (BBO #630767)
robert.jones@ropesgray.com
Levina Wong (BBO #654510)
levina.wong@ropesgray.com
ROPES & GRAY LLP
One International Place
Boston, MA 02110
(617) 951-7000

*Attorneys for New York Life Insurance
 and Annuity Corporation*

Dated:  February 13, 2006

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ..............................................................................................5

ARGUMENT ..................................................................................................................14

    I.    New York Life Is Entitled To Summary Judgment On Mr. Linton's
        Breach Of Contract Claim. ..................................................................................15

        A.  The Right Mr. Linton Seeks To Enforce Appears Nowhere
            In The Contract. ......................................................................................15

        B.  The 1999 Prospectus Is Not Part Of The Contract. ........................................17

            1.  The Policy's Integration Clause Establishes That The 1999 Prospectus
                Does Not Form Part Of The Parties' Contract..........................................18

            2.  The Telephone Authorization Form – Included By Reference
                In The 1999 Prospectus – Informed Mr. Linton That New York
                Life Could Discontinue His Telephone Privileges At Any Time. .............19

        C.  In View Of The Contract's Lack Of Ambiguity, Mr. Linton Cannot
            Resort To Course Of Performance To Add Terms To The Policy. .................20

    II.   New York Life Is Entitled To Summary Judgment On Mr. Linton's
        Good Faith And Fair Dealing Claim.....................................................................21

    III.  Summary Judgment Should Be Granted On Count II (Misrepresentation)
        Of The Complaint ...............................................................................................23

        A.  Mr. Linton Cannot Have Reasonably Relied On
            Mr. Redfearn's Statements.......................................................................24

        B.  Mr. Linton Cannot Prove That He Has Suffered Cognizable Damages. .........29

    IV.  Summary Judgment Should Be Granted On Count VI
        (Unjust Enrichment) Of The Complaint ...............................................................32

CONCLUSION................................................................................................................32

9925571

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Accusoft Corp. v. Palo*, 237 F.3d 31 (1st Cir. 2001)..........................................................21, 22, 23

*Alliance of Automobile Manufacturers v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005)......................14

*American National Bank & Trust Co. of Chicago v. Allmerican Finance Life Insurance*
    *& Annuity Co.*, 304 F. Supp. 2d 1009 (N.D. Ill. 2003) ......................................................17

*Berenson v. National Financial Services*, F. Supp. 2d, 2005 WL 2849616 ................................24

*Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193 (1st Cir. 2001)................................................20

*Boston Edison Co. v. FERC*, 856 F.2d 361 (1st Cir. 1988) ........................................................18

*Burke v. Town of Walpole*, 405 F.3d 66...................................................................................14

*Conward v. Cambridge School Committee*, 171 F.3d 12 (1st Cir. 1999) ......................................14

*Davis v. Dawson,Inc.*, 15 F. Supp. 2d 64 (D. Mass. 1998) ..........................................................28

*Elias Brothers Restaurants Inc. v. Acorn Enterprises, Inc.*,
    831 F. Supp. 920 (D. Mass. 1993) ...................................................................................23

*First Lincoln Holdings, Inc. v. Equitable Life Assurance Society of the U.S.*,
    164 F. Supp. 2d 383 (S.D.N.Y. 2001)................................................................17, 19, 20

*Gill v. Metropolitan Prop. & Casualty Insurance Co.*, 864 F. Supp. 251 (D. Mass. 1994)..........24

*In re Global Crossings Sec. and Erisa Litigation*, 225 F.R.D. 436 (S.D.NY. 2004) ...................31

*ITT Corp. v. LTX Corp.*, 926 F.2d 1258 (1st Cir. 1991)..............................................................18

*Masso v. United Parcel Service of America, Inc.*, 884 F. Supp. 610 (D. Mass. 1995)................24

*Milford Power Ltd. Partnership v. New England Power Co.*,
    918 F. Supp. 471 (D. Mass. 1996) ...................................................................................22

*Mundy v. Lumberman's Mutual Casualty Co.*, 783 F.2d 21 (1st Cir.1986)..................................24

*In re New Era Packaging, Inc.*, 186 B.R. 329 (D. Mass. 1995) ...................................................18

*Nilsen v. Mutual Marine Office, Inc.* 428 F. Supp. 1375 (D. Mass. 1995)....................................21

*Okmyansky v. Herbalife International of America, Inc.*, 415 F.3d 154 (1st Cir. 2005) ...............32

-ii-

*Prusky v. Prudential Insurance Co. of America*, 2001 WL 34355665 (E.D. Pa. 2001) ...............19

*Redstone v. Goldman, Sachs & Co.*, 583 F. Supp. 74, 777 (D. Mass. 1984) ................................30

*Rodriguez v. J.C. Penney Life Insurance Co., et al.*, No. 8:02-CV-695-T-17MAP,
    2006 WL 208775 (M.D. Fla. Jan. 25, 2006) ....................................................................27

*Sparks v. Fidelity National Title Insurance Co.*, 294 F.3d 259 (1st Cir. 2002) ...........................31

*Turner v. Johnson & Johnson*, 809 F.2d 90 (1st Cir. 1986) .........................................................28

*Windsor Securities, Inc. v. Hartford Life Insurance Co.*, 986 F.2d 655 (3d Cir. 1993) ...............17

*Wortley v. Camplin*, 333 F.3d 284 (1st Cir. 2003) .......................................................................31

## STATE CASES

*Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass.
    451, 583 N.E.2d 806, 820 (1991) ....................................................................................21

*Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*,
    438 Mass. 459, 781 N.E.2d 787, 795-96 (2003) .............................................................25

*Poly v. Moylan*, 423 Mass. 141, 667 N.E.2d 250, 256 (1996) .....................................................31

*Powell v. Rasmussen*, 355 Mass. 117, 243 N.E.2d 167, 168-69 (1969) ......................................23

*PDV-El Paso Meriden, LLC v. Alstom Power, Inc.*, No. 996016BLS,
    2004 WL 1588201 (Mass. Super. June 14, 2004) .....................................................29, 30

*Ravosa v. Zais*, 40 Mass. App. Ct. 47, 661 N.E.2d 111, 117 n.12 (1996) ...................................29

*Sarnafil v. Peerless Insurance Co.*, 418 Mass. 295, 636 N.E.2d 247 (1994) ..............................25

*Somerset Savings Bank v. Chicago Title Insurance Co.*,
    420 Mass. 422, 649 N.E.2d 1123, 1127 (1995) ..........................................................16, 21

*Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*,
    441 Mass. 376, 805 N.E.2d 957, 964 (2004) ........................................................21, 22, 23

Defendant New York Life Insurance and Annuity Corporation ("New York Life" or the "Company") respectfully submits this memorandum of law in support of its motion for summary judgment on all remaining counts of the Complaint filed by Plaintiff Barry Linton.[1]

## PRELIMINARY STATEMENT

This case involves a breach of contract action brought by plaintiff Barry Linton, who in 1999, purchased a variable life insurance policy (the "Policy") that allowed him to invest a portion of the cash value of the policy in underlying investment portfolios or funds which, while dedicated specifically to receiving investments under the variable insurance policies, served very much like mutual fund investments (and often were merely clone funds of existing mutual funds and managed by the same fund managers). Mr. Linton concedes that he purchased the Policy in order to execute a "market timing" investment strategy which resulted in rapid – sometimes daily – transfers among the funds available through the Policy. Mr. Linton complains that New York Life breached the Policy when it suspended Mr. Linton's alleged "right" to make transfers *via* the telephone. But the Policy contains no such rights, and Mr. Linton's claims fail as a matter of law.

