UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARRY LINTON,<br><br>    Plaintiff<br><br>v.<br><br>NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION,<br><br>    Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:  C.A. No. 04-11362-RWZ<br>:<br>:<br>:<br>: |

**DECLARATION OF JOHN HESS, JR. IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

I, JOHN HESS, JR., do hereby state as follows:

1. I am a Manager at New York Life Insurance and Annuity Corporation ("New York Life"), a corporation organized under the laws of the State of Delaware.

2. I make this declaration in support of New York Life's Motion for Summary Judgment in the above-captioned action (the "Litigation") and have personal knowledge of the matters stated herein.

3. Currently, I am Product Manager, Life Department for New York Life and, prior to this position, from 1997 – 2000, I was Assistant Product Manager, Life Department.

4. As Product Manager and Assistant Product Manager, my responsibilities included, and currently still include, product development (including review of marketing materials, such as the annual prospectuses) for variable universal life products, such as the Flexible Premium Variable Universal Life Insurance Policy at issue in this case.

9923154

*Variable Universal Life Insurance*

5.      Variable universal life insurance products are a type of insurance product within which policyholders are provided the option to invest a portion of their premiums in underlying mutual funds. Those mutual funds are registered under the federal securities laws and sponsored either by New York Life affiliates or by other mutual fund companies. The funds are referred to as "Investment Divisions." The Investment Divisions available in June 1999 may be found on the page bearing Bates label NY 0051 of the prospectus dated May 1, 1999 (the "1999 Prospectus"), attached as Exhibit B, to the Declaration of Levina Wong Transmitting Documents Relied Upon in Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Wong Decl.").[1]

6.      Persons seeking to purchase a variable universal life policy must complete an application. After an application is submitted, New York Life must approve it. If it does, New York Life issues a policy.

7.      On or about June 11, 1999, Barry Linton completed an application for a Flexible Premium Variable Universal Life Insurance Policy. Upon approval of his application, Mr. Linton was issued Policy number 63 615 359 (the "Policy"). *See* Policy, attached hereto as Exhibit A.

8.      In a provision entitled "What Constitutes the Entire Contract?," the Policy states that "[t]he entire contract consists of this policy, any attached riders or endorsements, and the attached copy of the application." Exhibit A at ¶ 9.1. The Policy also provides that only the Chairman, President, Secretary, or one of New York Life's Vice Presidents is authorized to

---

[1]     All citations to "Exhibit __" refer to the respective exhibits to the Declaration of Levina Wong Transmitting Documents Relied Upon in Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Wong Decl.").

change the contract. Exhibit A at ¶ 9.1. No agent is authorized to change the contract. Exhibit A at ¶ 9.1.

9. The ability to make transfers between Investment Divisions, and the contractually-provided means for doing so, is addressed in the Policy. The Policy states that in order to make a transfer between Investment Divisions, a policyholder must submit "a notice you sign which gives us the facts that [New York Life] need[s]." Exhibit A at ¶ 5.12. This language requires that policyholders provide a written notice of transfers, and New York Life has available a written form which policyholders may use in order to satisfy this requirement. *See* Exhibit Z. As the form shows, the "facts" that New York Life needs in order to process a transfer include (a) the date of the request, (b) the amount of the transfer, (c) the Investment Division from which the transfer is being made, and (d) the Investment Division to which the transfer is being made. New York Life also accepts written letters, so long as the "facts" are specified in the letter and the letter is signed by the policyholder. *See, e.g.*, Exhibit AA, Letter from B. Linton to New York Life, dated July 10, 2003. There is no reference in the Policy to any right to make transfers by telephone or over the internet.

10. The agent who sold the Policy to Mr. Linton is Paul Redfearn, an independent agent of New York Life. *See* Agent's Contract, attached hereto as Exhibit H. Paul Redfearn also is a registered representative of an affiliated company that is registered as a broker-dealer pursuant to the Securities Exchange Act of 1934 and applicable blue sky laws. (Because a variable universal life policy is a security, persons who sell those policies must be "registered representatives" and hold appropriate securities licenses for the sale and distribution of securities).

11. I understand there is no dispute that Mr. Linton received from Mr. Redfearn a copy of the most-current prospectus then on file with the Securities and Exchange Commission relating to

New York Life's variable universal life insurance product. *See* Exhibit B. Because the Policy is considered a security, New York Life is required to file annually, and does file annually, a prospectus with the Securities and Exchange Commission (SEC) relating to the product. The prospectus relating to the Policy also includes separate prospectuses relating to each of the underlying mutual funds (or Investment Divisions). New York Life annually distributes to all policyholders a copy of the most current prospectus on file with the SEC.

