UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARRY LINTON,<br><br>    Plaintiff<br><br>                *v*.<br><br>NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION,<br><br>    Defendant. | C.A. No. 04-11362-RWZ |

**NEW YORK LIFE INSURANCE AND
ANNUITY CORPORATION'S RESPONSE
TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

Defendant New York Life Insurance and Annuity Corporation ("New York Life") respectfully submits this Response to Plaintiff's Statement of Undisputed Facts in support of its Opposition to Plaintiff's Motion for Partial Summary Judgment.  While New York Life does not dispute any material facts set forth by Plaintiff for the purpose of his Motion for Partial Summary Judgment, New York Life would like to clarify some points of facts for the convenience of the Court.

**RESPONSES**

1.   Mr. Linton is an individual who had developed and implemented a unique and successful investment strategy over the past 20 years.

Response:  New York Life would like to clarify the facts set forth in Paragraph 1.  New York Life does not dispute Mr. Linton is an individual who had developed and implemented a unique investment strategy over the past 20 years.  However, to say that Mr. Linton's investment strategy was "successful" is an inaccurate characterization of the facts.  In fact, Mr. Linton's company Contemporary Investment Management ("CIM"), which implemented Mr. Linton's

9958254.1

investment strategy, was dissolved because mutual funds ceased to allow market timing in their funds. Linton Dep. Tr. at 30, 37-38, 39-45, 51-53; Lepke Dep. Tr. at 82-83.

2.  At all times relevant to this action, Mr. Linton was married to JoAnn Leptke [*sic*].

<u>Response</u>:  New York Life does not dispute that at all times relevant to this action, Mr. Linton was married to Joanne Lepke.

3.  Mr. Linton had developed an investment strategy whereby computerized models of historical economic performance were analyzed and "buy" or "sell" signals were generated based on the confluence of specific market indicators.

<u>Response</u>:  New York Life does not dispute this statement.

4.  Successful implementation of his investment strategy required timely end of the business day trades to take advantage of future market activity predicted by the models.

<u>Response</u>:  New York Life does not dispute this statement.

5.  Due to the nature of Mr. Linton's strategy, transfers could not be effectuated by mail, but had to be communicated quickly either by the telephone or through the internet.

<u>Response</u>:  New York Life does not dispute this statement.

6.  In the early 1990's, Mr. Linton was contacted by Mr. Paul Redfearn, an independent agent of New York Life, who solicited Mr. Linton to purchase a life insurance policy.

<u>Response</u>:  New York Life would like to clarify the facts set forth in Paragraph 6. Mr. Redfearn first met with Mr. Linton on or about August 14, 1996. *See* Redfearn Dep. Tr. at 32. Initial conversations between Mr. Linton and Mr. Redfearn dealt with term life insurance policies to fund a buy/sell agreement for Mr. Linton's company, whereby if Mr. Linton or his business partner were to die, the company could take the proceeds of the life insurance policy to repurchase the decedent's shares. *See* Linton Dep. Tr. at 55-56. It was around that time in 1996

that Mr. Linton's company purchased a term life insurance policy through Mr. Redfearn. *Id.* About six months to a year prior to March of 1999, Mr. Redfearn and Mr. Linton first discussed whether Mr. Linton would like to purchase a variable universal life insurance policy. *See* Linton Dep. Tr. at 58.

       7.     Mr. Linton told Mr. Redfearn that he did not need additional life insurance but was interested the investment opportunity they provided, as well as the opportunity to employ his investment strategy.

       <u>Response</u>:  New York Life does not dispute this statement.

       8.     While researching various options, Mr. Linton and Mr. Redfearn examined numerous variable universal life products to find one that matched Mr. Linton's requirements.

       <u>Response</u>:  New York Life does not dispute this statement.

       9.     In evaluating these life insurance products, Mr. Linton explained his investment strategy to Mr. Redfearn and informed him of his two primary concerns – the requirement that he be entitled to unlimited transfers within his accounts and that his trading instructions be acted upon in a timely fashion upon telephonic notice.

       <u>Response</u>:  New York Life does not dispute this statement.

       10.     With the understanding of Mr. Linton's strategy, Mr. Redfearn suggested that the New York Life Variable Universal Life policy ("Policy") was the right match for Mr. Linton's investment needs.

       <u>Response</u>:  New York Life does not dispute that Mr. Redfearn had an understanding of Mr. Linton's investment strategy and suggested that the Policy matched Mr. Linton's investment needs.  Redfearn Dep. Tr. at 116.

       11.     The Policy has two main components to it, life insurance where a death benefit is paid out upon the death of the insured and an investment vehicle that is based upon the investment performance of the New York Life [s]eparate accounts, known as Investment Divisions.

       <u>Response</u>:  New York Life does not dispute this statement.

