UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11362-RWZ

BARRY LINTON

v.

NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION

MEMORANDUM OF DECISION AND ORDER

September 18, 2006

ZOBEL, D.J.

Plaintiff Barry Linton ("Linton") bought an insurance policy from defendant New York Life Insurance and Annuity Corporation ("NYLIAC") as a vehicle for investment in mutual funds.  He understood that the prospectus permitted him to execute immediate orders by telephone for purchasing, redeeming or exchanging mutual fund shares.  The success of plaintiff's investment strategy specifically depended upon his ability to execute same-day trading orders.  After several years of tolerating plaintiff's investment strategy by telephone and internet, defendant revised the prospectus to limit market timing activity and notified plaintiff that only written, and not telephonic, instructions for investment decisions would be accepted.  As a result of this modification, plaintiff filed suit in state court for breach of contract (Count I), misrepresentation (Count II), breach of the covenant of good faith and fair dealing (Count V), unjust enrichment (Count VI) and violation of state consumer protection laws codified at Mass. Gen. Laws ch. 93A

(Count VII).[1]

Defendant removed the suit to federal court and moved for dismissal of all counts. This court dismissed the Mass. Gen. Laws ch. 93A count (Count VII) on March 1, 2005, as the record contained no evidence that plaintiff had complied with the notice requirements of that statute. Defendant now moves for summary judgment on all remaining counts, while plaintiff seeks partial summary judgment in his favor on the issue of liability on Counts I, II and V. Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in his favor, no genuine issue of material fact remains. See Fed. R. Civ. P. 56(c); Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 684 (1st Cir. 1994).

Both parties agree on the basic facts in the case. Plaintiff and his wife are registered investment advisors and experienced investment managers. (NYLIAC Concise Statement of Undisputed Material Facts ("DSOF") ¶¶ 3-5, 11-12, 16-18.) Plaintiff developed an investment model which could tell him when to buy/sell selected mutual funds. The models' predictions were accurate towards the end of the day and required same-day execution by telephone or over the internet. (Pl.'s Mem. in Supp. of His Mot. for Partial Summ. J. ("PMSJ"), § 2 Statement of Undisputed Facts ("PSOF") ¶¶ 3-5.) Mr. Linton and his wife researched forty variable life insurance products, seeking

---

[1] Although plaintiff also included specific performance and declaratory judgment as separate counts (Counts III and IV), these "allegations" actually describe the remedies sought by plaintiff in addition to his requests for restitution and attorneys' fees and thus do not constitute actionable claims.

one for use as a vehicle for their personal investments.  (DSOF ¶ 34.)  In evaluating investment options, plaintiff's primary concerns were that "he be entitled to unlimited transfers within his accounts and that his trading instructions be acted on upon in a timely fashion upon telephonic notice."  (PSOF ¶ 9.)  Paul Redfearn, an independent agent of New York Life, was aware of plaintiff's investment strategy and recommended the New York Life Variable Universal Life policy ("Policy").  (Id. ¶ 10.)  The 1999 Prospectus for the Policy stated that policyholders had the option of effecting transfers among investment divisions (i.e. making purchases and sales of the mutual fund-like investment options in their Policy account) by telephone (either through a live operator or an automated voice-recognition system), provided the policyholder followed "established procedures."  (DSOF ¶ 40.)  The 1999 Prospectus promised "same-day processing" for telephone transfer requests received no later than 4:00 p.m. Eastern Time.  (PSOF ¶ 14.)  Mr. Redfearn assured Linton and his wife that the 1999 Prospectus was the only one that would apply to the Policy.  (Id. ¶¶ 18, 25-26.)  Plaintiff purchased the Policy in June 1999.  During the "Free Look" period, in which plaintiff could cancel the Policy without penalty, plaintiff communicated with a representative of NYLIAC several times "inquiring about several aspects of the Policy, including face amount changes, partial withdrawals, and transfers to investment divisions and the fixed account."  (DSOF ¶¶ 42, 44-47.)  In his written response to plaintiff's inquiries, the representative stated that NYLIAC did not anticipate any revision to the product, but "reserve[d] the right to make adjustments to administrative provisions."  (Id. ¶¶ 45, 47.)  Annually, defendant sent plaintiff a new prospectus, relating to the Policy, that