Market timing frequently involves trading based on movements in specific market indices (and overseas developments which may move those indices) which, the timer believes, accurately predict how overseas markets will perform overnight, while the U.S. market is closed (and mutual fund trading suspended). The net asset value of a mutual fund, particularly ones which hold primarily securities that are traded on overseas markets, can be expected to increase

---

[1]    Plaintiff's Complaint originally set forth seven counts. On March 1, 2005, this Court issued a Memorandum of Decision, first noting that Counts III and IV were not actionable claims because they merely sought remedies, and dismissing Count VII. *Linton v. New York Life Ins. & Annuity Corp.*, No. 01-11362-RWZ, slip op. at 1-2, 4 (D. Mass. Mar. 1, 2005). As to remaining Counts I, II, V, and VI, the Court suggested that a summary judgment motion would be more appropriate.

overnight if the prediction based on market indices is correct.  Thus, for example, a market timer may purchase shares of a mutual fund weighted towards international stocks late in the afternoon on Monday, relying on market signals indicating that the international markets will be up overnight, while the U.S. market is not trading.  The timer may then sell the shares on Tuesday, locking in the overnight, overseas price movements.  While a single overnight gain may be comparatively small, the market timer hopes to make money by making rapid trades, in large amounts, seeking to lock in repeated gains based on daily price movements.  Because the trades are rapid, the cash "invested" by a market timer in the mutual fund rarely stays in the fund for more than a few days; portfolio managers have no time to put the cash to work in underlying investments on behalf of the fund.  Even though the market timer is taking his share of the overnight gains in a fund's net asset value, his cash – because it was never invested on behalf of the fund in underlying securities – did not contribute to the gain.  (Indeed, from a fund accounting standpoint, the money invested by a market timer when he purchases a fund share late on Day 1 and sells the share on Day 2 never becomes available for the portfolio manager to invest.)  The overnight gains repeatedly extracted from the fund by the market timer, therefore, dilute the gains earned by longer term investors in the fund. [2]

---

[2]     The Securities and Exchange Commission has discussed the potentially harmful impacts of market timing and excessive trades in a release relating to now-final Rule 22c-2, promulgated by the Commission under the Investment Company Act of 1940. *See* Mutual Fund Redemption Fees, Investment Company Act Release No. IC-26782, 70 FR 13328 (Mar. 18, 2005), attached as Exhibit CC to the Declaration of Levina Wong Transmitting Documents ("Wong Decl.").  The release cites the dilutive impact of frequent trading on the value of shares held by long-term investors, the disruptive impact such trading may have on management of the underlying fund portfolio, and the increased costs to the funds of such transactions, borne by all shareholders. *Id.* at § I.  Newly promulgated Rule 22c-3 authorizes funds to impose redemption fees on short-term transactions by market timers, and requires funds and financial intermediaries to work together to enforce limitations on excessive trading.  17 C.F.R. § 270.22c-2 (2005).  Mr. Linton seeks here to enforce some non-existent "contractual right" to market time under the Policy, but that claim squarely conflicts with public policy where the SEC has acted specifically to enable funds (and intermediaries, like New York Life) to restrict such activities.

In 2003, based on heightened regulatory scrutiny and changing business practices, New York Life announced a policy aimed at limiting market timing activity, citing concerns that rapid-fire market timing investment strategies were harmful to long-term investors in investment funds like the portfolios that served as Investment Divisions under the Policy.  In a 2003 Prospectus, and a June 13, 2003 letter to policyholders, New York Life advised policyholders that their ability to make rapid trades by telephone or through the internet would be suspended, and that future transfers would need to be made in writing, if they continued to trade excessively.

It did not take long for New York Life to identify rapid transfers by Mr. Linton into and out of an International Fund and Emerging Markets Fund (both heavily weighted with international securities) in excess of $500,000.  In response, New York Life suspended Mr. Linton's Personal Identification Number, or PIN, thereby eliminating his ability to make transfers among the funds either over the telephone or the internet.  Mr. Linton can still make an unlimited number of transfers, as the Policy provides.  However, he must do so in a signed writing, as also provided for in the Policy.

Mr. Linton claims that New York Life's actions amounted to a breach of contract.  But the contract at issue – the written Policy – makes no mention at all of a right to make automated transfers by telephone (or over the internet) and certainly contains no obligation on the part of New York Life to maintain those non-contractual privileges without interruption or suspension. To the contrary, the Policy itself only sets forth the right of a policyholder to effect transfers in a written "notice" that is "sign[ed]" by the policyholder.  The privilege that Mr. Linton enjoyed allowing him to make transfers by telephone was described in the prospectus (the "1999 Prospectus") issued at the time he purchased the Policy, not in the Policy itself, and the 1999

Prospectus does not form part of the parties' contract, as the Policy's integration clause and the 1999 Prospectus itself make clear.

Mr. Linton also claims that the change in administrative procedures alerting policyholders that New York Life might suspend their ability to trade by telephone if they engaged in market timing gives rise to a claim for misrepresentation. Specifically, Mr. Linton claims that the agent responsible for selling him the Policy assured him that "only" the 1999 Prospectus – that is, the version of the prospectus on file with the SEC at the time Mr. Linton purchased the Policy – would govern the Policy throughout its life. According to Mr. Linton, the changes in the 2003 Prospectus relating to market timing run counter to Mr. Redfearn's prior assurances, since the language describing the market timing policy did not appear in the 1999 Prospectus.

Mr. Linton's misrepresentation claim fails because he cannot show that he reasonably relied on any suggestion that the provisions of the 1999 Prospectus, rather than the Policy itself, would determine the rights of the parties, or that the administrative provisions described in the prospectus were not subject to change in updated prospectuses to be filed annually with the SEC. Mr. Linton cannot show reasonable reliance because:

- The Policy's integration clause told Mr. Linton that the Policy (with riders and the application) – and no other document – formed the contract between him and New York Life.

- In correspondence during the so-called "Free Look Period" – during which time Mr. Linton was free to cancel and surrender the Policy at no cost to him, New York Life told him twice in writing that the administrative provisions set forth in the Prospectus were subject to change for a variety of reasons, including "changing business practices."

- At the same time that he executed an application to purchase the Policy, Mr. Linton signed a Telephone Authorization Form in which he agreed that New York Life had the right to "discontinue" his telephone privileges at any time.

- The Policy itself made reference to the fact that certain administrative matters relating to the Policy could be determined by referring to the "most current prospectus on file with the SEC."

- Mr. Linton was a professional investment manager whose business was to invest on behalf of his clients in mutual funds. He regularly received annually updated prospectuses from the mutual funds in which he invested, and understood that prospectuses relating to those investment securities were subject to change.

Mr. Linton's misrepresentation claim also fails because he cannot prove as a matter of fact or law that he sustained any cognizable damages. On the contrary, he made substantial profits by purchasing the Policy.

For the reasons set forth more fully below, this Court should grant summary judgment in favor of Defendant New York Life on all remaining counts set forth in the Complaint.

## STATEMENT OF FACTS

New York Life is a life insurance company that offers a wide range of life insurance and annuity products, including "variable" life insurance policies. New York's Concise Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("SOF") ¶¶ 1, 20. Plaintiff Barry Linton purchased a variable life insurance policy from New York Life in June 1999 (the "Policy"). SOF ¶ 39.

Mr. Linton is a sophisticated, professional investor whose business over many years was to invest in mutual funds on behalf of wealthy clients and institutions. SOF ¶ 2. Mr. Linton's investment strategy was to invest into and out of mutual funds rapidly – even, sometimes, daily – based on market signals (often from overseas markets) indicating whether a fund's shares were likely to increase or decrease overnight – an investment strategy that has become known by the familiar phrase "market timing." SOF ¶¶ 6-7, 54-55.

Mr. Linton's own investment management business, Contemporary Investment Management, Inc. ("CIM"), employed a mutual fund market timing investment strategy

exclusively on behalf of clients. SOF ¶¶ 9-10. In 1999, for example, CIM had more than $20,000,000 in assets under management, solely devoted to the rapid-fire transfer of assets into and out of mutual funds. SOF ¶ 11. CIM closed it doors in 2003 after industry-wide regulatory and criminal investigations forced mutual fund companies to prevent market timing in their funds, thus eliminating via regulatory action CIM's sole strategy for investing. SOF ¶ 15. (Mr. Linton's wife, Mrs. Joanne Lepke, who played an equal role with Mr. Linton in evaluating and deciding to purchase the variable life insurance products at issue in this case, also was employed for a period of years as a registered investment adviser, and she also executed exclusively a mutual fund market timing strategy on behalf of investment clients. SOF ¶¶ 16-19).

Even prior to this purchase of the Policy from New York Life in June 1999, Mr. Linton had had trades and accounts in mutual funds stopped or cancelled by dozens of mutual funds due to his rapid trading patterns and market timing activity. SOF ¶¶ 13-14.[3] Mr. Linton was familiar with the right of mutual fund companies to take action to limit or stop such trading. SOF ¶ 14. And he was aware that fund companies believed that his market timing strategy was harmful to long-term shareholders in the mutual funds he was "timing." SOF ¶ 14.