12. The prospectus does not form part of the contract between New York Life and the policyholder, and it says so. *See, e.g.,* Exhibit B at 6 ("The entire contract consists of the policy, the application and any riders to the policy."); Exhibit A at ¶ 9.1.

13. The Prospectus contains, among other things, information New York Life provides to policyholders on an annual basis to inform policyholders of changes to administrative or business practices. For example, in the prospectus dated May 1, 2002 (the "2002 Prospectus"), New York Life informed policyholders of a change to its administrative practice that made internet service available to policyholders and described the availability of internet-based transfers between Investment Divisions. *See* Exhibit D at 45. Prior to that time, there was no way for policyholders to make transfers through the internet. In 1999, when Mr. Linton purchased his Policy, policyholders did not have the ability to transfer assets via the internet. The 2002 Prospectus announced that New York Life would provide this additional service to its policyholders, but the ability to make transfers *via* the internet, like the ability to make telephone transfers, was not made a right under the contract.

14. After the Policy is delivered to the policyholder, the policyholder is entitled to a twenty (20)-day "Free Look" period, during which time he or she is entitled to inspect the Policy and has the option to return the Policy for a full refund. *See* Exhibit A at 1. While Mr. Linton's

policy had been approved earlier, on or about June 30, 1999, his "Free Look" period was extended through Sunday, August 8, 1999, as an accommodation to ensure that he had sufficient time to review the Policy before accepting it. *See* Exhibit L.

15. In a letter dated June 11, 1999, Mr. Linton wrote to Customer Service at New York Life inquiring about several aspects of the Policy, including face amount changes, partial withdrawals, and transfers to investment divisions and the fixed account. *See* Exhibit J.

16. I responded to Mr. Linton in a letter dated June 21, 1999 (the "June 21 Response"). In that response, I pointed Mr. Linton to the then current prospectus, the 1999 Prospectus, and informed him that the administrative provisions described in the Prospectus were subject to change for a variety of reasons. I wrote: "The [prospectus] states current limits for face amount charges, partial withdrawals and transfers between investment divisions and to the fixed account. From time to time [New York Life] may be required to make product changes to comply with changing tax laws, regulatory provisions, state laws and changing business practices. At this time we do not anticipate any revisions to the product however, we do reserve the right to make adjustments to our administrative provisions." *See* Exhibit K.

17. In a letter dated June 30, 1999, Mr. Redfearn wrote, at the request of Mr. Linton, seeking further clarification concerning my June 21 Response. Mr. Redfearn's June 30 letter stated that Mr. Linton "is very much aware of the '20-day Right to Examine Policy' period which extends through Sunday, August 8th." *See* Exhibit M.

18. In response to Mr. Redfearn's June 30 letter, I wrote again to Mr. Linton on July 26, 1999, providing a further response to the issues he had addressed initially in his June 11 correspondence. *See* Exhibit N. My July 26 letter, responding for a second time to Mr. Linton, informed him again that New York Life reserved the rights to make changes to the

administrative provisions set forth in the 1999 Prospectus. I wrote: "However, as I stated in my previous reply, we do reserve the right to make future adjustments to our administrative provisions." *See* Exhibit N.

19.     Mr. Linton did not cancel his Policy during the Free Look Period.

20.     Mr. Linton began making transfers between the Investment Divisions shortly after the Policy went into effect.

*Market Timing*

21.     Market timing is an investment strategy that involves excessive trades into and out of mutual funds within short periods of time. Market timing can dilute the performance of mutual funds, and thus dilute the returns achieved by investors in those funds. Market timing frequently involves trading based on movements in specific market indices (and overseas developments which may move those indices) which, the timer believes, accurately predict how overseas markets will perform overnight, while the U.S. market is closed (and mutual fund trading suspended).

22.     The net asset value of a mutual fund, particularly ones which hold primarily securities and are traded on overseas markets, can be expected to increase overnight if the prediction based on market indices is correct. Thus, for example, a market timer may purchase shares of a mutual fund weighted towards international stocks late in the afternoon on Monday, relying on market signals indicating that the international markets will be up overnight, while the U.S. market is not trading. The timer may then sell the shares on Tuesday, locking in the overnight, overseas price movements. While a single overnight gain may be comparatively small, the market timer hopes to make money by making rapid trades, in large amounts, seeking to lock in repeated gains based on daily price movements. Because the trades are rapid, the cash "invested" by a market timer in

the mutual fund rarely stays in the fund for more than a few days; portfolio managers have no time to put the cash to work in underlying investments on behalf of the fund. Even though the market timer is taking his share of the overnight gains in a fund's net asset value, his cash – because it was never invested on behalf of the fund in underlying securities – did not contribute to the gain. (Indeed, from a fund accounting standpoint, the money invested by a market timer when he purchases a fund share late on Day 1 and sells the share on Day 2 never becomes available for the portfolio manager to invest.) The overnight gains repeatedly extracted from the fund by the market timer, therefore, dilute the gains earned by longer term investors in the fund.