-3-

9958254.1

12. Knowing that Mr. Linton intended to implement his investment strategy with the Policy, Mr. Redfearn confirmed that there were no restrictions on trading, both in the number of trades and the amount, and Mr. Redfearn further assured Mr. Linton that telephonic trading was authorized under the Policy.

Response: New York Life would like to clarify the facts set forth in Paragraph 12. New York Life does not dispute that Mr. Redfearn knew that Mr. Linton intended to implement his investment strategy with the Policy. Nor does New York Life dispute that Mr. Redfearn confirmed that there were no restrictions on the number and the amount of trades. Mr. Redfearn assured Mr. Linton that the *1999 Prospectus* included a description of telephonic transfer privileges. Redfearn Dep. Tr. at 51. There is no evidence, however, that Mr. Redfearn stated that the *Policy* confirmed a contractual right to trade *via* telephonic instructions; nothing in the Complaint, in Mr. Linton's deposition transcript, or in Mr. Linton's responses to interrogatories say that Mr. Redfearn did so. Whether or not telephonic trading "was authorized under the Policy" is the legal issue at the heart of Mr. Linton's breach of contract claim and is a matter of law for this Court to decide.

13. As further assurance, Mr. Redfearn referred Mr. Linton to the 1999 Prospectus, which identified the specific procedures New York Life required in order to effectuate trades. Transfer requests must be in writing on a form approved by NYLIAC or by telephone in accordance with established procedures.

Response: New York Life does not dispute that Mr. Redfearn referred Mr. Linton to the 1999 Prospectus, which stated, "Transfer requests must be in writing on a form approved by NYLIAC or by telephone in accordance with established procedures."

14. The "established procedures" were identified to Mr. Linton as those also found within the 1999 Prospectus; [ . . . ]

Response: New York Life would like to clarify the facts set forth in Paragraph 14. The "established procedures" for telephonic transfer privileges, as found within the 1999 Prospectus,

state that if policyholders "intend to conduct telephone transfers through the [Voice Response Unit], [the policyholder] must complete a Telephone Authorization Form." 1999 Prospectus, Exhibit B to Wong Decl. at 43.  The Telephone Authorization Form, Exhibit C to Wong Decl., clearly states, "Telephone privileges may be discontinued at any time."

15. The established procedures in the 1999 Prospectus were also consistent with the Policy language in Section 5.12, which states; **5.12 How Do You Make Transfers Between Investment Divisions and to the Fixed Account?** "If you want to make a transfer, you must tell us in a notice you sign which gives us the facts that we need."

Response:  New York Life does not dispute that the Policy states, "**5.12 How Do You Make Transfers Between Investment Divisions and to the Fixed Account?** 'If you want to make a transfer, you must tell us in a notice you sign which gives us the facts that we need.'"

16. Mr. Linton had some additional questions about some of the language in the 1999 Prospectus that might affect his ability to implement his strategy.

Response:  New York Life does not dispute this statement.

17. New York Life addressed each of these issues with Mr. Linton to his satisfaction concluding that New York Life did not retain the ability to change the material terms of the Policy without his consent.

Response:  New York Life does not dispute that it answered Mr. Linton's questions to his satisfaction, but there is no basis in the record to show that New York Life knew what Mr. Linton did or did not conclude on the basis of New York Life's responses to his questions, which speak for themselves.

18. Mr. Redfearn informed Mr. Linton, on numerous occasions, that the 1999 Prospectus was the one that applied to his Policy.

Response:  New York Life does not dispute this statement.

-5-

19.     In April 1999, having been advised by Mr. Redfearn as to the precise meaning of the terms used in the Prospectus and the Policy with reference [to] the right to make unlimited telephonic transfers; having received written confirmation of these rights, and verifying that neither the Policy, nor the Prospectus, provided New York Life with the right to amend these material terms, Mr. Linton agreed to purchase the Policy and paid New York Life substantial fees associated therewith.

Response:  New York Life would like to clarify the facts set forth in Paragraph 19.  New York Life does not dispute that in June 1999, Mr. Linton agreed to purchase the Policy and paid New York Life fees associated therewith, as reflected in the Policy.  *See* Exhibit A to Wong Decl. at Application, pages 3, 6.  New York Life also does not dispute that Mr. Redfearn advised Mr. Linton concerning the 1999 Prospectus and the Policy.  New York Life does not dispute that under the Policy, Mr. Linton had the right to make an unlimited number of transfers between Investment Divisions.  New York Life does not dispute that under the *1999 Prospectus*, New York Life provided Mr. Linton with the ability to make transfers between Investment Divisions *via* telephonic instructions.  Whether the Policy conferred upon Mr. Linton an absolute and unfettered contractual right to make telephonic transfers is the legal issue at the heart of Mr. Linton's breach of contract claim and is a matter of law for this Court to decide.