contained updated provisions and administrative procedures. (Id. ¶ 51.) From June 1999 through July 9, 2003, plaintiff was able to make transfers between his investment divisions either through telephonic or internet requests. (PSOF ¶ 27.) In 2003, defendant issued an annual prospectus which reserved the right to require "all subsequent transfer requests ... be made through U.S. mail or an overnight courier." (Id. ¶ 31.) The limitations on trading described in the 2003 Prospectus were intended to prevent market timing and to limit trading activity that might harm the interests of other policyholders. (DSOF ¶ 56.) Plaintiff continued to make a series of rapid transfers in excess of the limits set forth in the 2003 Prospectus. (Id. ¶ 60.) Subsequently, NYLIAC suspended plaintiff's personal identification number ("PIN"), prohibiting him from making transfers by telephonic or internet instruction. (PSOF ¶ 34.)

Between June 11, 1999 and August 1, 2001, plaintiff paid total premiums of $300,000 into his Policy account. On March 31, 2005, the cash value of the Policy was $520,001.12 and the Cash Surrender Value of the Policy was $499,098.90. (DSOF ¶¶ 64, 66.) Prior to the suspension of telephone and internet trading privileges, plaintiff claimed an increase in the value of his investment portfolio of $276,760 or 201% (Id. ¶ 65; Aff. of Barry Linton in Supp. of Pl.'s Mot. for Partial Summ. J. ¶ 20.) After his trading privileges were limited in 2003, plaintiff moved his Policy funds into a money market investment option, and since 2003 his investment return has been 2.7%. (PSOF ¶ 36.)

While the parties agree on these facts, they disagree on the right of NYLIAC to

4

limit plaintiff to transfers by written instruction only and on the harm resulting from the elimination of plaintiff's telephone transfer privileges. Plaintiff claims that the specific language of the Policy, the 1999 Prospectus, Mr. Redfearn's representations and the course of performance in allowing him to trade by telephone or internet until 2003, show a "binding agreement with regards to immediate execution of investment instructions by telephone." (PMSJ 13.) He argues that, had he been allowed to continue to make immediate transfers by telephone or internet, his investment strategy would have increased his account value by $942,227 or approximately 179%. (PSOF ¶¶ 36-37.)

Defendant counters that its contract with plaintiff always required written transfer instructions. While defendant did allow plaintiff to make transfers initially by telephone (and later by internet), these were administrative privileges, not contact terms, which NYLIAC claims it had the right to rescind at any time. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("DMSJ") 12.) In addition, defendant disputes plaintiff's claims of harm, noting that plaintiff elected to place his Policy funds in a cash account after his telephone trading privileges were suspended and arguing that plaintiff has not provided any evidence to substantiate his claims for damages. (NYLIAC's Resp. to PSOF ¶¶ 36-37.)

I.      Breach of Contract (Count I)

The crux of the disagreement in this case is whether, in the contract governing the life insurance policy purchased by plaintiff, NYLIAC "agreed to allow plaintiff to obtain immediate execution of his instructions for securities transactions

5

telephonically." (Compl. ¶ 15.)  The interpretation of an insurance contract is a question of law for the trial judge, not a question of fact for the jury.  <u>Cody v. Connecticut General Life Ins. Co.</u>, 387 Mass. 142, 146, 439 N.E.2d 234, 237 (1982).  "In the absence of an ambiguity, [the court] will construe the words of the policy in their usual and ordinary sense."  <u>116 Commonwealth Condominium Trust v. Aetna Cas. & Sur. Co.</u>, 433 Mass. 373, 376, 742 N.E.2d 76, 78 (2001) (internal quotation marks deleted); <u>see also</u> <u>Sommerset Sav. Bank v. Chicago Title Ins. Co</u>, 420 Mass. 422, 427, 649 N.E.2d 1123, 1127 (1995) ("[the courts] construe and enforce unambiguous terms according to their plain meaning").

The integrated contract at issue is defined in the Policy:

> **9.1 What Constitutes The Entire Contract?** The entire contact consists of this policy and any attached riders or endorsements, and the attached copy of the application. ... Only our Chairman, President, Secretary, or one of our Vice Presidents is authorized to change the contract, and then, only in writing.  No change will be made to this contract without your consent.  No agent is authorized to change this contract.