Variable life insurance policies allow policyholders to invest the cash value of the policy in a limited set of underlying investment funds -like the Morgan Stanley Dean Witter Emerging

---

[3]    Mr. Linton has conceded that CIM had received notices to discontinue or limit its excessive market timing trading from the following mutual fund companies:  59 Wall Street Funds; AIM Funds; Allegiance; American Funds; American Century Funds; American Express IDS Funds; Artisan Funds; Barron Funds; Berger Funds; Brinson Funds; BT Investment Int'l Equity Fund; Columbia Funds; Credit Suisse Warburg Pincus Funds; Credit Suisse Funds; Deutsche Funds; Fifth Third Funds; Franklin Templeton Funds; Fremont Funds; Gabelli Funds; GT Global; Harbor Funds; Invesco Funds; Janus Funds; JP Morgan Funds; Kemper Global Discovery Fund; Kent International Growth; Lexington Funds; Liberty Acorn Funds; Managers Funds; Markman Funds; Northern Funds; Oakmark Funds; Pimco Funds; Preferred Funds; Putnam Funds; Robertson Stevenson Funds; Safeco Funds; Scudder Funds; SEI Funds; Seligman Funds; SIT Funds; Stein Roe Funds; Strong Funds; TIAA-CREF Funds; T Rowe Price Funds; UMB Scout Funds; USAA Funds; Van Kampen Funds; Vanguard Funds; and Warburg Pincus. *See* Exhibit I to the Declaration of Levina Wong Transmitting Documents ("Wong Decl.").

Markets Equity Fund in which Mr. Linton frequently invested.  SOF ¶ 20.  Mr. Linton purchased the Policy for himself personally, not on behalf of clients, and hoped to execute a market timing strategy in the underlying portfolios, or funds, made available under the Policy in order to generate gains that were shielded from tax.  SOF ¶¶ 34-35.

Because a variable life insurance product offers the possibility of investing in  underlying investment funds, such a policy is a security.  SOF ¶ 27.  Also because it is a security, New York Life is required to file annually a prospectus with the Securities and Exchange Commission (SEC) relating to the product, as well as other periodic filings required by the federal securities laws.  SOF ¶ 27.  Also, because a variable policy is a security, persons who sell those policies to the public (in the insurance context, usually thought of as "agents") also must be "registered representatives" – that is, they must hold appropriate securities licenses for the sale and distribution of securities.  The independent agent who sold Mr. Linton his policy in June 1999 was Paul Redfearn, who previously had sold Mr. Linton a life insurance policy, and who also was a registered representative.[4]  SOF ¶¶ 33, 37.

As noted, the Policy purchased by Mr. Linton in June 1999 allows Mr. Linton to allocate assets under the Policy among a series of funds.  SOF ¶¶ 20-24, 40.  Under the terms of the Policy, the investment funds are referred to as "Investment Divisions" within a so-called Separate Account (in which the assets of all policyholders are placed).  *See* Exhibit A at ¶¶ 5.1-5.14, SOF ¶ 55.[5]  The Policy also offers an interest earning investment option called the Fixed Account, which is not part of the Separate Account.  The Policy enables the holder to revise his

---

[4]    Mr. Redfearn is an independent agent of New York Life.  He is a registered representative of NYLIFE Securities, Inc., a New York Life affiliate that is a registered broker-dealer.  SOF ¶¶ 32-33.

[5]    All citations to "Exhibit __" refer to the respective exhibits to the Declaration of Levina Wong Transmitting Documents ("Wong Decl.").

-7-

Separate Account allocations by transferring assets among the Investment Divisions within the Separate Account.  *See* Exhibit A at ¶ 5.11.  The number of transfers among Investment Divisions is not limited under the Policy.  *See* Exhibit A at ¶5.12 ("There is no limit to the number of transfers that can be made.")

By its terms, however, the Policy does limit the *manner* in which a policyholder like Mr. Linton could make those transfers:

> **5.12  How Do You Make A Transfer Between Investment Divisions And To The Fixed Account?**  If you want to make a transfer, you must tell us in a notice you sign which gives us the facts that we need. . . .

*See* Exhibit A at ¶ 5.12 (emphasis in original).  Thus, the Policy requires that transfers be submitted in advance to New York Life in a written "notice" that was "sign[ed]" by Mr. Linton. Self-evidently, such a notice would have to provide, at least, information sufficient to inform New York Life of (i) the amount being transferred, (ii) the fund from which the transfer was being made,  and (iii) the fund to which the transfer was being made.  No language in the Policy refers to any right of a policyholder to make transfers among investment divisions in some manner other than in writing.  New  York Life maintains forms specially designed to allow policyholders to provide this written notice in a form sufficient for processing, although other written transfer requests may be accepted.  SOF ¶ 24.

The Policy also contains a straightforward integration clause.  Under the heading "What Constitutes The Entire Contract?" the Policy explains in plain terms that the "entire contract" between New York Life and Mr. Linton consists only of "this policy, any attached riders or endorsements, and the attached copy of the application."  *See* Exhibit A at ¶ 9.1.[6]

---

[6]    By accepting the Policy, Mr. Linton also acknowledged, *inter alia*, that "[n]o agent . . . has any right to accept risks, make or change contracts, or give up any of [New York Life's] rights or requirements."  *See* Exhibit A at Life Ins. Application (Part I), as appended to the Policy at 6.

-8-

In the period leading up to his purchase of the Policy, Mr. Linton and Ms. Lepke performed a review of the New York Life variable life insurance product (as well as variable life insurance products offered by other companies) in order to assess whether the policies would allow them to execute their rapid, market timing investment strategy. SOF ¶ 34. Ms. Lepke was an equal partner in this review process with Mr. Linton. SOF ¶ 34. The two paid close attention to several factors, including (a) whether the policy in question made available fund choices that were appropriate to the kind of economic modeling on which a market timing strategy depended; (b) whether and how any gains generated by their trading activities would be sheltered from tax; and (c) whether the number of trades they could make was restricted. SOF ¶ 36. As part of that review, they obtained from Mr. Redfearn and reviewed a copy of the prospectus relating to the Policy. In part by evaluating the prospectus dated May 1, 1999 (the "1999 Prospectus"), Mr. Linton and Ms. Lepke determined that at least two of the investment options available (an International Fund and an Emerging Markets Fund) would be suitable for a market timing strategy. SOF ¶ 38.

Mr. Linton and Ms. Lepke also sought to determine whether New York Life placed limitations on the number of transfers they could make between and among the underlying funds. SOF ¶ 38. Just as the Policy does, the 1999 Prospectus stated that the Policy did not place any restriction on the number of "transfers" a policyholder could make between and among the Investment Divisions within the Separate Account. *See* Exhibit B at 34.

Mr. Linton (and Ms. Lepke) also allege that they also relied on Mr. Redfearn's assurance that the provisions set forth in the 1999 Prospectus would govern their Policy throughout the life of the Policy. SOF ¶ 49. It may be assumed for the purposes of this motion that Mr. Redfearn did in fact assure them that the provisions of the 1999 Prospectus would apply throughout the life

-9-

of the Policy, and that Mr. Redfearn apparently believed at the time that this assurance was true, even though it was not.[7] SOF ¶ 50. Mr. Linton (and Ms. Lepke) claim that they relied upon this assurance and believed that the 1999 Prospectus would not be subject to annually updated filings with the SEC, even though Ms. Lepke was herself a registered representative of the Equitable (an insurance company), and, therefore, was trained and licensed to market and sell variable life insurance products to customers. SOF ¶ 17.

In addition to addressing the *number* of transfers a policyholder could make, the 1999 Prospectus described the *manner* in which such transfers could be made. Exhibit B at 34. According to the 1999 Prospectus, in addition to effecting transfers among Investment Divisions in writing, as called for by the Policy, policyholders also could effect transfers among investment divisions by telephone (either through a live voice operator or an automated voice-recognition system). Exhibit B at 34. In order to secure privileges to transfer by the automated voice recognition system, policyholders were required to obtain a Personal Identification Number, or PIN. As described in the 1999 Prospectus, in order to obtain his PIN, Mr. Linton was required to execute a Telephone Authorization Form. That form, which Mr. Linton signed on the same day he executed the Policy, stated in plain terms that his "[t]elephone privileges may be discontinued at any time." SOF ¶ 41.