23.     In order to address these concerns, New York Life filed a Prospectus dated May 1, 2003 with the SEC (the "2003 Prospectus"), in which New York Life announced a change in its administrative provisions intended to limit excessive trading and market timing. Because New York Life understood that the ability to make automatic transfers late in the day was critical to a market timer's ability to "time" the market and obtain overnight gains, the 2003 Prospectus advised investors that New York Life could take action to limit the ability of a policyholder to make electronic and telephonic transfers (by suspending his or her PIN), or take other action, if New York Life determined that the policyholder had engaged in excessive trading under the Policy. A broad guideline of the types of excessive trading that could trigger action was set forth. *See* Exhibit E.

24.     Following the publication of that change in administrative practice, New York Life put in place procedures aimed at identifying policyholders that were trading excessively within the guidelines set forth in the 2003 Prospectus.

25.     Relying on its procedures, New York Life identified Mr. Linton as having violated the excessive trading guidelines.

26.     In a letter dated June 13, 2003, New York Life informed Mr. Linton that should he continue to market time, New York Life would disable his PIN (and, therefore, his ability to effect transfers through the telephone or internet). *See* Letter from M. Kern to B. Linton, dated June 13, 200, attached as Exhibit O.

27.     Despite the warning contained in the June 13, 2003 Letter, Mr. Linton continued to market time. On or about June 16, 2003, Mr. Linton, or someone on his behalf, requested a transfer in the amount of $499,000.00 from the MainStay VP Cash Management investment division to the MainStay VP International Equity investment division; on or about June 18, 2003, Mr. Linton, or someone on his behalf, requested a transfer in the amount of $499,610.94 from the MainStay VP International Equity investment division to the MainStay VP Cash Management investment division; on or about July 2, 2003, Mr. Linton, or someone on his behalf, requested a transfer in the amount of $490,000.00 from the MainStay VP Cash Management investment division to the MainStay VP International Equity investment division; on or about July 3, 2003, Mr. Linton, or someone on his behalf, requested a transfer in the amount of $493,285.98 from the MainStay VP International Equity investment division to the MainStay VP Cash Management investment division; and on or about July 7, 2003, Mr. Linton, or someone on his behalf, requested a transfer in the amount of $490,000.00 from the MainStay VP Cash Management investment division to the MainStay VP International Equity investment division.

28.     In a letter dated July 9, 2003, New York Life informed Mr. Linton that it was going to suspend and disabled his PIN. *See* Letter from M. Kern to B. Linton, dated July 9, 2003, attached as Exhibit Q.

29. New York Life filed a Prospectus dated May 1, 2004 with the SEC (the "2004 Prospectus"), wherein New York Life announced another change in administrative procedure, modifying its procedures with regard to market timing. New York Life still reserved its right to discontinue a policyholder's ability to make transfers over the telephone or internet, by suspending the policyholder's PIN, and to "require that all subsequent transfer requests for [the] policy be made through the U.S. mail or an overnight courier," but now stated that it would exercise that right if the policyholder "request[s] three or more transfers into or out of one or more Investment Divisions within any 60-day period, or request[s] a transfer of an amount of $250,000 or more," *See* the 2004 Prospectus at 36; Hess. Dep. Tr. at 69-70.

30. Because a new policy had been announced, in a letter dated June 1, 2004, New York Life informed Mr. Linton that it was reinstating Mr. Linton's PIN (and his ability to effect transfers through the telephone or internet) subject to his willingness to abide by the revised guidelines. *See* Letter from M. Kern to B. Linton, dated June 1, 2004, attached as Exhibit R.

***Mr. Linton's Policy Value***

31. At the time Mr. Linton signed his application, on June 11, 1999, he paid an initial premium of $100,000. *See* Linton Dep. Tr. at 97, 149.

32. Mr. Linton subsequently paid two more premiums, both for an additional $100,000, posted on July 7, 2000, and August 1, 2001, respectively. *See* Linton Dep. Tr. at 149.

33. As of June 13, 2003, Mr. Linton's net gain on investment under the Policy was over $200,000.00 *See* Linton Dep. Tr. at 154-155, 164.

34. On March 31, 2005, the Cash Value of Mr. Linton's Policy was $520,001.12, from total premium payments of $300,000, as described above. *See* Exhibit BB.

35. As of the date of this declaration, Mr. Linton has been charged $66,908.76 in fees and charges including the cost of his life insurance coverage under the Policy. *See* Exhibit T.

I declare under penalty of perjury that the foregoing is true.

EXECUTED this 10th day of February, 2006 in New York, New York.

_____
John Hess, Jr.