New York Life agrees that Mr. Linton has paid fees in connection with the Policy, although the term "substantial" is a relative term.  The investment gains earned by Mr. Linton under the Policy have far exceeded the fees paid by Mr. Linton.  *See, e.g.,* Linton Dep. Tr. at 154-155; Exhibit U to Wong Decl.  To the extent that "substantial" does not mean that the fees were greater than Mr. Linton's gains under the Policy, New York Life does not dispute the use of the term "substantial" to characterize the fees paid by Mr. Linton.

20.     In 1999, Paul Redfearn was authorized to make representations to purchasers of NYL insurance products consistent with the representations of the 1999 Prospectus.

Response:  New York Life does not dispute this statement.

-6-

9958254.1

21.     The Policy provides that policyholders like Mr. Linton are entitled to unlimited trades among the assets assigned to "Investment Divisions" and held in the various mutual funds made available to policyholders by New York Life. Specifically, the Policy provides: "There is no limit to the number of transfers that can be made. We reserve the right to apply a charge not to exceed $30, for each transfer after the first twelve in a given year."

<u>Response</u>:  New York Life does not dispute this statement.

22.     The Policy authorizes Mr. Linton unlimited right to revise his asset allocations among the mutual funds by transferring assets among the Investment Divisions.

<u>Response</u>:  New York Life does not dispute this statement.

23.     Mr. Linton provided the required notice to New York Life as required by the Policy and as of the date of the Policy, was able to make transfers between Investments Divisions by telephone, by either talking to a New York Life representative, or by making use of the voice recognition system, or later, by use of the virtual service center, via the internet.

<u>Response</u>:  New York Life would like to clarify the facts set forth in Paragraph 23. At the time Mr. Linton purchased his Policy, he was able to make transfers between Investment Divisions either in a notice signed by Mr. Linton, as the Policy requires, or by providing telephonic instructions (by talking to a New York Life representative or by making use of the Voice Response Unit (VRU)), as described in the 1999 Prospectus. *See* 1999 Prospectus, Exhibit B to the Wong Decl. at 43. New York Life disclosed, in its 2002 Prospectus, that it was extending to policyholders the additional ability to communicate instructions to make transfers between Investment Divisions over the internet. *See* 2002 Prospectus, Exhibit D to the Wong Decl. at 45.

24.     Sometime in or around 2000, New York Life allowed immediate transfer instructions under the Policy to be communicated by the internet.

<u>Response</u>:  New York Life would like to clarify the facts set forth in Paragraph 24. In 2002, not in 2000, New York Life extended to policyholders the additional ability to make

transfers between Investment Divisions via the internet. *See* 2002 Prospectus, Exhibit D to the Wong Decl. at 45.

    25.    Upon the mailing of a 2000 prospectus for the New York Life product, Mr. Redfearn informed Mr. Linton to throw the prospectus away because it did not apply to his policy.

    Response:  New York Life does not dispute that Mr. Redfearn told Ms. Lepke that the 1999 Prospectus governed the Policy.  Lepke Dep. Tr. at 45.

    26.    Redfearn reported to the Plaintiff, that future prospectuses could not affect the material terms of the Policy.

    Response:  New York Life does not dispute that Mr. Redfearn told Mr. Linton that future prospectuses could not affect the material terms of the Policy.

    27.    From June 1999 to July 9, 2003, a period of approximately four years, Mr. Linton and New York Life enjoyed a mutually rewarding contractual relationship and engaged in a course of performance with respect to telephonic trading identical to that identified within the Policy and the 1999 Prospectus and confirmed by Mr. Redfearn, whereby Mr. Linton made all of his transfers between Investments Divisions by telephone or the Internet, except as to Mr. Linton's initial premium allocation.

    Response:  New York Life would like to clarify the facts set forth in Paragraph 27.  All of Mr. Linton's transfers instructions, from the commencement of the Policy in June, 1999 through July 7, 2003 (except as to Mr. Linton's initial premium allocation), have been either by telephonic instructions or over the internet.  Between December 2002 and July 7, 2003, Mr. Linton communicated all his transfer instructions over the internet.

    28.    New York Life accepted and processed all Mr. Linton's telephone and internet transfer requests for the next four plus years.  Moreover, from 1999 through June 8, 2003, New York Life never objected to Mr. Linton's transfer activity.

    Response:  New York Life does not dispute this statement.

-8-
9958254.1

29. In 2003, New York Life advised Mr. Linton of the issuance of its annual prospectus, dated May 1, 2003 (the "2003 Prospectus")[.]

Response: New York Life does not dispute that in 2003, New York Life sent Mr. Linton a copy of the annual prospectus, as filed with the Securities and Exchange Commission, just as New York Life had sent Mr. Linton an updated annual prospectus in 2000, 2001, and 2002.