(Def.'s Ex. A § 9.1.)  The parties appear in agreement that the Policy forms the entire contract between them.[2]  (<u>See</u> DMSJ 18; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. 4 n.4.)  Plaintiff argues that his breach of contract claim is "based upon the specific language of the Policy," but an examination of the Policy language belies this claim.  (PMSJ 12.)  Section 5.12 describes the procedure for transferring funds between investments:

---

[2] Plaintiff, however, argues that the 1999 Prospectus is relevant as extrinsic evidence because he believes that the Policy language in section 5.14, "[t]here is no limit to the number of transfers," is ambiguous.  As discussed <u>infra</u>, this is incorrect.

> **5.12 How Do You Make A Transfer Between Investment Divisions And To The Fixed Account?** If you want to make a transfer, you must tell us in a <u>notice you sign</u> which gives us the facts that we need....

(Def.'s Ex. A § 5.12) (emphasis added). In addition, the following section clarifies not only the timing of transfer requests, but again describes the form:

> **5.13 When Will These Transfers Take Effect?** Transfers will take effect as of the day after we received your <u>signed written consent</u>.

(Def.'s Ex. A § 5.13) (emphasis added). Both sections 5.12 and 5.13 explicitly state that transfer requests must be signed, and section 5.13 requires "written consent." The usual and ordinary meaning of "a notice you sign" and "signed written consent" is the policyholder's signature on a written document.

A plain reading of sections 5.12 and 5.13 together makes clear that "signed written consent" is required for <u>each</u> transfer, not as plaintiff implies, only once prior to the initiation of all subsequent transfers. (<u>See</u> PMSJ 12.) This is true because section 5.12 poses the question "[h]ow do you make <u>a</u> transfer...?," then section 5.13 answers "[w]hen will <u>these transfers</u> take effect?" The plain meaning of this sequence is that "these transfers" in section 5.13 refers to the individual transfer initiated in section 5.12, and section 5.13 explains that each transfer takes place the day after the corresponding written consent is received. Plaintiff claims that he "provided New York Life with the information it required in order to effectuate trades" but fails to explain how telephone and internet trades satisfy the signing requirements of sections 5.12 and 5.13. (PMSJ 12.) The plain meaning of requiring transfer requests to be "signed" is that the Policy requires each transfer request to be in writing.

7

Plaintiff cites the provisions of section 5.14, which promises that "[t]here is no limit to the number of transfers that can be made," as supporting his claim that "under the policy" there are "no limitations on the means by which transfer instructions may be communicated."[3] (PMSJ 12) (emphasis added).  Plaintiff does not explain why he believes this section, which on its face solely concerns limitations on the number of transfers a policyholder may make, is ambiguous or supports his view that there are no Policy limitations on how transfers are initiated.[4]  Even if plaintiff believed that section 5.14 guaranteed no limits could be placed on the method of transfers, the plain meaning of "there is no limit to the number of transfers" cannot be extended to include the method of transfers.  (See Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. 4.)

---

[3] While it is true that section 5.14 itself contains no limitations on the means by which transfers are made, there is no reason to expect it to address how transfers are to be communicated.  The paragraph is titled: "Are There Limits On What You May Transfer?"  (Def.'s Ex. A § 5.14) (emphasis added).

[4] Plaintiff also argues that the limitations on the method of transfers (by mail) and the amount of transfers (not more than $500,000) put into place by the 2003 prospectuses are in "direct conflict" with the promise of unlimited number of transfers in section 5.14.  (See Pl.'s Resp. to DSOF ¶¶ 59-60.)  This is incorrect.  The additions to the 2003 Prospectus limit the method by which transfers may be requested and the maximum amount of an individual transfer, but do not limit the total number of transfers a policyholder may make.  While the 2003 Prospectus does limit individual transfers to a maximum of $500,0000 (reduced to $250,000 in the 2004 Prospectus), it is not in direct conflict with any provision in the Policy because the Policy is silent as to limits on the maximum amount of transfers.  In any event, plaintiff does not claim that the limits as to the amount of transfers caused him harm, only that the refusal to effect "immediate execution of investment instructions communicated by telephone ... breached the terms of ... [the] agreement."  (PMSJ 13.)  Based on plaintiff's statement of facts, even if the NYLIAC agreed not to limit the amount of any transfer, plaintiff would still be unable to effect his investment strategy unless transfer requests were accepted by telephone or internet and effected immediately.  (See PSOF ¶¶ 4-5, 9, 34, 36.)  Therefore, any theoretical beach concerning limits on the maximum amount of individual transfer requests is unavailing.

This is especially true where the preceding two sections explicitly require transfer requests to be "sign[ed]."