After purchasing the Policy, Mr. Linton had a 20-day free look period during which he was entitled to surrender it to New York Life at no cost. SOF ¶¶ 26, 42-43, 46. During this period (which New York Life agreed to extend to August 8, 1999), Mr. Linton and Ms. Lepke corresponded with New York Life directly (and not with Mr. Redfearn) concerning certain

---

[7]    As will be shown below, the question of whether the 1999 Prospectus applied to Mr. Linton's policy through its life, or would instead be subject to change, is a red herring. New York Life's ability to restrict Mr. Linton's ability to trade by telephone has never changed throughout the life of the Policy; it was the same in 1999 Prospectus as it is today.

aspects of the variable life insurance product, including issues relating to investment transfers, and they carefully considered whether or not to surrender the Policy.  SOF ¶¶ 43-47.  Mr. Linton's first letter to New York Life's Customer Service, dated June 11, 1999 – which was drafted principally by Ms. Lepke – raised questions about the "mechanics" of coverage as described in the prospectus.  SOF ¶ 45, Exhibit J.  Mr. Linton asked a variety of questions, including questions about the page of the prospectus discussing the ability to make transfers between Investment Divisions, which includes a discussion of transfers by telephone.  SOF ¶ 44, Exhibit J.

In response to Mr. Linton's June 11 letter, New York Life attempted to answer Mr. Linton's specific questions, but also responded with a broadly worded statement: "The [prospectus] states current limits for face amount charges, partial withdrawals and transfers between investment divisions and to the fixed account.  From time to time [New York Life] may be required to make product changes to comply with changing tax laws, regulatory provisions, state laws and changing business practices.  At this time we do not anticipate any revisions to the product however, we do reserve the right to make adjustments to our administrative provisions." SOF ¶ 45, Exhibit K.  When Mr. Redfearn wrote back at the request of Mr. Linton seeking further clarification, SOF ¶ 46; Exhibit M, Mr. Hess sent a further response that provided some additional information to Mr. Linton but, repeated, "However, as I stated in my previous reply, we do reserve the right to make future adjustments to our administrative provisions."  SOF ¶ 47; Exhibit N.

Underscoring that both Mr. Linton and Ms. Lepke appreciated that future changes to New York Life's administrative procedures could one day impact their ability to market time the funds made available to them as Investment Divisions under the Policy, they looked seriously at

-11-

canceling the New York Life Policy during the Free Look Period.  SOF ¶ 43;  Exhibit L. In July

1999, Mr. Linton and Ms. Lepke considered alternative variable life insurance products,

including one offered by Pacific Life Insurance Company, the Pacific Select Exec II product.

SOF ¶ 43.  In the end, notwithstanding both the language in the Telephone Authorization Form

(cautioning Mr. Linton that his "telephone privileges may be discontinued at any time") *and* the

two letters from Mr. Hess of New York Life saying that the Company reserved the right to make

changes to its administrative provisions, including provisions relating to investment transfers,

Mr. Linton and Ms. Lepke decided to keep the Policy.  SOF ¶ 48.

After the Policy went into effect, New York Life continued to send to Mr. Linton annual

prospectuses relating to the Policy, containing updated provisions.  Those updated prospectuses,

which New York Life was required by law to send, contained changes to the administrative

procedures by which transfers could be made, and Mr. Linton clearly was aware of this fact.  For

example, when Mr. Linton purchased his Policy in 1999, policyholders did not have the ability to

make transfers between Investment Divisions over the internet.  SOF ¶ 30.  Thus, the 1999

Prospectus said nothing about transfers over the internet.  SOF ¶ 30.  In 2002, however, New

York Life made internet service available to policyholders and described the availability of

internet-based trading in its 2002 Prospectus.  SOF ¶ 30.  Just as with the privilege of making

transfers by telephone, the ability to trade *via* the internet is not a right described (or even

mentioned) in the Policy; it is a privilege that can be taken away when it is abused or for any

reason.  SOF ¶ 57.  Even though Mr. Linton (and Ms. Lepke) claim to have believed that the

1999 Prospectus governed the Policy for all time and would not change, they nevertheless took

advantage of the internet-based transfer capability first made available in the 2002 Prospectus.

Both Mr. Linton and Ms. Lepke  began making transfers among Investment Divisions over the

internet. SOF ¶ 53. There was no complaint then about changes to the administrative provisions for making transfers. SOF ¶ 53.

In 2003, as New York Life began to appreciate more fully the harm inflicted on long-term shareholders by market timing investors, the Company amended its administrative procedures in an effort to prevent that harm. SOF ¶ 54-59. In its May 2003 Prospectus (the "2003 Prospectus") (which Mr. Linton did receive), New York Life disclosed that it would take steps to limit excessive trading among investment divisions under the policies, and provided policyholders with a broad disclosure of the standards New York Life would apply and the steps it might take to enforce them. SOF ¶¶ 28, 56-59; Exhibit E at 36. Among other things, the updated language in the 2003 Prospectus provided that New York Life also reserved the right to discontinue a policyholder's ability to make transfers over the telephone or internet, by suspending his or her PIN, and to "require that all subsequent transfer requests . . . be made through the U.S. Mail or an overnight courier," i.e., by a written notice signed by the policyholder giving New York Life facts as required by the contract. Exhibit E at 36; Exhibit A at ¶ 5.12.

After issuing the 2003 Prospectus, New York Life began in May 2003 to review transfers by policyholders among Investment Divisions in order to identify and, where necessary, to take appropriate action to limit excessive trading. SOF ¶ 59. After the Company identified a series of rapid transfers in excess of $500,000 by Mr. Linton, New York Life first cautioned Mr. Linton in writing that market timing trades were harmful to other, long-term investors and that further rapid trading in large amounts would result in New York Life suspending his PIN, thereby discontinuing his ability to trade by telephone (or over the internet). SOF ¶ 60. When Mr. Linton's trading continued notwithstanding this notice, New York Life suspended his PIN.

-13-

SOF ¶ 61. Although Mr. Linton can still make an unlimited number of transfers, as the Policy allows, he must do so by sending a written for he signs, as the contract requires.[8]

## ARGUMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 34 (1st Cir. 2005). "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party; 'material' means that the fact is one 'that might affect the outcome of the suit under the governing law.'" *Burke v. Town of Walpole*, 405 F.3d 66, 75-76 (quoting *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir.1992) (citations omitted)). While the district court must look at facts "in the light most favorable" to the non-moving party and "draw all reasonable inferences therefrom to that party's behoof," *Alliance of Auto. Mfrs.*, 430 F.3d at 34, any "conclusory allegations, improbable inferences, and unsupported speculation" may be ignored. *Burke*, 405 F.3d at 76 (quoting *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249 (1st Cir.1996) (citation omitted)). Likewise, the court need not "indulge rank speculation or unsupportable hyperbole." *Conward v. Cambridge School Comm.*, 171 F.3d 12, 18 (1st Cir. 1999) ("[Fed. R. Civ. P. 56(c)] acts as a firewall to contain the blaze of cases that are so lacking in either factual foundation or legal merit that trial would be a useless exercise.") (citations omitted).

---

[8]     New York Life subsequently reinstated Mr. Linton's PIN to give him a second chance to comply with the restrictions in market timing, but he has not made use of it. SOF ¶ 63.

**I.      New York Life Is Entitled To Summary Judgment On Mr. Linton's Breach Of Contract Claim.**

Mr. Linton's primary claim is that New York Life breached the contract between the parties when it suspended his ability to transfer assets among Investment Divisions by telephone. As this Court noted in its March 1, 2005 Memorandum of Decision, in order to prevail on his breach of contract claim, Mr. Linton must demonstrate, among other things, "that the parties reached a valid and binding agreement with regard to [immediate execution of investment instructions communicated by telephone]." *Linton*, No. 01-11362-RWZ, slip op. at 2.  This Mr. Linton has failed to do.  The integrated contract at issue here – the Policy, along with "any attached riders or endorsements, and the attached copy of the application" – makes no mention of a contractual right to make transfers over the telephone.  Mr. Linton's inability to locate any term in the Policy that would prevent New York Life from suspending his ability to make automatic transfers over the telephone or through the internet, and his unavailing effort – in the face of the integration clause – to locate that contractual right in the 1999 Prospectus, are dispositive.  New York Life's actions limiting Mr. Linton's ability to transfer via the telephone do not amount to a breach of contract.