30. The 2003 Prospectus purportedly reserved to New York Life the right prospectively to limit transfers "to or from some or all of the Investment Divisions."

Response: New York Life would like to clarify the facts set forth in Paragraph 30. The 2003 Prospectus described New York Life's policy concerning excessive trading, including market timing. New York Life's 2003 Prospectus speaks for itself. *See* Exhibit E to Wong Decl. at 36.

31. Included within these reserved rights was that of requiring "that all subsequent transfer requests . . . be made through U.S. mail or an overnight courier.["]

Response: New York Life would like to clarify the facts set forth in Paragraph 31. The 2003 Prospectus described New York Life's policy concerning excessive trading, including market timing. New York Life's 2003 Prospectus speaks for itself. *See* Exhibit E to Wong Decl. at 36.

32. Mr. Linton responded by sending a letter to New York Life informing it that it did not have the right to impose transfer limitations on him.

Response: New York Life would like to clarify the facts set forth in Paragraph 32. On or about June 13, 2003, New York Life identified a series of rapid transfers in excess of $500,000 by Mr. Linton, Hess Decl. at 25, and sent Mr. Linton a letter, cautioning him that further rapid trading in excessive amounts would result in the suspension of his PIN. *See* Exhibit O at Wong

Decl.; Hess Decl. at 26. Mr. Linton responded to New York Life's letter dated June 13, 2003 with a letter dated June 19, 2003, which speaks for itself. *See* Exhibit P to Wong Decl.

33. There is no provision in the Policy that provides New York Life with the ability to modify the material terms of the Policy, without first obtaining the Plaintiff's prior consent.

Response: New York Life does not dispute this statement.

34. Asserting its rights under the 2003 Prospectus, but not referencing any right to limit the number of transfers or to modify the telephonic procedures under the Policy, in July 2003, New York Life prohibited Mr. Linton's [*sic*] from making transfers of assets within the Investment Divisions by telephonic instruction.

Response: New York Life would like to clarify the facts set forth in Paragraph 34. New York Life does not dispute that in July 2003, the Company took action to suspend Mr. Linton's PIN, thereby preventing Mr. Linton from conveying transfer instructions *via* telephonic instructions or over the internet. New York Life sent Mr. Linton a letter, dated July 9, 2003, which speaks for itself. *See* Exhibit Q to Wong Decl.

35. New York Life never received Mr. Linton's prior consent before limiting his ability to transfer between Investments Division by telephone.

Response: New York Life does not dispute this statement.

36. Having been denied the ability to implement his investment strategy, from 2003 to date, Mr. Linton's investment performance was 2.7%.

Response: For the purposes of this motion, New York Life does not dispute that since July 2003, Mr. Linton's return on the cash value of the Policy has been 2.7%. However, Mr. Linton, at his own discretion, has placed his investment into a cash account, and not in the Investment Division funds. To the extent that Paragraph 36 is intended to suggest that the suspension of Mr. Linton's PIN is the cause of that investment performance, Mr. Linton has not pointed to any facts to support that conclusion.

37. Applying the "Buy" and "Sell" signals generated by the computer models to the actual market data during this period, Mr. Linton would have increased the value of the portfolio by $942,227 or approximately 179%.

Response: At Mr. Linton's deposition, Linton Dep. Tr. at 175-176, and in Responses to Interrogatories that specifically instructed Plaintiff to calculate and describe his damages, Plaintiff failed to put forth any amount or calculation of damages. *See* Exhibit S to Wong Decl. at 3-5. There is no basis in the record to substantiate Mr. Linton's claim for damages.

38. Had Mr. Linton known that New York Life intended to retain the right to restrict his trading authorization in the manner it did, he would not have purchased the Policy.

Response: New York Life does not dispute this statement.

> Respectfully submitted,
>
> NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION
>
> By its attorneys,
>
> /s/ Robert G. Jones
> John D. Donovan, Jr. (BBO # 130950)
> john.donovan@ropesgray.com
> Robert G. Jones (BBO #630767)
> robert.jones@ropesgray.com
> Levina Wong (BBO #654510)
> levina.wong@ropesgray.com
> ROPES & GRAY LLP
> One International Place
> Boston, MA 02110
> (617) 951-7000

Dated: March 13, 2006

-11-

9958254.1

CERTIFICATE OF SERVICE

      I hereby certify that on March 13, 2006, I served a copy of New York Life Insurance and Annuity Corporation's Responses and Objections to Plaintiff's Statement of Undisputed Facts, by hand, upon Richard J. Grahn, Looney & Grossman, LLP, 101 Arch Street, Boston, MA 02110, attorney for Plaintiff Barry Linton.

      /s/ Levina Wong_____
      Levina Wong