Plaintiff's reliance on the 1999 Prospectus describing the telephone transfer procedures and Mr. Redfearn's representations that only the 1999 Prospectus would apply for the life of the Policy is unavailing. Plaintiff was on notice that the transfer procedures in the 1999 Prospectus did not form any part of his agreement with NYLIAC. The integration clause of the Policy, section 9.12, states that the Policy and its attachments form the "entire contract." The application signature page, attached to the Policy and signed by Linton, included an additional integration statement under the heading: "THOSE PERSONS WHO SIGN BELOW AGREE THAT:" The second of the five paragraphs states:

> 2. No agent or medical examiner has any right to accept risks, make or change contacts, or give up any of NYLIC's or NYLIAC's rights or requirements.

(Def.'s Ex. A, Life Ins. Application 6.) Because the 1999 Prospectus and Mr. Redfearn's representations do not form any part of the contract between the parties, their only value is as extrinsic evidence to interpret the contract terms.[5] However, "parol evidence may not be admitted to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists." ITT Corp. v. LTX Corp., 926 F.2d 1258 (1st Cir. 1991) (citing to Massachusetts law). Here, the telephone transfer provisions described in the 1999 Prospectus are in direct conflict with the Policy

---

[5] Indeed, even the 1999 Prospectus itself warned plaintiff that it did not form part of the contract, stating: "The entire contract consists of the policy, the application and any riders to the policy." (Def.'s Ex. B, NYLIAC Variable Universal Life Prospectus May 1, 1999 at 6.)

transfer terms of sections 5.12 and 5.13 requiring a writing. Where the extrinsic evidence is in conflict with the plain meaning of the Policy terms, the Policy must prevail.

Plaintiff's reliance on course of performance is similarly misplaced. Recourse to performance and usage of trade to interpret contract terms are only necessary where the contract terms are ambiguous. Sommerset, 420 Mass. at 427-28 ("express terms are to be given preference in interpretation over course of performance and usage of trade"). Plaintiff has not provided any explanation for why he believes the Policy terms in sections 5.12 and 5.13 concerning the method of initiating transfers are ambiguous. Absent such argument, the fact that NYLIAC accepted unsigned telephone and internet orders for four years cannot modify the terms of the Policy.

The cases cited by plaintiff are unavailing. Plaintiff's reliance on Prusky v. Aetna Life Ins. & Annuity Co., 2004 U.S. Dist. LEXIS 21597 (E.D. Pa. Oct. 25, 2004), is unfounded. (PMSJ 11.) While the circumstances in that case are similar, the critical fact is opposite. In Prusky, the district court found that "[t]he clear language of the contract ... allows plaintiffs to engage in market--timing activity by electronic means ..." Id. at *15. Similarly, the contract at issue in American Nat. Bank and Trust Co. of Chicago v. Allmerica Financial Life Ins. & Annuity Co., 304 F. Supp. 2d 1009 (N.D. Ill. 2003), also cited by plaintiff, explicitly allowed the policyholder to "transfer amounts among accounts by Written or Telephone Request." Id. at 1011 (emphasis added). In Am. Nat'l Bank & Trust Co. v. AXA Client Solutions, LLC, 2001 U.S. Dist. LEXIS 8893 (N.D. Ill. June 28, 2001), the plaintiff negotiated a "Special Transfer Agreement" with a

Senior Vice President for the defendant insurance company to preclude future limitations on transfers. Id. at *6. In contrast, here the clear language of the Policy, unmodified by any special agreements negotiated with an authorized party, requires a "sign[ed]" transfer request, thus denying plaintiff the right to engage in market-timing activity by electronic means.

In the alternative, plaintiff argues that even if the explicit contract did not authorize immediate execution of investment instructions communicated by telephone or the internet, there existed an implied contract between NYLIAC and plaintiff that was breached by defendant's denial of Linton's right to engage in telephonic trades. (PMSJ 13-15.) "[T]he law will not imply a contract where there is an existing express contract covering the same subject matter." Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 162 (1st Cir. 2005) (quoting Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 85, 134 N.E.2d 141, 143 (1956)). In the instant case, the express contract, i.e. the Policy, addressed the manner of communicating plaintiff's transfer requests to NYLIAC. Thus, there is no room for an implied contract covering the same issue.

Because the plain language of the contract unambiguously requires a signed transfer request, plaintiff was not expressly or impliedly entitled to "immediate execution of his instructions for securities transactions telephonically." (Compl., Count I ¶ 15.) Accordingly, defendant's Motion for Summary Judgment on Count I of the Complaint is allowed and plaintiff's Motion for Partial Summary Judgment as to Liability on Count I is denied.