**A.      The Right Mr. Linton Seeks To Enforce Appears Nowhere In The Contract.**

The Policy makes no mention of allowing transfers among Investment Divisions by telephone as a matter of right, and Mr. Linton's Policy predates the introduction of internet-based trading by three years.  Instead, the Policy clearly describes the manner in which Mr. Linton could transfer assets among Investment Divisions:

> **5.12  How Do You Make A Transfer Between Investment Divisions And To The Fixed Account?**  If you want to make a transfer, you must tell us in <u>a notice you sign</u> which gives us the facts that we need. . . .

Exhibit A at ¶ 5.12.

"In interpreting the provisions of a policy, [courts should] construe and enforce unambiguous terms according to their plain meaning." *Somerset Sav. Bank v. Chicago Title Ins. Co.*, 420 Mass. 422, 427, 649 N.E.2d 1123, 1127 (1995) (citing *Thomas v. Hartford Accident & Indem. Co.,* 398 Mass. 782, 784, 500 N.E.2d 810 (1986); *Royal-Globe Ins. Co. v. Schultz,* 385 Mass. 1013, 434 N.E.2d 213 (1982)). "When the provisions of a policy are plainly and definitively expressed, the policy must be enforced in accordance with the terms." *Id.* "Absent ambiguous contractual language in the policy, custom and practice evidence cannot be used to vary the provisions of the policy." *Id.* This Court need look no further than these familiar principles of construction to dispose of Mr. Linton's contract claim.

Section 5.12 of the Policy requires that transfers among Investment Divisions be accomplished by a notice of the transfer signed by the policyholder ("a notice you sign"). The adjective "written" does not need to be added to the verb "sign" for it to mean a signature "in writing." Just as plainly, its *absence* cannot transform the meaning of "sign" into an "oral" command. The phrase "notice you *sign*" simply does not translate into "an instruction you *say*." If the English language is to govern the Court's analysis of the relevant text – as it must – the Policy does not confer on policyholders any right to transfer by a means – such as by telephone or over the internet – which does not require a *signed* notice of the transfers.

Because this language shows in unambiguous terms that the ability to transfer funds *via* telephone was not among the bundle of rights conferred on Mr. Linton under the Policy, New York Life's suspension of Mr. Linton's PIN, which in 2003 prevented him from making transfers by telephone or over the internet, did not breach its obligations under the Policy. For this reason, Mr. Linton's breach of contract claim must fail.[9]

---

[9]     Plaintiff also points to language in the Policy stating that the *number* of transfers between Investment Divisions is not limited. Linton Dep. Tr. at 68-69, attached as Exhibit V. But that is just a

**B.        The 1999 Prospectus Is Not Part Of The Contract.**

Because he recognizes that the terms of the Policy itself do not supply the contractual right he wishes to enforce, Mr. Linton points to sources *outside* of the Policy.  In part, Mr. Linton relies on the 1999 Prospectus and "assurances" from New York Life's agent who, Linton alleges, "assured" him that 1999 Prospectus would "govern" for "the life of the Policy."  SOF ¶ 49. These allegations, even if true, are immaterial, because neither the provisions of the 1999 Prospectus, nor Mr. Redfearn's statements, form part of the contract.  Moreover, even if the Court could read the 1999 Prospectus into the Policy, the provisions of the 1999 Prospectus (together with the Telephone Authorization Form included by reference into the 1999 Prospectus) explicitly reserve to New York Life the ability to "discontinue" Mr. Linton's "telephone privileges" "at any time." [10]

---

diversion.  In this case, New York Life has not limited the number of transfers Mr. Linton may make; there is no dispute that he can still make any number of transfers by mailing in a signed form, just as the Policy requires.

[10]        The facts alleged by Mr. Linton bear considerable resemblance to those in *First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc'y of the U.S.,* 164 F. Supp. 2d 383 (S.D.N.Y. 2001), in which the District Court granted the defendant life insurance company's motion to dismiss.  Citing concerns over the harm that frequent transfers may cause to other policyholders and shareholders in the mutual funds in which the plaintiff was making frequent transfers, the defendant administrator withdrew plaintiff's rights to make electronic transfers or transfers by telephone.  *Id.* at 388.  When the plaintiff sought to reinstate its "right" to telephonic and electronic transfer privileges, based on allegations that the defendant had "misrepresented to the plaintiff the types of transactions in which the plaintiff would be permitted to engage," the court found "there is no promise in the annuity contract or Prospectus that [plaintiff] would have a 'right' to make trades via telephone, fax or internet."  *Id.* at 393. *Cf. Windsor Secs., Inc. v. Hartford Life Ins. Co.,* 986 F.2d 655, 658, 667-668 (3d Cir. 1993) (finding breach of contract where policy did not limit policy owner's common law right to act through an agent and where defendant tried to so limit policy owner's right); *Am. Nat'l Bank & Trust Co. of Chicago v. Allmerican Fin. Life Ins. & Annuity Co.,* 304 F. Supp. 2d 1009, 1011, 1015 (N.D. Ill. 2003) (finding breach of contract where contract did grant "right" to telephone transfers, but holding however, that integration clause barred incorporation of the terms of the Prospectus where defendant attempted to introduce terms of the Prospectus as grounds for restricting "right" to telephonic transfers).

-17-

    1.    *The Policy's Integration Clause Establishes That The 1999 Prospectus Does Not Form Part Of The Parties' Contract.*

The Policy's integration clause – under the heading "What Constitutes The Entire Contract?" – states in simple terms that the "entire contract" between New York Life and Mr. Linton consists of "this policy, any attached riders or endorsements, and the attached copy of the application." *See* Exhibit A at ¶ 9.1. Notably absent from the integration clause is any mention of the 1999 Prospectus. The Policy also states that "[o]nly our Chairman, President, Secretary, or one of our Vice Presidents is authorized to change the contract, and then, only in writing" and "[n]o agent is authorize to change this contract." Exhibit A at ¶9.1. Additionally, Mr. Linton's signed application, which is part of the parties' contract, expressly acknowledges that "no registered representative has the right to make any representation not included in the prospectus for the policy." Exhibit A at Life Insurance Application (Part I), page 6. Because the parties agreed between themselves that their agreement would consist only of those materials set forth in that integration clause – and that the contract could not be modified by an agent – Mr. Linton may not look to the 1999 Prospectus or statements made by agent Redfearn for additional alleged rights. *ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1261 (1st Cir. 1991) (under Massachusetts law extrinsic evidence "may not be admitted to contradict the clear terms of an agreement"); *Boston Edison Co. v. FERC*, 856 F.2d 361, 367 (1st Cir. 1988) ("extrinsic evidence is inadmissible, under the parol evidence rule, when it is introduced to add to, detract from, or vary the terms of a written contract") (internal quotations omitted); *In re New Era Packaging, Inc.*, 186 B.R. 329, 334 (D. Mass. 1995) (refusing to consider extrinsic evidence to contradict or modify the terms of the written contract where the contract "[did] not suffer from any ambiguity which would justify disregarding its integration clause").

-18-

Indeed, the 1999 Prospectus itself cautioned Mr. Linton that its contents did not form part of his contract with New York Life.  The 1999 Prospectus stated, "The *[P]olicy* is a legal contract between you and [New York Life].  The entire contract consists of the policy, the application and any riders to the policy."  Exhibit B at 6, ¶ 2 (emphasis added).  In a similar case, a district court held that "[b]ecause the [Prospectus] states that another document (rather than the prospectus) constitutes the Contract, the prospectus cannot be construed to be part of the Contract."  *Prusky v. Prudential Ins. Co. of Am.*, 2001 WL 34355665 *1, *25 (E.D. Pa. 2001) (citing *Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 306 (3d Cir. 1982) for the proposition that "where literature [stated] that it merely described another, controlling document, literature not integrated into contract").

> 2.    *The Telephone Authorization Form – Included By Reference In The 1999 Prospectus – Informed Mr. Linton That New York Life Could Discontinue His Telephone Privileges At Any Time.*

Even assuming, *arguendo,* the 1999 Prospectus *had* established contractual rights between Mr. Linton and New York Life, it does not supply the "assurance" Mr. Linton claims.  The 1999 Prospectus, *see* Exhibit B at 43, required policyholders who intended to make telephone transfers through the Voice Response Unit ("VRU") to complete a Telephone Authorization Form.  That form, which Mr. Linton signed on the same day he executed the Policy, states that "Telephone privileges may be discontinued at any time."  *See* Exhibit C at 2.  By its terms, then, telephone authorization was permitted only "in accordance with established procedures," Exhibit B at 34, and those procedures authorized discontinuance of telephone privileges "at any time."  *See, e.g., First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc'y of the U.S.*, 164 F. Supp. 2d 383, 393-94 (S.D.N.Y. 2001) (finding no breach of contract where unambiguous written contract "provides no guarantees with respect to trading vehicles,

that is, there is no promise in the annuity contract or prospectus that [plaintiff] would have a 'right' to make trades via telephone, fax, or internet").