II.   Misrepresentation (Count II)

To succeed on a claim of misrepresentation, plaintiff must prove "a false statement of material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 42 (1st Cir. 2002). Here, plaintiff argues that Mr. Redfearn's representations concerning the telephone transfer features of the Policy along with Mr. Redfearn's admittedly incorrect statement that only the 1999 Prospectus would govern the Policy were made in order to induce plaintiff to purchase the Policy. Plaintiff claims that he justifiably relied on these representations to his detriment. Even if plaintiff's reliance on Mr. Redfearn's representations were justified despite the Policy language, the integration clause, the signature page statement, his communications with NYLIAC during the "Free Look" period and his previous professional experience in mutual fund investing, his claim fails because he has failed to show he suffered any legally recognizable detriment due to Mr. Redfearn's representations.

To support his claim that he relied on Mr. Redfearn's representations to his detriment, plaintiff points to his statement that, had he been allowed to continue telephone and internet transfers in his account, his account value would now exceed $942,000. (PMSJ 17.) Even if plaintiff could prove that this figure is not speculative,[6]

---

[6] There is no evidence in the record, other than plaintiff's affidavit, to support this figure. Plaintiff apparently bases this calculation on his computer models and a retrospective analysis of the performance of the investment options available in the Policy account. In addition, it is unclear whether his calculations take into account any restrictions put into place by the underlying funds to restrict frequent trading subsequent to 2003. Plaintiff does not claim to have contemporaneously continued to send transfer instructions to NYLIAC or to have made any other attempt to mitigate damages. (See Pl.'s Ex. A ¶ 23); cf. Prusky v. Aetna Life Ins. & Annuity Co., 2006 U.S. App. LEXIS 9343 at *5 (3rd Cir. April 13, 2006) (finding that where plaintiffs continued

benefit of the bargain damages are only recoverable for <u>fraudulent</u> misrepresentation. <u>Danca v. Taunton Sav. Bank</u>, 385 Mass. 1, 8, 429 N.E.2d 1129, 1133 (1982). However, plaintiff does not claim, and the evidence does not show, that any of the representations he relied upon were fraudulently made. <u>See</u> <u>id.</u> (noting that a claim for fraudulent misrepresentation requires a showing that "defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon ...") (internal quotation marks deleted). Absent a showing of fraud, plaintiff must show some recoverable harm commensurate with the <u>negligent</u> misrepresentation measure of damages to succeed. <u>Kuwaiti Danish Computer Co. v. Digital Equip. Corp.</u>, 438 Mass. 459, 469 (2003) (finding a claim of negligent misrepresentation "deficient on a necessary element" where plaintiff offered no evidence to show it incurred any losses as a result of its reliance on defendant's misrepresentations); <u>see also</u> <u>Veranda Beach Club Ltd. Partnership v. Western Sur. Co.</u>, 936 F.2d 1364, 1380 (1st Cir. 1991) (finding a failure to demonstrate any recoverable damages fatal to a claim of misrepresentation).

Massachusetts has adopted the out-of-pocket measure of damages stated in the Restatement (Second) of Torts § 552B(1) (1977), in actions for negligent misrepresentation. <u>Danca</u>, 385 Mass. at 9, 429 N.E.2d at 1134; <u>Anzalone v. Strand</u>, 14 Mass. App. Ct. 45, 48-49, 436 N.E.2d 960, 962 (1982). The successful plaintiff is entitled to recover damages based upon the pecuniary loss caused by his reliance on

---

to "fax transfer requests knowing they would not be honored [they] created a paper trail that allows the diminution in cash value to be determined with precision" and thus the damages were non-speculative).

the false or misleading information, traditionally the difference between the purchase price and the price at which the property could be resold if its true quality were known. Danca, 385 Mass. at 10, 429 N.E.2d at 1134. Here, the record includes no evidence that in 1999 the market value of a variable universal life policy which guaranteed no limits on immediate trading would have been higher than one which reserved the right to terminate immediate trading. Thus, under the traditional measure of damages, plaintiff has shown no pecuniary losses due to the alleged misrepresentation. See Anzalone, 14 Mass. App. Ct. at 49, 436 N.E.2d at 963 (noting that "the proper method for assessing damages [in a case of negligent misrepresentation] is to calculate the plaintiff's 'out of pocket' losses, i.e., the difference between the purchase price and the actual value of the property").