If, as Mr. Linton claims, the 1999 Prospectus is to be incorporated into the Policy, so too must the Telephone Authorization Form be incorporated.  *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 198 n.4 (1st Cir. 2001) ( "multiple documents may be read together . . . if it is shown that the papers were so connected in the minds of the parties that they adopted *all* of them as indicating their purpose") (citations and internal quotations omitted) (emphasis added).  By executing the Telephone Authorization Form, Mr. Linton expressly agreed that "[t]elephone privileges maybe discontinued at any time."  Exhibit C at 2.  Hence, even if the 1999 Prospectus were determined to form a part of the parties' contract (it does not), New York Life would still possess the authority to suspend Mr. Linton's telephone trading privileges.[11]

### C.    In View Of The Contract's Lack Of Ambiguity, Mr. Linton Cannot Resort To Course Of Performance To Add Terms To The Policy.

Finally, Mr. Linton's allegations also appear to suggest that the mere fact that New York Life permitted his telephonic transfers from the time he executed the Policy suffices to show that he had a contractual "right" to make such transfers under the Policy.  In the absence of ambiguous contractual language in the Policy on the question of whether transfers could be made without a signed notice from the policyholder, however, "custom and practice evidence cannot be used to vary the provisions of the policy."  *Somerset Sav. Bank*, 420 Mass. at 427, 649 N.E.2d

---

[11]    A major thrust of Mr. Linton's claim is that New York Life somehow changed the terms of the parties' contract by inserting new language in its 2003 Prospectus alerting policyholders to the Company's new policy concerning excessive trading and market timing.  It bears noting, however, that the *action* taken by New York Life – the suspension of his PIN and, thereby, his telephone and internet privileges – is entirely consistent with the Policy (which nowhere mentions telephone transfers or internet transfers), and also is consistent with the 1999 Prospectus which, together with the Telephone Authorization Form, explicitly informed Mr. Linton that his privileges could be discontinued "at any time."

at 1127 (citing *Newell-Blais Post # 443, Veterans of Foreign Wars of the U.S., Inc. v. Shelby Mut. Ins. Co.,* 396 Mass. 633, 638, 487 N.E.2d 1371 (1986) (language clear and unambiguous; recourse to extrinsic evidence not required); *Nilsen v. Mut. Marine Office, Inc.,* 428 F. Supp. 1375, 1378-1380 (D. Mass. 1977)).   To read the Policy to confer a right to conduct transfers among Investment Divisions *without* a written transfer request signed by the policyholder – such as, for example, a transfer made over the telephone – would indeed "vary the provisions" of the Policy.  It would squarely conflict with the Policy's plain terms.  The unambiguous language of the contract must prevail.  In consequence, Mr. Linton fails to provide any support for his claim that New York Life breached that contract when it suspended his ability to make transfers over the telephone.

For all the reasons set forth above, the Court should grant summary judgment in favor of New  York Life on Mr. Linton's breach of contract claim.

**II.    New York Life Is Entitled To Summary Judgment On Mr. Linton's Good Faith And Fair Dealing Claim.**

Massachusetts law implies into every contract a covenant of good faith and fair dealing, requiring that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *See Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471, 583 N.E.2d 806, 820 (1991) (citations omitted).  However, the implied covenant may not be invoked "to create rights and duties not otherwise provided for in the existing contractual relationship."  *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385, 805 N.E.2d 957, 964 (2004) (citing *Cadle Co. v. Vargas*, 55 Mass. App. Ct. 361, 366, 771 N.E.2d 179 (2002)).   Neither does the implied covenant extend to any alleged representations made prior to the contract's existence.  *See Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001) ("[the covenant of good faith and fair dealing] applies only to conduct during

-21-

performance of the contract, not to conduct occurring prior to the contract's existence, such as conduct affecting contract negotiations"). So, in this case, for example, New York Life's duties under the implied covenant are limited by "the obligations – the contractual 'fruits' – actually contained in the [Policy]." *AccuSoft Corp.,* 237 F.3d at 45. Where the contract transfers no "right," there is no good faith obligation with regard to that conjured "right." *See Uno Rests.*, 441 Mass. at 385, 805 N.E.2d at 964 (citing *FDIC v. LeBlanc*, 85 F.3d 815, 822 (1st Cir. 1996)); *Accusoft*, 237 F.3d at 45 (citing *LeBlanc*, 85 F.3d at 822). *See also Milford Power Ltd. P'ship v. New England Power Co.*, 918 F. Supp. 471, 483 (D. Mass. 1996) (rejecting attempts by a seller of power to imply into a contract the condition that the purchase of power occur "at an economically viable cost," because the contract in question imposed no such condition on purchases).

Here, because there is no contractual right to trade by telephone (or over the internet), Mr. Linton's claim that New York Life acted in bad faith when it took away that purported right fails as a matter of law. Indeed, the good faith and faith dealing claim does not even purport to be based on the contract. *See* Complaint ¶ 32 (alleging that New York Life breached the implied covenant "by unilaterally and arbitrarily changing the material terms of its prospectus . . . " (emphasis added)).[12]

Moreover, the implied covenant claim fails to the extent that it is based on statements allegedly made during negotiations (when Mr. Linton reviewed the prospectus) prior to entering

---

[12]    To prevail on this claim, Mr. Linton also "must show a lack of good faith," *Uno Rests.*, 441 Mass. at 385 n.5, 805 N.E.2d at 964 n.5, which he cannot do. New York Life affirmatively acted in good faith: it sent Mr. Linton an updated prospectus detailing the new trading guidelines, which were placed to protect the policyholders from the effects of market timing; it applied those guidelines to all policyholders equally; it sent Mr. Linton a warning letter before suspending his PIN; and it gave Mr. Linton a second change to abide by the market timing restrictions by reinstating his PIN in June 2004, which remains active today.

a contract: "[B]ad faith in contract negotiations is not reached by the implied duty of good faith and fair dealing, but instead by concepts such as fraud in the inducement or absence of agreement." *Accusoft*, 237 F.3d at 45 (citing *Restatement (Second) of the Law of Contracts § 205, cmt. c*).

### III.    Summary Judgment Should Be Granted On Count II (Misrepresentation) Of The Complaint

Claims for misrepresentation require in part that the defendant (or its agent) made a false representation of material fact with the intent that the plaintiff rely on that representation, and that the plaintiff reasonably relied on the statement. *Elias Bros. Rests. Inc. v. Acorn Enters., Inc.*, 831 F. Supp. 920, 926 (D. Mass. 1993) (requiring plaintiff's reliance on representation to be reasonable); *Powell v. Rasmussen*, 355 Mass. 117, 118-119, 243 N.E.2d 167, 168-69 (1969).

When asked in a interrogatory to state the basis for his misrepresentation claim, Mr. Linton stated:

> Mr. Redfearn repeatedly represented that under the terms of the Policy Mr. Linton was and would continue to be authorized to make an unlimited number of telephonic transfers within his Investment Divisions under the Policy. Moreover, Mr. Redfearn assured Mr. Linton that only the 1999 Prospectus would govern the Policy.

Exhibit S at 4 (emphasis added).[13]

Mr. Linton cannot possibly show, and no reasonable juror could possibly conclude, that Mr. Linton reasonably relied on the statement (assuming it were made) that "only" the 1999

---

[13]    Over the course of discovery, in fact, Mr. Linton's version of precisely what Mr. Redfearn said to him has evolved in predictable ways. When asked at his deposition what Mr. Redfearn specifically represented to him, Mr. Linton said only that Mr. Redfearn "specifically assured us that there were no restrictions on trading, and he specifically assured us that the current prospectus would be the prospectus that would always govern the policy." Linton Dep. Tr. at 69. But later, apparently aware that his claim would fail if premised solely on a statement that the 1999 Prospectus "governed," Mr. Linton refined his version in response to interrogatories and provided a written response which included the claim that Mr. Redfearn had made specific reference to the ability to transfer by telephone. *See* Pl.'s Resp. to Interrog. No. 2. at 4 (quoted above). It makes little difference how Mr. Linton chooses to reformulate his case, however.