Plaintiff argues that he would not have purchased the Policy had he not relied on the alleged misrepresentations. (PMSJ 17.) This alone, however, does not establish any out-of-pocket loss; rather the court must look for proof of some actual loss plaintiff suffered as a result of purchasing the Policy. See Szpiro v. Corkin, 340 Mass. 260, 262 (1960) (upholding a directed verdict where, even though defendant made false representations, plaintiffs had failed to show that their profits would have been diminished by not having the promised exclusive rights); Kuwaiti, 438 Mass. at 469-70. Here, plaintiff admits that he realized an investment return of at least $276,760 in his Policy account. Even if plaintiff surrenders his Policy, he will have received almost $200,000 profit on his initial $300,000 investment after fees and surrender charges. See also PDC-El Paso Meriden, LLC v. Alstom Power, Inc., No. 996016BLS, 2004 WL

1588201 at *15 (Mass. Super. June 14, 2004) (noting that a claim for misrepresentation could not succeed where the plaintiff "sustained no out-of-pocket losses ... and, instead, made a handsome net profit after reimbursing itself for its costs.").

Because plaintiff cannot recover benefit of the bargain losses for negligent misrepresentation, and because he has not shown any out-of-pocket loss from defendant's alleged misrepresentations, defendant's Motion for Summary Judgment on Count II of the Complaint is allowed and plaintiff's Motion for Partial Summary Judgment as to Liability on Count II is denied.

III.     Breach of the Covenant of Good Faith and Fair Dealing (Count V)

The covenant of good faith and fair dealing, implied in every contract under Massachusetts law, may be breached, as alleged in Count V, upon conduct by defendant that deprives plaintiff of the intended "fruits" of the contract. See McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 301 (1st Cir. 2004). The covenant operates "to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." UNO Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957, 964 (2004). The covenant does not, however, "create rights and duties not otherwise provided for in the existing contractual relationship." Id. Indeed, the implied covenant may not add terms to a contract. McAdams, 391 F.3d at 301.

In his Complaint, plaintiff claims that NYLIAC breached the implied covenant of good faith and fair dealing by "changing the material terms of its prospectus that governed how the plaintiff could obtain execution of his investment instructions."

15

(Compl. ¶ 32.) On its face, a change to the prospectus cannot give rise to a breach of the implied covenant because the prospectus does not form any part of the express contract between the parties. (See Def.'s Ex. A § 9.1; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. 4 n.4.) Plaintiff argues, however, that the implied covenant of good faith and fair dealing was breached because "there was a binding contract with regard to immediate execution of investment instructions communicated by telephone." (PMSJ 18). Because the express contract required transfer instructions to be communicated in writing, and that the prospectus did not modify these transfer provisions in the Policy, there was no breach by NYLIAC in enforcing the terms of the contract after proper notice. Accordingly, defendant's Motion for Summary Judgment on Count V of the Complaint is allowed, and plaintiff's Motion for Partial Summary Judgment as to Liability on Count V is denied.

IV.   Unjust Enrichment and Restitution (Count VI)

In Count VI, plaintiff alleges that NYLIAC has been unjustly enriched by collecting fees associated with the Policy, which would not have been received but for Mr. Redfearn's representations to plaintiff. The existence of an express contract, however, bars the application of equitable doctrines such as unjust enrichment. Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 162 (1st Cir. 2005) (citing Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 85, 134 N.E.2d 141, 143 (1956)) (noting that there is no basis for recovery on principles of unjust enrichment where an express contract covers the same subject matter). Plaintiff acknowledges as much: "[S]hould this court determine that the agreement to make immediate execution of

investment instructions is one implied in fact and not expressed, then New York Life has been unjustly enriched." (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. 15.)

Because the express contract required transfer requests to be signed and in writing, and that there was no implied contract granting plaintiff the right to immediate execution of his transfer instructions, there can be no unjust enrichment.

Accordingly, defendant's Motion for Summary Judgment (#26) on all remaining counts of the Complaint is allowed.  Plaintiff's motion (#27) is denied.  Judgment may be entered for defendant on Counts I, II, V and VI and dismissing Counts III, IV and VII.


 September 18, 2006                /s/Rya W. Zobel
      DATE                          RYA W. ZOBEL
                                    UNITED STATES DISTRICT JUDGE