9925571

Prospectus would govern the Policy, or that, "under the terms of the Policy," Mr. Linton had a continuing right to make telephonic transfers.

### A.    Mr. Linton Cannot Have Reasonably Relied On Mr. Redfearn's Statements.

Misrepresentation claims require that a plaintiff reasonably relied on the statement at issue. *Berenson v. Nat'l Fin. Servs., LLC*, – F. Supp. 2d – (D. Mass. 2005), 2005 WL 2849616 at 10; *Masso v. United Parcel Serv. of Am., Inc.*, 884 F. Supp. 612, 616 (D. Mass. 1995) ("reliance must be reasonable to state a claim for negligent misrepresentation).[14]

The undisputed record shows that Mr. Linton cannot have reasonably relied on an agent's statement that only the 1999 Prospectus governed the rights of the parties or that he had a unfettered right under the Policy to make telephonic transfers.

First, the Policy's integration clause, described *supra* at Section I.B.1, states in the plainest terms that it, not the Prospectus, governs the right of the parties.  The 1999 Prospectus says the same thing.  By informing Mr. Linton that his contract with New York Life was confined to the written Policy itself (along with riders and the application), both the Policy and the 1999 Prospectus informed Mr. Linton that the 1999 Prospectus was not a binding part of the contract.  In the insurance context, especially, it is well settled that, "the acceptance of a contract establishes all its terms." *Gill v. Metro. Prop. & Cas. Ins. Co.*, 864 F. Supp. 251, 253 (D. Mass. 1994) (quoting *John Hancock Life Ins. Co. v. Schwarzer,* 354 Mass. 327, 329, 237 N.E.2d 50, 52 (1968)).  An insured is presumed to have assented to the terms of the policy that he signed and executed even if he has retained the policy without reading it.  *Gill*, 864 F.2d at 253; *Mundy v. Lumberman's Mut. Cas. Co.,* 783 F.2d 21, 22-23 (1st Cir.1986).  Thus, Mr. Linton is presumed to have read and understood the plain terms of the Policy, and he cannot claim ignorance of its

---

[14]    The complaint does not allege an intentional misrepresentation claim; nor could it on the facts of this case.

contents.   As a result, as a matter both of law and common sense, Mr. Linton cannot have reasonably relied on the agent's statement that the 1999 Prospectus governed the rights of the parties in a binding way when the Policy itself contradicted that representation in clear and unambiguous terms.   *Sarnafil v. Peerless Ins. Co.*, 418 Mass. 295, 306-07, 636 N.E.2d 247 (1994) (holding that plaintiff could not reasonably rely on agent's representations that loss prevention coverage was included, when such coverage as "distinctly absent" from the policy itself).   *See also Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 468, 781 N.E.2d 787, 795-96 (2003) (finding no reasonable reliance where merely reading the document would reveal terms contradicting the alleged representation and no evidence that defendant tried to conceal the "obvious" language of the contract).

For that same reason, Mr. Linton cannot have reasonably relied upon the alleged statement that the Policy authorized Mr. Linton to make transfers by telephone without interruption during the life of the Policy.   As shown above, the Policy requires transfers to be made by a *signed* notice.   Distinctly absent from the Policy is any mention of a contractual right to make transfers *via* telephone.   The express terms of the Policy negate any reliance by Mr. Linton on what he understood Mr. Redfearn to have said.

In addition, New York Life advised Mr. Linton that the administrative procedures spelled out in the 1999 Prospectus were, in fact, subject to change.   On June 11, 1999 – the day he signed the application – Mr. Linton wrote to New York Life saying: "As several issues are not clearly defined in your prospectus, I am writing to illicit your clear response on the following points."   Exhibit J.   Mr. Linton's letter went on to address a series of issues raised in the

prospectus, including the section entitled "Transfers to Investment Divisions and to the Fixed Account." Exhibit J.[15]

By letter dated June 21, 1999 – during the Free Look Period – New York Life's John Hess, Jr. responded to Mr. Linton. Mr. Hess responded in broad terms:

> From time to time [New York Life] may be required to make product changes to comply with changing tax laws, regulatory provisions, state laws and changing business practices. At this time we do not anticipate any revisions to the product however, we do reserve the right to make adjustments to our administrative provisions. Should any revisions be made, VUL policyowners will be notified.

Exhibit K. This language is clear and unambiguous, and it informed Mr. Linton during the Free Look Period – that is, during the period when he was free to surrender the Policy at no expense – that New York Life reserved the right to "make adjustments to [its] administrative provisions."

After receiving this response from Mr. Hess, Mr. Linton prompted the agent, Mr. Redfearn, to press New York Life for a further response. At Mr. Linton's behest, Mr. Redfearn wrote to New York Life on June 30, 1999, underscoring that Mr. Linton's focus was clearly on the "reservation of rights" language contained in Mr. Hess's letter:

> In order to understand where New York Life might exercise these rights, he is asking the company to elaborate on the circumstances or situations where they would be inclined to exercise their rights.

Exhibit M. In response to Mr. Redfearn's request for "a more elaborate" response to Mr. Linton's concerns, Mr. Hess replied again to Mr. Linton on July 26 – still during the Free Look Period – and made an attempt to identify some of circumstances in which New York Life might limit the rights of policyholders in the three specific areas addressed in Mr. Linton's initial letter on June 11. But, in his second letter, Mr. Hess continued to advise Mr. Linton that "this list is

---

[15]    That portion of the 1999 Prospectus appears in the same section, and on the very same page, as does the discussion of a policyholder's ability to transfer assets over the telephone system. *See* Exhibit B at 43.

not exhaustive of all circumstances under which we may limit certain requests" and, more broadly, that   "we do reserve the right to make future adjustments to our administrative provisions," which includes the procedures to make transfers *via* telephone. SOF ¶ 47; Exhibit N.

Under these circumstances, with Mr. Linton having been advised twice during the Free Look Period that the 1999 Prospectus's administrative provisions – including provisions contained in the same section and same page of the Prospectus as the telephone privilege disclosure – were subject to change due to "changing business practices," it would be unreasonable for Mr. Linton to continue to rely on Mr. Redfearn's statement, assuming that Mr. Linton understood Mr. Redfearn to mean that the provisions set forth in the 1999 Prospectus were not subject to change.   *See, e.g., Rodriguez v. J.C. Penney Life Insurance Co., et al.*, No. 8:02-CV-695-T-17MAP, 2006 WL 208775 (M.D. Fla. Jan. 25, 2006) (holding that reliance on oral statements was not justified since information available during the "free look" period would have informed the policyholder of the true facts and granting summary judgment in favor of defendants). [16]

In addition, it is beyond dispute that the 1999 Prospectus itself informed policyholders that their telephone privileges were subject to the completion of a Telephone Authorization Form, and that by signing that form (which he acknowledges he did at the same time that he signed the application for the Policy), Mr. Linton agreed that New York Life reserved the right to

---

[16]     Mr. Linton's claimed belief that the administrative procedures set forth in the 1999 Prospectus would "govern" forever and would not change is even more unreasonable in light of Mr. Linton's later use of the internet to make transfers among Investment Divisions.  The capability of making transfers over the internet was not available at the time he purchased the Policy, but instead was made available to policyholders after the new capability was disclosed in the updated 2002 Prospectus.  It is especially unreasonable for Mr. Linton to insist that the 1999 Prospectus – and no later prospectus – could apply to him, when he eagerly took advantage of subsequent changes to that same prospectus when the change happened to suit him.

discontinue his ability to make transfers over the telephone. *See* Exhibit C at 2 ("By signing this form, you agree to the following terms: . . . Telephone privileges may be discontinued at any time."). Surely, having signed the form at the same time he executed the Policy, Mr. Linton cannot argue that he was unaware of New York Life's right to discontinue his telephone privileges, no matter what meaning he now claims to have attached to Mr. Redfearn's statement.

It also is settled that when an express provision in a contract is inconsistent with a statement on which a plaintiff claims to have relied, the plaintiff's claim that he reasonably relied on the statement is unavailing. *Turner v. Johnson & Johnson*, 809 F.2d 90, 96-97 (1st Cir. 1986) (where a contractual provision contradicts the allegedly fraudulent statement, court's evaluation for reasonable reliance gives more weight to the contract, particularly where the parties are experienced businesspeople); *Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 137 (D. Mass. 1998) ("[A] plaintiff with considerable business intelligence should not be able to claim reliance on a representation made during negotiations which directly conflicts with the terms of the integrated contract."). Describing the annual surrender charges that would apply to him if he were to surrender the Policy in any given future year, the Policy clearly states that the surrender charges that will apply will be set forth in "the *most current* prospectus which is on file with the SEC." Exhibit A at 2.2 (emphasis added). This language plainly contemplates that subsequent prospectuses – with updated information – not only would exist, but would apply to the Policy. Yet, in this case, Mr. Linton argues that Mr. Redfearn's statement – that the 1999 Prospectus applied to his Policy throughout its life – led Mr. Linton to believe that no provisions in the Prospectus were subject to change over time. The Policy's reference to a "most current prospectus which is on file with the SEC" runs squarely counter to the statement that Mr. Linton

-28-

claims misled him (or, at the very least, runs counter to the meaning Mr. Linton seeks to attach to that statement).

A final reason that Mr. Linton could not reasonably have relied on Mr. Redfearn's statement to mean that the 1999 Prospectus was not subject to change arises from his sophistication as professional investment manager whose business was to invest on behalf of clients in mutual fund securities.   In that capacity, Mr. Linton routinely reviewed annual prospectuses provided to him by mutual funds in which he had invested on behalf of clients. SOF ¶ 11.   He knew that prospectuses relating to the securities in which he invested his clients' assets were updated annually and subject to revision.   SOF ¶ 11.   Just like the prospectuses Mr. Linton was accustomed to reviewing as an investment professional, the 1999 Prospectus described the investment opportunities available under the Policy, as well as the various administrative provisions applicable to the investment.   The 1999 Prospectus also contained within it separate prospectuses from other companies describing each of the fund "Investment Divisions" available for investing under the Policy.   SOF ¶ 27.   It simply would have been unreasonable for Mr. Linton to have believed that the prospectuses applicable to the security in which he was investing on this occasion – the Policy – would not also be updated annually, or in any event that their terms were not only fixed, but binding.

### B.     Mr. Linton Cannot Prove That He Has Suffered Cognizable Damages.

"Proof of damages flowing from the mis-representations is essential to recovery." *Ravosa v. Zais*, 40 Mass. App. Ct. 47, 54 n.12, 661 N.E.2d 111, 117 n.12 (1996) (affirming judgment that there was no actionable misrepresentation where misrepresentation provided no basis for damages).

Mr. Linton may not recover *any* damages for misrepresentation where he has no out of pocket losses.  *PDV-El Paso Meriden, LLC v. Alstom Power, Inc.*, No. 996016BLS, 2004 WL

-29-

1588201 (Mass. Super. June 14, 2004) (granting summary judgment and finding that plaintiffs'

"misrepresentation claim cannot succeed" where plaintiffs "sustained no out-of-pocket losses …

and, instead,  made a handsome net profit after reimbursing itself for its costs.").  Here, as Mr.

Linton acknowledged in his complaint, Mr. Linton made substantial gains on his investments

under the Policy from 1999 to 2003 (and even since that time, the value of his assets in the

Policy have appreciated over time).  In fact, the total amount of fees paid by Mr. Linton on his

Policy is $66,908.76, SOF ¶ 68, while his investment gains amounted to over $200,000.00.  SOF

¶ 67.  These amounts show plainly that Mr. Linton's investments gains – the benefits to him of

owning the Policy – have far exceeded the fees he has incurred.  Thus, as in *PDV-El Paso*

*Meriden*, even after allowing for Mr. Linton's costs, his investment in the Policy has resulted in

substantial profits to him, not losses.

Mr. Linton's responses to interrogatories suggest that he had hoped to reclaim, not "out

of pocket" costs, but what his gains *would have been* from the time his PIN was suspended had

he been permitted to continue with his esoteric market timing investment strategy.  He is not

entitled to that measure of damages, *Redstone v. Goldman, Sachs & Co.*, 583 F. Supp. 74, 777

(D. Mass. 1984) ("'Benefit of the bargain' damages are not available in a case of negligent

misrepresentation.").  Even so, an attempt to prove such damages would be an exercise in

fantastic speculation, driven by after-the-fact judgments about what he would or would not have

done in the volatile stock market conditions of the past few years reconstructed after-the-fact.

But the Court need not simply find at this stage that such a measure of damages would be

speculative.  Rather, for purposes of summary judgment, it is enough that Mr. Linton has failed

even to undertake to measure or establish those damages.  At the time of his deposition, Mr.

Linton proclaimed that he had not calculated his damages and did not expect to testify

-30-

concerning them.  SOF ¶ 70.  In response to interrogatories, plaintiff changed course and indicated his intention to testify personally as to damages; but in response to interrogatories which directly called for him to identify and explain those damages, he failed to state any damage amount at all.  *See* Pl.'s Resp. to Interrog. Nos. 1-3, attached as Exhibit S.  And Mr. Linton allowed the date for designating experts to pass without identifying an expert to testify on his behalf concerning damages.  *See, e.g., Wortley v. Camplin*, 333 F.3d 284, 296-97 (1st Cir. 2003) (noting "expert testimony on damages is likely to be helpful" in securities context, although not required); *In re Global Crossings Sec. and Erisa Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) (citing *In Re Independent Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689, 2003 WL 22244676, at *3 (S.D.N.Y. Sept. 29, 2003) ("[P]roof of damages in securities cases is always difficult and invariably requires expert testimony…").

Mr. Linton bears the burden of proving damages and, on this record, he has not (after being given every reasonable opportunity) come forth with any evidence suggesting that he can prove *any* amount of damages – out of pocket or otherwise – let alone in a non-speculative way. For these additional reasons, then, this Court should grant summary judgment in favor of New York Life on Mr. Linton's misrepresentation claim.[17]

---

[17]    Mr. Linton signed a Telephone Authorization Form (as the 1999 Prospectus told him he must do) *agreeing* that his "[t]elephone privileges may be discontinued at any time."  Exhibit C at 2.  Any supposed damages alleged arising from that suspension, whatever their cause, were not caused because Mr. Linton was mislead into believing otherwise.  Because Mr. Linton cannot prove the supposed harm he suffered from the suspension of his PIN is a harm caused by the purported misstatement, he cannot show that his loss was a result of the charged misrepresentation, and his claim fails as a matter of law. *See, e.g., Sparks v. Fidelity Nat'l Title Ins. Co.*, 294 F.3d 259, 273 (1st Cir. 2002) (granting summary judgment to defendant where misrepresentation was not the cause of any consequent economic damages); *Poly v. Moylan*, 423 Mass. 141, 149 (1996) ("Where a plaintiff does not prove that he is worse off than if there than been no misrepresentation he has not made out a case of deceit.") (quoting *Connelly v. Bartlett*, 286 Mass. 311, 315, 190 N.E. 799 (1934) (internal quotations omitted)).

9925571

**IV.     Summary Judgment Should Be Granted On Count Vi (Unjust Enrichment) Of The Complaint**

The existence of a valid express contract between parties bars a claim for equitable relief, such as unjust enrichment. *Okmyansky v. Herbalife Int'l. of Am., Inc*., 415 F.3d 154, 162 (1st Cir. 2005) (affirming grant of summary judgment). "An express contract leaves 'no room ... for recovery on principles of unjust enrichment.'" *Id.* (quoting *Zarum v. Brass Mill Materials Corp*., 334 Mass. 81, 134 N.E.2d 141, 143 (1956). Therefore, the Court should grant summary judgment in favor of New York Life on this claim, as well.

## CONCLUSION

For the foregoing reasons, New York Life respectfully requests that the Court grant defendant's motion for summary judgment and dismiss the Complaint in its entirety.

Respectfully submitted,

NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION

By its attorneys,

/s/ Robert G. Jones
John D. Donovan, Jr. (BBO # 130950)
john.donovan@ropesgray.com
Robert G. Jones (BBO #630767)
robert.jones@ropesgray.com
Levina Wong (BBO #654510)
levina.wong@ropesgray.com
ROPES & GRAY LLP
One International Place
Boston, MA 02110
(617) 951-7000

Dated:  February 13, 2006

9925571

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2006, I served a copy of Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, by hand, upon Richard J. Grahn, Looney & Grossman, LLP, 101 Arch Street, Boston, MA 02110, attorney for Plaintiff Barry Linton.


/s/ Levina Wong
Levina Wong